**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHERLNELL LANE, ILIANA RIVERA HAVEN, MICHELE LEE, and KEVIN SULLIVAN on behalf of themselves and all others similarly situated, | ) ) ) ) ) | **Case No.** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| CITY OF CHICAGO, | ) ) | |
| Defendant. | ) ) | |

**COMPLAINT**

**INTRODUCTION**

1.      Throughout the City of Chicago, public pedestrian rights of way are dilapidated, dangerous, and generally inaccessible to people with mobility disabilities. These barriers are pervasive and prevent people with mobility disabilities from traveling freely and participating in everyday life.

2.      Twenty years ago, people with mobility disabilities sued the City of Chicago for failing to install, repair, and maintain curb ramps in violation of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 *et seq.* ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Section 504"). The City of Chicago settled that class action lawsuit in 2007, agreeing to invest millions of dollars to install thousands of curb ramps and to implement systems to address curb ramp accessibility.

3.      Yet since then, the City of Chicago (the "City", "Chicago", or the "Defendant") stopped many of the systems it had implemented as part of that settlement and has failed to adequately maintain Chicago's curb ramps. Across the City, curb ramps are cracked,

deteriorated, and in a state of disrepair. They often have steep slopes, excessive changes in level at the top or bottom of the ramp, and allow water accumulation. At several locations, legally required curb ramps are missing altogether.

4.     Chicago's sidewalks, crosswalks, and other pedestrian passages are similarly riddled with access barriers. Many sidewalks are deteriorated, cracked, crumbling, sunken, uplifted, uneven, covered with holes, and/or overgrown with vegetation. They often are too narrow to traverse. And many crosswalks are deteriorated or damaged with excessive slopes, potholes, cracks, and other gaps in the surface, as well as abrupt changes in grade.

5.     These access barriers in the City's sidewalks, curb ramps, crosswalks, pedestrian crossings, and other public walkways (collectively, the "pedestrian rights of way") negatively impact people with mobility disabilities throughout the City on a daily basis. Among other things, these barriers impede travel, cause unnecessary expenditure of time (as people with mobility disabilities must find alternative accessible routes or use longer routes), and create risk of injury or even death (as people often have no choice but to travel in the street with vehicular traffic). As a result of these access barriers, people with mobility disabilities suffer isolation, segregation, humiliation, hardship, anxiety, indignity, and embarrassment.

6.     Ensuring access to pedestrian rights of way goes to the heart of the ADA and Section 504, which exist to provide people with disabilities with full and equal access to public facilities, promote independence, and facilitate social and economic integration.

7.     The City's policies and practices—and lack thereof—have led to inaccessible and unsafe conditions in substantial portions of the City's more than 7,400 miles of public sidewalks, curb ramps, and crosswalks in direct violation of the ADA and Section 504.

8.     In particular, the City lacks a coordinated, proactive system to maintain its pedestrian rights of way and relies, instead, on complaint-based, reactive, and ineffective programs. Data from the City's 311 system, for example, shows that thousands of sidewalk inspection complaints languish for *years* before resolution. Indeed, more than 20,000 requests for sidewalk improvements have been open for at least a year, and more than 6,000 have been open for more than three years.

9.     Plaintiffs Cherlnell Lane, Iliana Rivera Haven, Michele Lee, and Kevin Sullivan (together, "Plaintiffs") bring this class action lawsuit against the City of Chicago on behalf of themselves and a proposed class of similarly situated people with mobility disabilities to challenge Defendant's failure to provide people with mobility disabilities full and equal access to the pedestrian rights of way within Chicago in violation of the ADA and Section 504.

10.     At all times relevant to this action, Defendant has engaged in the following discriminatory and unlawful policies and practices:

a.     Constructing pedestrian rights of way that do not comply with applicable disability access standards, including the 2010 Americans with Disabilities Act Standards for Accessible Design, the 1991 Americans with Disabilities Act Accessibility Guidelines, and the Uniform Federal Accessibility Standards (collectively, "Disability Access Standards"), and failing to remediate such non-compliant construction;

b.     Altering and/or repairing pedestrian rights of way in a manner that fails to comply with applicable Disability Access Standards;

c.     Failing to install curb ramps that comply with applicable Disability Access Standards at intersections adjacent to newly resurfaced or otherwise altered sidewalks, streets, roads, and/or highways;

      d.      Failing to maintain the pedestrian rights of way in a condition that is readily accessible to people with mobility disabilities;

      e.      Failing to effectively and timely (i) identify and remediate access barriers caused by structural damage or deterioration; (ii) respond to and address complaints; and (iii) otherwise ensure pedestrian rights of way are kept free of non-temporary obstructions that cause barriers for people with mobility disabilities;

      f.      Failing to adopt or implement adequate policies and procedures for constructing, altering, inspecting, repairing, and maintaining the pedestrian rights of way so that they are readily accessible to people with mobility disabilities; and

      g.      Failing to provide accessible routes and/or temporary access features when necessary to maintain access to pedestrian rights of way during construction.

11.    As a result of Defendant's acts and omissions, the City's pedestrian rights of way are replete with physical access barriers that prevent people with mobility disabilities from enjoying full and equal access to the City, including places of civic participation, public accommodation, employment, and more.

12.    Plaintiffs seek declaratory and injunctive relief against Defendant for violating the ADA and Section 504. Plaintiffs' injuries alleged herein are ongoing and Plaintiffs have no adequate remedy at law. Unless Defendant is permanently enjoined, Plaintiffs will continue to suffer irreparable harm as a result of being denied full and equal access to the City's pedestrian rights of way.

## JURISDICTION

13.    Plaintiffs' claims arise under Title II of the ADA, 42 U.S.C. § 12131 *et seq*., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*. Accordingly, this Court's

jurisdiction is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over

Plaintiffs' claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

14.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because

Defendant is located in the Northern District of Illinois, and because the events, acts, and

omissions giving rise to Plaintiffs' claims occurred in the Northern District of Illinois.

## PARTIES

15.      Plaintiff Cherlnell Lane, a resident of Chicago's Washington Park neighborhood,

has several mobility disabilities (herniated discs, neuropathy, heart failure, and other conditions).

Ms. Lane has used a power wheelchair for over ten years, and previously used a walker and a

cane. Ms. Lane travels using the City's pedestrian rights of way several times per week.

16.      Plaintiff Iliana Rivera Haven, a resident of Chicago's Near West Side, has a

mobility disability (myasthenia gravis). Ms. Haven has used an electric scooter for

approximately ten years, and previously used a manual wheelchair. Ms. Haven travels using the

City's pedestrian rights of way almost every day.

17.      Plaintiff Michele Lee, a resident of Chicago's Streeterville neighborhood, has a

mobility disability (spinal cord injury). Ms. Lee has used a power wheelchair for over 20 years.

Ms. Lee travels using the City's pedestrian rights of way almost every day.

18.      Plaintiff Kevin Sullivan, a resident of Palatine, Illinois, a Chicago suburb, has a

mobility disability (arthrogryposis multiplex congenita). Mr. Sullivan has used a power

wheelchair for approximately 30 years, and uses a manual wheelchair on occasion. Mr. Sullivan

regularly travels the City's pedestrian rights of way during visits to Chicago to attend sporting

events, festivals, visit with friends, and eat at restaurants.

19.     Plaintiffs Lane, Haven, Lee, and Sullivan are qualified persons with one or more disabilities within the meaning of all applicable statutes and regulations.

20.     Hereafter, references to Plaintiffs include the named Plaintiffs and each member of the putative class, unless otherwise indicated.

21.     Defendant City of Chicago is a "public entity" within the meaning of Title II of the ADA and a "recipient" of federal financial assistance subject to Section 504. 29 U.S.C. § 794(b); 34 C.F.R. §§ 104.3(f), (h). The City of Chicago is responsible for constructing, altering, maintaining, repairing, and regulating the City's pedestrian rights of way.

## FACTS COMMON TO ALL PLAINTIFFS

**Widespread Access Barriers Prevent People with Mobility Disabilities from Safely and Independently Accessing Chicago's Pedestrian Rights of Way**

22.     For decades, federal law has required Chicago's pedestrian rights of way to be accessible to people with disabilities.

23.     Section 504 and its implementing regulations, effective June 3, 1977, require recipients of federal financial assistance—including Chicago—to construct, alter, and maintain their facilities, including those facilities comprising municipal pedestrian rights of way programs, in a manner that complies with applicable Disability Access Standards.

24.     Title II of the ADA, effective January 26, 1992, requires public entities—including Chicago—to construct, alter, and maintain their facilities, including those facilities comprising municipal pedestrian rights of way programs, in a manner that complies with applicable Disability Access Standards.

25.     Despite these longstanding requirements, the City has systematically failed, and is still failing, to construct, alter, and maintain pedestrian rights of way that are accessible to and usable by pedestrians with mobility disabilities.

26.     In 2005, the City was sued for failing to install, repair, and maintain curb ramps in violation of Title II and Section 504. *See* Complaint, *Council for Disability Rights v. City of Chicago*, No. 1:05-CV-05689 (N.D. Ill. Oct. 3, 2005).

27.     In 2007, the City settled the suit, agreeing to invest $140 million over five years to install curb ramps. The City also agreed to implement systems to address curb ramp accessibility, such as convening a Curb-Cut Advisory Committee and training relevant city supervisors, employees, and contractors on design specifications. The City also consented to inspections, recordkeeping, and reporting requirements.

28.     The City has since discontinued many processes it implemented to address the widespread barriers, and has reverted to a widespread failure to maintain pedestrian rights of way in compliance with federal law.

29.     Today—fifty years after the Rehabilitation Act was passed, thirty years after the ADA was enacted, and eighteen years after the City agreed to undertake widespread remediation in response to a lawsuit alleging violations of both statutes—people with mobility disabilities still face pervasive, city-wide barriers in the pedestrian rights of way.

30.     Across Chicago, curb ramps are missing at locations where they are legally required. Curb ramps that do exist regularly violate applicable Disability Access Standards because they have steep slopes, excessive changes in level creating lips at the top or bottom of the ramp, allow water accumulation, and/or have other hazardous conditions.

31.     Sidewalks throughout the City are deteriorated, cracked, crumbling, sunken, uplifted, uneven, riddled with holes, and/or overgrown with vegetation. Sidewalks often are too narrow to traverse, as the accessible path of travel is blocked by physical obstacles, such as

improperly placed signs, bus stop benches, lampposts, utility boxes, trash receptacles, traffic signals, and outdoor dining at restaurants.

32. Similarly, many crosswalks are deteriorated or damaged with excessive slopes, potholes, cracks, and other gaps in the surface, as well as abrupt changes in grade.

33. The following photographs illustrate examples of just some of the common barriers found throughout the City:

a. Curb ramps with excessive slopes and abrupt transitions:



*North Halsted Street and West Ohio Street*
*Credit: Google*

b.     Curb ramps with water accumulation (ponding conditions), often caused by

improper drainage, insufficient grade, or improper design:



*South Michigan Avenue and East Garfield Boulevard*
*Credit: Google*

c.     Curb ramps with upshifted, broken, deteriorated, and/or detached

detectable tactile warning panels:



*North Ashland Avenue and East Catalpa Avenue*
*Credit: Google*

d.  Curb ramps that are damaged with deep holes, cracks, and crevices:



*South State Street and West 14th Street*
*Credit: Google*

e.  Sidewalks where non-temporary barriers block the accessible route:



*South Ingleside Avenue and East 63rd Street*
*Credit: Google*

f.    Sidewalks that are not stable, firm, and slip resistant due to deterioration:



*5200 Block of West Nelson Street*
*Credit: Iliana Rivera Haven*

g.    Sidewalks with abrupt changes in level due to sunken sidewalk panels:



*5300 Block of North Bowmanville Avenue*
*Credit: Google*

h. "Islands of accessibility," where accessible curb ramps lead directly to a deteriorating, unsafe sidewalk:



*North Long Avenue and West Henderson Street*
*Credit: Google*

**Defendant's Policies and Practices Fail to Ensure People with Mobility Disabilities Have Access to the City's Pedestrian Rights of Way**

34. Defendant does not operate a comprehensive system to ensure that the City's pedestrian rights of way are, and remain, accessible to people with mobility disabilities. Instead, Defendant uses an uncoordinated patchwork of programs that collectively fail to provide access.

35. In particular, various individuals and groups are involved in the construction, alteration, and maintenance of the pedestrian rights of way including the Chicago Department of Transportation ("CDOT"), other City agencies, alderpersons, private-property owners, and third-party contractors.

36. The City's programs for constructing, altering and maintaining pedestrian rights of way span several initiatives, programs, and subprograms, such as the Aldermanic Menu Program, Shared Cost Sidewalk Program, Hazardous Right of Way Sidewalk Repair Program, Vaulted Sidewalk Program, Right of Way Concrete Construction Program, Residential Street Resurfacing Program, and Major Streets Program.

37.     On information and belief, Defendant—who bears the ultimate responsibility to construct, alter, and maintain the City's pedestrian rights of way[1]—has never implemented a comprehensive, coordinated, and ongoing plan among these individuals and groups, and between the programs concerning construction, alteration, and maintenance of the pedestrian rights of way, to ensure accessibility for people with mobility disabilities.

38.     Nor, on information and belief, has the City ensured that CDOT designate an ADA Coordinator, as required by federal regulations. All public entities with fifty or more employees must designate a person "familiar with the requirements of the [ADA]" as ADA Coordinator to "communicate those requirements to other individuals in the agency who may be unaware of their responsibilities." Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35694-01 (July 26, 1991); 28 C.F.R. § 35.107(a). Although other large City agencies, such as the Chicago Park District and Chicago Police Department, have designated an ADA Coordinator, CDOT, the City's sixth largest department with over 1,000 employees, has not.[2]

39.     Moreover, federal regulations also require public entities to conduct a Self-Evaluation and create and publish a Transition Plan, yet CDOT has neither. 28 C.F.R. § 35.105; 45 C.F.R. § 84.6 (Self-Evaluation); 28 C.F.R. §§ 35.150(d)(1)-(2); 45 C.F.R. § 84.22(e) (Transition Plan).

---

[1] *See Doak v. City of Moline*, 323 Ill. App. 3d 597, 599, 753 N.E.2d 544, 546 (2001) (holding that maintenance of alignment, grade, and surface of sidewalks "is the obligation of a municipality and it cannot be delegated"); *Thiede v. Tambone*, 196 Ill. App. 3d 253, 260, 553 N.E.2d 817, 821 (1990) ("Municipalities are obligated to maintain public ways within their limits, and this obligation is nondelegable.").

[2] *See* City of Chicago, *Number of Employees by Department - Based on Current Employee Names, Salaries, and Position Titles*, Chicago Data Portal, *available at* https://data.cityofchicago.org/Administration-Finance/Number-of-Employees-by-Department-Based-on-Current/atdi-52tt (Sept. 1, 2025) (CDOT has 1,332 employees).

**Defendant Relies on a Complaint-Based System to Identify Access Barriers and a Patchwork of Programs to Fix Them; Both Approaches Are Flawed and Ineffective**

40.     To identify barriers in the City's pedestrian rights of way, Defendant primarily relies on sidewalk inspection requests or complaints made to the 311 City Services request system ("311" or "311 system"). To redress barriers in the City's pedestrian rights of way, Defendant relies on its primary residential infrastructure program, the Aldermanic Menu Program, along with other uncoordinated programs, such as the Shared Cost Sidewalk Program. The 311 system and these programs are insufficient and ineffective to ensure that the pedestrian rights of way are accessible to people with mobility disabilities.

### *311 System*

41.     Defendant relies on complaints lodged in its 311 system to identify barriers in the pedestrian rights of way that require repair or maintenance.

42.     Under the 311 system, individuals can submit a "sidewalk inspection request" to file complaints about barriers in the pedestrian rights of way, such as damaged sidewalks or deteriorating curb ramps.

43.     Once received and recorded, the 311 system refers sidewalk inspection requests to CDOT to conduct an inspection.

44.     Defendant's 311 system is backlogged, under-resourced and ineffective at addressing barriers in the public rights of way.

45.     From July 2, 2020 to July 2, 2025, over 42,000 sidewalk inspection requests were submitted to the 311 system.[3] As of July 2, 2025, over 29,000 of these sidewalk inspection

---

[3] All data regarding sidewalk inspection requests to 311 in paragraphs 45 to 49 were obtained from the City of Chicago Data Portal on July 2, 2025, via the 311 webpage (data filtered for Sidewalk Inspection Request service type), available at https://data.cityofchicago.org/Service-Requests/311-Service-Requests/v6vf-nfxy/about_data.

requests are listed as "open" or unresolved. At least 21,000 had been open for at least one year, at least 12,500 for two years, at least 6,800 for three years, and at least 2,900 for four years.

| Open sidewalk inspection requests Data as of July 2, 2025 | | | | |
|---|---|---|---|---|
| Years requests have been pending | 1+ year | 2+ years | 3+ years | 4+ years |
| Number of requests | 21,000+ | 12,500+ | 6,800+ | 2,900+ |

46.     The median number of days that open sidewalk inspection requests had been pending is 552, or more than one and a half years.

47.     Of the sidewalk inspection requests designated as "completed," over 17,000 took at least one year to be closed, over 9,500 took at least two years, over 6,000 took at least three years, and over 2,700 took at least four years to be closed.

| Completed Sidewalk Requests Data as of July 2, 2025 | | | | |
|---|---|---|---|---|
| Years requests had been pending | 1+ year | 2+ years | 3+ years | 4+ years |
| Number of inspection requests | 17,000+ | 9,500+ | 6,000+ | 2,700+ |

48.     In comparison, CDOT reports that it aims to repair potholes on the road within one week.[4]

49.     Defendant, through its 311 system, regularly receives multiple complaints about the sidewalk barriers at the same location. As of July 2, 2025, there were over 9,000 locations with at least two open sidewalk inspection requests, over 4,000 with at least three, and over 1,900 with at least four.

---

[4] Chicago Data Portal, Performance Metrics – Transportation – Pothole in Street, last accessed on September 3, 2025, *available at* https://data.cityofchicago.org/Administration-Finance/Performance-Metrics-Transportation-Pothole-in-Stre/vnjd-fwu4/about_data, ("The target response time for pothole repairs is within 7 days.").

| Open Sidewalk Requests Data as of July 2, 2025 | | | |
|---|---|---|---|
| Number of inspection requests per location | 2+ requests | 3+ requests | 4+ requests |
| Number of locations | 9,000+ | 4,000+ | 1,900+ |

50. On information and belief, once the inspection is complete, Defendant refers any remediation determined necessary to one or more of the infrastructure programs discussed below, all of which are insufficient to ensure access for people with mobility disabilities.

51. Defendant's use of its 311 system is inherently problematic as it is a reactive, complaint-based approach that overly relies on third-parties to report access barriers and limits remediation to communities who lodge complaints.

52. The City of Chicago Office of Inspector General ("OIG"), which has the power and duty to recommend "to the Mayor and/or the City Council policies and methods for the elimination of inefficiencies and waste, and the prevention of misconduct,"[5] has criticized Defendant's reliance on this complaint-based approach for maintaining City infrastructure.

53. In a December 18, 2023 letter to Mayor Brandon Johnson, OIG urged Defendant to stop relying on a reactive, complaint-based strategy for addressing public services. OIG found that, while a complaint-based approach may reduce short-term costs by delaying routine maintenance of capital infrastructure, a reactive delivery of services ultimately increases long-term costs, impedes the full provision of public services, and creates inequities and safety risks.[6]

---

[5] Municipal Code of Chicago ("MCC") §§ 2-56-030(b), (c).

[6] See OIG, Advisory Concerning the City's Complaint-Based Approach to City Services app. A (Mar. 6, 2024), *available at* https://igchicago.org/wp-content/uploads/2024/03/Advisory-Concerning-the-Citys-Complaint-Based-Approach-to-City-Services.pdf ("[F]orgoing routine, proactive work in favor of responding to complaints can increase costs, actually impede the full provision of public services, and create or magnify inequities in service delivery.").

54.     OIG recommended that Defendant proactively intervene before major problems arise and explained that proactive "types of service delivery can extend the useful life of assets and discover small problems before they have larger impacts on cost, safety, and quality of life."[7]

55.     On information and belief, Defendant has not instituted this type of proactive program. Defendant does not even require City employees or contractors to report inaccessible or dangerous conditions in the pedestrian rights of way that are identified while working on other City projects.

56.     When other City services have switched from reactive, complaint-based systems to proactive, citywide maintenance, those services significantly increased in productivity. For example, the Department of Forestry switched from a complaint-based system to a grid-based system for tree trimming and the number of annual trims increased by 118%.[8]

### *Aldermanic Menu Program*

57.     Defendant's primary infrastructure program for residential areas is the Aldermanic Menu Program ("AMP").

58.     Under the AMP, the Alderperson for each of the City's 50 wards is allocated $1.5 million annually to spend on infrastructure projects in their ward. Each alderperson selects capital improvements from a list ("menu") that includes repairs to streets, alleys, curbs, and sidewalks; replacements/improvements for lighting and traffic signals; and beautification projects to improve public spaces at schools and parks.

---

[7] *Id*. at 3.

[8] *See, e.g.*, Alex Nitkin, *A New City Tree Trim Strategy Produces Big Results. Not Everyone Is On Board.*, Illinois Answers Project (Oct. 22, 2024), *available at* https://illinoisanswers.org/2024/10/22/chicago-tree-trim-strategy-produces-big-results-despite-complaints/.

59.     Alderpersons have complete discretion about how to spend AMP funding within the established menu with no minimum allocation for any category of infrastructure project.

60.     Each ward receives the same amount of funding for infrastructure improvements regardless of the ward's geographic size, miles of road or sidewalk, or infrastructure needs.

61.     Wards spend vastly different amounts on sidewalk maintenance. For example, Ward 13, which has approximately 100 miles of arterial and residential streets, spent $697,424.06 on sidewalk replacement projects in 2023. In contrast, Ward 19, which has approximately 46 *more* miles of arterial and residential streets than Ward 13, spent none.

62.     OIG has repeatedly criticized the City's overreliance on the AMP due to its ineffectiveness, lack of strategic planning, and funding disparities between wards.[9]

63.     In its 2017 Audit Report, OIG found that the AMP does not align with best practices for infrastructure planning and that its annual cycle precludes CDOT from developing a comprehensive, long-term strategy to address residential infrastructure needs. OIG also found that the AMP, together with other smaller funding mechanisms, does not provide adequate funding to meet the City's residential infrastructure needs.

64.     Through the AMP, each alderperson also has discretion to use a supplemental allocation for curb ramps to subsidize the cost of constructing curb ramps in street resurfacing projects of their choosing. The funding available across all wards is currently set at $10 million.

_____

[9] *See* City of Chicago Office of Inspector General, Advisory Concerning Inequities in Residential Street Infrastructure Management at 5 (June 13, 2019), *available at* https://igchicago.org/wp-content/uploads/2019/06/OIG-Advisory-Concerning-Inequities-in-Chicagos-Residential-Street-Infrastructure-Management.pdf ("2019 OIG Report"); Report of the Office of Inspector General: Chicago Department of Transportation Aldermanic Menu Program Audit (April 2017), *available at* https://igchicago.org/wp-content/uploads/2017/04/CDOT-Aldermanic-Menu-Program-Audit.pdf ("2017 OIG Report").

65.     The curb ramp supplement provides funding solely for curb ramps and disregards access barriers with adjacent sidewalks. It is another uncoordinated initiative that results in a disjointed patchwork of conditions and "islands of accessibility" in the City's pedestrian rights of way, with many curb ramps leading directly to inaccessible sidewalks.

66.     OIG has repeatedly recommended that CDOT take direct responsibility for residential infrastructure planning by implementing a comprehensive, long-term strategic plan for maintenance and improvement.[10]

67.     Nevertheless, Defendant continues to use the AMP as the primary method of addressing the City's core residential infrastructure needs, leaving many accessibility barriers in the pedestrian rights of way un-remediated.

### *Additional Programs*

68.     Defendant administers several other small, uncoordinated programs, such as the Shared Cost Sidewalk Program ("SCSP"), that are ineffective and insufficient to ensure the City's pedestrian rights of way are accessible to, and usable by, people with mobility disabilities.

69.     The SCSP is a voluntary program through which property owners apply to have CDOT replace damaged sidewalk adjacent to their property. Selected property owners split the repair cost 50/50 with the City.

70.     The total annual estimated cost of the SCSP is approximately $8 million, with $4 million coming from City funds and $4 million coming from private property owners.

71.     Not all Chicago residents are eligible to participate in the SCSP. For instance, the SCSP is not an option for property owners who live adjacent to vaulted sidewalks, which are sidewalks constructed above underground vaults that date back to the nineteenth century.

---

[10] *See* 2019 OIG Report; 2017 OIG Report.

19

72.     The limited funding for the SCSP further restricts the program's availability even for those Chicago residents who are eligible and wish to participate. The City selects applications on a first-come, first-served basis and the slots often fill-up almost immediately. In 2024 and 2025, applications were accepted only on a single day.

73.     The SCSP is effectively only available to property owners with the disposable income to pay for half of the project cost, resulting in an inequitable distribution of repair projects. For example, from 2021 to 2023, there were 320 projects completed in Ward 19, while only one SCSP project was completed in Ward 20.

74.     SCSP sidewalk repairs are also backlogged and delayed. On information and belief, CDOT does not adhere to a timeframe to complete SCSP sidewalk repairs and, as of 2024, had not fully completed all SCSP projects from 2022 and 2023.

75.     Another flaw in the SCSP is that there is typically no maintenance performed on sidewalks adjacent to abandoned or demolished property, or even on inaccessible sidewalks next to the SCSP property. Due to this patchwork approach to sidewalk repair, one Chicago block can have segments of both brand-new and completely deteriorated sidewalk.

76.     With the SCSP, the City relies on the voluntary, arbitrary decisions of property owners with the financial ability to undertake and subsidize sidewalk repair projects and has limited control over project selection and location, further contributing to the inaccessible sidewalk conditions across Chicago.

77.     In addition, the Hazardous Right-of-Way Sidewalk Repair Program purports to pay for repairs of hazardous conditions in the pedestrian rights of way identified through the 311 system. Yet on information and belief, as of 2024, CDOT had not fully completed all Hazardous Right-of-Way Sidewalk Repair Program projects from 2022 and 2023.

20

78.     Similarly, the Vaulted Sidewalk Program purports to pay for repairs to vaulted sidewalks. On information and belief, as of 2024, CDOT had not fully completed all Vaulted Sidewalk Program projects from 2021 and 2022, and all work from the 2023 Vaulted Sidewalk Program was slated for 2024.

79.     Projects selected based on 311 complaints and funded by other programs, such as the Right of Way Concrete Construction Program, are similarly limited in scope and insufficient to address barriers in the pedestrian rights of way in a reasonable time frame.

## FACTS SPECIFIC TO NAMED PLAINTIFFS

### *Cherlnell Lane*

80.     Cherlnell Lane has several disabilities including herniated discs, Sjogren's Disease, neuropathy, heart failure, and other conditions. Ms. Lane's ability to stand and walk is severely limited. Ms. Lane uses a power wheelchair whenever she is outside of her home.

81.     Ms. Lane lives on East Garfield Boulevard ("Garfield") on Chicago's South Side. She routinely encounters numerous obstacles on the pedestrian rights of way in her neighborhood when she goes to shop, dine, run errands, and engage in everyday life. Ms. Lane also encounters barriers in other parts of Chicago, including but not limited to the Streeterville neighborhood, where she has regular appointments with medical providers. These barriers deny her full and equal access to the City's sidewalks, curb ramps and crossings; cause her injuries, pain, difficulty, and discomfort; and deter her from using portions of the sidewalk or traveling to certain locations.

82.     Ms. Lane must navigate barriers in the pedestrian rights of way. She is often forced to take longer routes and/or travel in the street in her power wheelchair to avoid barriers in the pedestrian rights of way. Ms. Lane also risks injury to herself and damage to her power wheelchair when she traverses the defects and damage in the pedestrian rights of way. Because

of the challenges and risks posed by these barriers, she is often deterred from visiting nearby stores, restaurants, and other locations in her neighborhood.

83.     Examples of specific instances and locations at which Ms. Lane has and continues to encounter barriers include, but are not limited, to:

    a.     <u>South Michigan Avenue ("Michigan")/Garfield intersection</u>: Multiple barriers immediately upon leaving her home, including:

        i.     Curb ramps at the northeast corner that allow water to accumulate at the transition with the roadway surface; the south-facing curb ramp is often flooded by standing water that rises to the top of the tactile panels. The flooding also deposits a mass of leaves, gravel, and other materials that render the ramps unusable even after the water recedes. Although these curb ramps are closest to Ms. Lane's residence, she is regularly unable to use the south-facing ramp due to the flooding and debris.

        ii.     The east-facing curb ramp at the southwest corner that has a rectangular rut in the concrete curb and gutter portion, between the tactile panels and the asphalt surface of roadway, with hazardous changes in level. Ms. Lane was injured while attempting to use this curb ramp when the rut snagged the front wheels of her wheelchair and she was thrown out of it. She was using this curb ramp to travel eastbound on the south side of Garfield to the Green Line Performing Arts Center because the curb ramp at the northeast corner of the intersection (nearest to her apartment building) was flooded.

        iii.     The north-facing curb ramp in the median on the west side of the intersection where the tactile panels are warped and upshifted, resulting in a jagged, dirt-filled bump at the bottom of the ramp. Ms. Lane avoids this curb ramp when she can but

must use it to cross Garfield when the curb ramp at the northeast corner of the intersection (nearest to her apartment building) is flooded.

                iv.      On information and belief, these curb ramps were constructed in 2014 in conjunction with a repaving project.

              b.    <u>Garfield between Michigan and South Indiana Avenue ("Indiana")</u>: Sidewalk panels on the north side of Garfield that are badly uplifted, causing lips at the seams between panels with excessive level changes. Proceeding eastbound towards Indiana, sidewalk with excessive cross-slope. Ms. Lane must proceed slowly and carefully when she traverses these barriers to avoid tipping or jarring her wheelchair.

              c.    <u>Garfield east of Indiana</u>: Sidewalk panels on the north side of Garfield that are badly uplifted and misaligned due to tree roots, causing abrupt changes in level at the seams that rise at an angle to multi-inch drop-offs. Ms. Lane nearly fell out of her wheelchair when she struck the edge of an upshifted panel with her chair, and she now avoids this location. Because of this barrier, Ms. Lane crosses over to use the sidewalk on the south side of Garfield and then crosses back over to the north side to access a local vendor, whose truck is located on the north side of Garfield, near South Prairie Avenue ("Prairie") and the Chicago Transit Authority ("CTA") station.

              d.    <u>Michigan between Garfield and East 53rd Street</u>: Sidewalk panels that are badly damaged on both sides of the road, as Ms. Lane proceeds north on Michigan towards the Hall Branch of the Chicago Public Library and her polling place. Multiple sidewalk panels along this stretch are uplifted or sunken, resulting in abrupt, multi-inch changes in level, excessive cross-slopes, and broken and decaying seams between panels. Several panels have large holes

with dirt at the bottom. Due to the level changes and other damage, this stretch of sidewalks is impassable for Ms. Lane, and she travels in the street to avoid it.

e.    Michigan/East 53rd Street intersection: A south-facing curb ramp at the northeast corner that has a rut in the concrete curb and gutter portion and tactile panels that are not flush with the concrete, resulting in lips that are jarring to Ms. Lane. Vegetation grows from the seam at the tactile panels, and dirt accumulates at the lower portion of the ramp. On information and belief, this curb ramp was constructed between July 2011 and October 2014, and this section of East 53rd Street was repaved in approximately 2014.

f.    East 53rd Street between Michigan and Indiana: A portion of sidewalk along much of the block on the north side of the street with a severe cross slope. On the south side of the street, sidewalk panels are cracked, decaying, and have deep holes with hazardous changes of level. Ms. Lane travels in the street along this block to avoid these barriers.

g.    East 53rd Street between Indiana and Prairie: Long stretches of crumbling, dilapidated sidewalks. On both sides of East 53rd Street, the sidewalks are broken, riddled with holes and cracks, and overtaken by grass and dirt. This block has vacant lots on both sides. These sidewalks are unusable to Ms. Lane, and she travels in the street.

h.    East 53rd Street between Prairie and South Calumet Avenue ("Calumet"): Additional stretches of crumbling, dilapidated sidewalks. The sidewalk on the south side of East 53rd is so badly deteriorated that much of it has been reduced to gravel. It is also entirely blocked by two support pillars for the elevated CTA train line, resulting in a dead-end sidewalk in the middle of the block that does not connect to any accessible route. The sidewalk on the north side of East 53rd has an excessive cross-slope where it crosses under the CTA line, including at a

newly reconstructed segment of sidewalk just west of the support pillars, and it is cracked and crumbling east of the CTA line.

i.      Calumet/East 53rd Street intersection: Curb ramps at the northwest and southwest corners, adjacent to Ms. Lane's polling place, where the upper portions of the ramp have excessive running slope. On information and belief, these curb ramps were constructed between May 2011 and October 2014, and East 53rd Street was repaved in 2014.

j.      Calumet between East 53rd Street and East 54th Street: A portion of sidewalk on the west side of Calumet where the panels have cracks and holes in them, which Ms. Lane must carefully avoid.

k.      Calumet between East 54th Street and Garfield: A portion of sidewalk on the west side of Calumet that has excessive cross-slope. At the entrance to the Garfield CTA station parking lot, there is a wide gap at the seam where the sidewalk meets the driveway surface, requiring Ms. Lane to navigate this section slowly and carefully.

l.      Garfield between Michigan and South Wabash Avenue ("Wabash"): Upshifted sidewalk panels on the south side of Garfield resulting in a hazardous, large vertical gap at the seam.

m.      Wabash/Garfield intersection: Curb ramps at the northwest corner of the intersection where the adjoining sidewalk panels are not in vertical alignment with the ramp panels and other sidewalk panels, resulting in a series of abrupt, excessive changes of level. Ms. Lane must navigate this corner slowly and carefully. On information and belief, these curb ramps were built prior to October 2014, when this section of Garfield was repaved, but were not remediated in conjunction with that alteration.

n.   <u>Garfield between Wabash and South State Street ("State")</u>: A section of sidewalk on the south side of Garfield with ruts and cracks where it traverses an alley, resulting in excessive changes in level. Ms. Lane avoids this stretch of sidewalk.

o.   <u>State/Garfield intersection</u>: Curb ramps at the southeast corner of the intersection that are regularly flooded. When the flooding subsides, it leaves behind a mass of gravel and other materials that render the north-facing curb ramp unusable. Ms. Lane must travel in the street to navigate around the north-facing curb ramp and use the driveway entrance at this corner. On information and belief, these curb ramps were constructed in 2014.

p.   <u>Garfield between State and South Dearborn Street ("Dearborn")</u>: A deteriorating portion of sidewalk on the north side of Garfield where sidewalk panels are cracked, have holes, and/or are uplifted or sunken, causing abrupt changes in level. To avoid these barriers, Ms. Lane travels in an adjacent parking lot, which is also uneven and requires her to proceed slowly and with caution.

q.   <u>Dearborn/Garfield intersection</u>: A west-facing curb ramp at the northeast corner with a wide crack across the curb and gutter, resulting in a gap. Ms. Lane must carefully navigate around the gap. On information and belief, this curb ramp was constructed in 2014.

r.   <u>Garfield between Dearborn and South Federal Street</u>: A stretch of sidewalk on the north side of Garfield where sections of the sidewalk are cracked, have large holes, and are deteriorating at the seams, allowing patches of vegetation to grow.

s.   <u>Garfield east of South LaSalle Street ("South LaSalle")</u>: A portion of sidewalk on the north side of Garfield, just east of the entrance to the Grand Boulevard Plaza shopping mall, where the sidewalk panels are upshifted by tree roots and badly out of alignment with each other. The upshifted sidewalk panels have counter-sloping changes in level, excessive

cross-slope, and excessive vertical gaps at the seams, making it difficult for Ms. Lane to access the mall.

t.     Garfield/South LaSalle intersection: A curb ramp at the northwest corner of the intersection (at the entrance to the Grand Boulevard Plaza mall) that enters the crosswalk at an angle and points into the street. This curb ramp requires Ms. Lane to turn onto adjoining side flair sections that are sloping and have grade breaks that are not perpendicular to the direction of travel. This curb ramp also has a large, deep seam at the transition to the crosswalk with an abrupt change of level. On information and belief, this curb ramp was constructed in 2014.

u.     Garfield west of the Grand Boulevard Plaza mall: Ms. Lane has traveled further west along Garfield, beyond the Grand Boulevard Plaza shopping mall, to the Wendy's on the far side the I-90/I-94 expressway, and desires to do so again, but a series of barriers deter her from doing so, including but not limited to:

i.     Sidewalk with excessive cross-slope on the north side of Garfield, west of the entrance to the Grand Boulevard Plaza shopping mall.

ii.     Curb ramps at the northeast corner of the intersection of South Wentworth Avenue ("Wentworth") and Garfield that are dilapidated, crumbling, and hazardous. The concrete is cracking and has holes; the tactile panels are broken and badly out of alignment; and the curb ramps have severe level changes.

iii.     A curb ramp at the northwest corner of the Wentworth/Garfield intersection, at the east end of the I-90/I-94 expressway overpass, with deep cracks and holes and a large seam at the bottom of the ramp with an abrupt, excessive change of level.

iv.　　　A curb ramp at the northeast corner of the intersection of South Wells Street ("Wells") and Garfield, at the west end of the I-90/I-94 expressway overpass, that has excessive running slope, grade breaks that are not perpendicular to the direction of travel, and a pronounced, excessive level change at the top of the ramp.

v.　　　A section of sidewalk on the north side of Garfield at a driveway apron, between Wells and the Wendy's driveway, where the concrete is badly cracked and has large holes in it. The sidewalk is vertically shifted at the cracks, resulting in considerable changes of level.

84.　　Ms. Lane also experiences access barriers outside her neighborhood. She often goes to events, medical appointments, shops, and restaurants in other parts of Chicago, and when she does, she encounters the same types of access barriers described above. Ms. Lane experiences access barriers in areas including, but not limited to, the Streeterville neighborhood (where she goes for medical appointments and to visit local attractions) and the shopping district along West 87th Street (just west of the I-94 expressway).

85.　　As a result of the foregoing, Ms. Lane has been and continues to be denied full and equal access to the City's pedestrian rights of way. She is often forced to risk her safety and life by traveling in the street in order to avoid access barriers. She is also forced to endure pain, suffering, and damage to her power wheelchair when she must navigate defective and damaged sidewalks, curb ramps, and crosswalks. Ms. Lane is often unable to visit public facilities, places of public accommodation, social events, and friends due to the serious risks associated with traveling on inaccessible pedestrian rights of way.

### *Iliana Rivera Haven*

86.　　Iliana Rivera Haven has myasthenia gravis; her ability to stand and walk is severely limited. She uses an electric scooter for mobility whenever she is outside of her home.

87.     Ms. Haven previously used a manual wheelchair to travel outside her home, which allowed her greater flexibility to visit locations with steps and narrow doors, but she stopped using it because she could not navigate the damaged sidewalks and constantly required assistance.

88.     Ms. Haven lives in a residential section of Chicago's Near West Side and previously resided with her family in the Belmont Cragin neighborhood. Ms. Haven frequently uses the pedestrian rights of way in the Near West Side, as she enjoys taking walks with her husband to Ellen Gates Starr Park on North Oakley Boulevard and around the neighborhood. Ms. Haven continues to use the pedestrian rights of way in Belmont Cragin during regular visits to her family home, where she parks her vehicle on the street and uses the sidewalks and curb ramps to access her vehicle.

89.     Ms. Haven must navigate extensive barriers in the pedestrian rights of way to travel around the Near West Side and Belmont Cragin. Ms. Haven is unable to work, shop, dine, run errands, and engage in everyday life without encountering defective and damaged sidewalks, curb ramps, and crosswalks in her electric scooter. These barriers deny her full and equal access to the City's pedestrian rights of way; cause her difficulty, discomfort, and inconvenience as well as damage to her electric scooter; and deter her from using portions of the sidewalk and traveling to certain locations.

90.     When traversing the City's defective and damaged pedestrian rights of way, Ms. Haven is often forced to bang her electric scooter on lips and bumps, which causes damage to the front wheel section, breakdowns, and excessive wear and tear. Ms. Haven often requires assistance to traverse the barriers in the pedestrian rights of way. For example, Ms. Haven has

gotten stuck on severely damaged sidewalk panels in Belmont Cragin and had to have her husband push her electric scooter off the obstruction.

91.　　Ms. Haven risks injury to herself when she traverses barriers in the pedestrian rights of way in the Near West Side, Belmont Cragin, and other parts of Chicago.

92.　　Ms. Haven is often forced to alter her route, take longer routes, and/or travel in the street to navigate around barriers in the pedestrian rights of way.

93.　　Because of the challenges and risks posed by barriers in the pedestrian rights of way in her neighborhood, Ms. Haven is often deterred from seeing friends and family members and visiting stores and restaurants.

94.　　Examples of specific locations in the Near West Side where Ms. Haven has and continues to encounter barriers include, but are not limited, to:

　　　　a.　　<u>West Maypole Avenue ("Maypole")/North Bell Avenue ("Bell")</u> <u>intersection</u>: Just outside her home, east-facing and south-facing curb ramps at the northwest corner of the intersection with multiple, excessive bumps and gaps resulting from concrete curb and gutter sections that are not flush with the asphalt of the roadway and the gradient section of the ramp. Additionally, the south-facing curb ramp leads into Maypole with no crosswalk, and there is no curb ramp on the opposite (south) side of Maypole. At the northeast corner of this intersection, the south-facing curb ramp leads into Maypole with no crosswalk, and there is no curb ramp on the opposite (south) side of Maypole.

　　　　b.　　<u>Maypole/North Oakley Boulevard ("Oakley") intersection</u>: A curb ramp with a broken tactile panel at the southwest corner of the intersection, adjacent to the entrance to Ellen Gates Starr Park. A portion of the tactile panel is missing, leaving behind a jagged hole

filled with dirt and gravel that is jarring to Ms. Haven in her scooter. On information and belief, this curb ramp was initially constructed between May 2011 and October 2014.

        c.    <u>Oakley outside Ellen Gates Starr Park</u>: Sidewalk panels on the west side of Oakley that are upshifted and out of alignment with each other due to tree roots, resulting in multi-inch changes of level at the seams.

        d.    <u>West side of Oakley</u>: Along the perimeter of Ellen Gates Starr Park, five sidewalk panels that are completely covered in deep shoeprint-shaped gouges, suggesting someone walked throughout the wet concrete during construction, resulting in dozens of holes in the surface, creating hazardous conditions. Ms. Haven must navigate slowly over and around the holes to avoid catching the front wheel of her scooter. There are additional sidewalk panels with excessive seams, and a panel with a large hole in it, proceeding south on the west side of Oakley along the Park, approaching West Washington Boulevard ("Washington").

        e.    <u>Oakley/Washington intersection</u>: A curb ramp at the northwest corner of the intersection where the landing panel at the top of the ramp is not flush with the adjacent sidewalk panel, resulting in an excessive seam that rises at an angle across the sidewalk which Ms. Haven must negotiate carefully.

        f.    <u>Washington between Oakley and North Western Avenue</u>: Proceeding west along Washington, sidewalk panels that are cracked and/or upshifted by tree roots, resulting in significant bumps and gaps that Ms. Haven must navigate around and jar her scooter when they cannot be avoided.

        g.    <u>North Leavitt Street/West Huron Street intersection</u>: A curb ramp at the southeast corner of the intersection where the bottom of the ramp connects to a large, badly damaged patch of asphalt that covers the full width of the crosswalk, resulting in jagged,

dangerous changes in level that Ms. Haven must traverse slowly and carefully to avoid being thrown from her scooter.

95.     Examples of specific locations in Belmont Cragin at which Ms. Haven has and continues to encounter barriers, include but are not limited to:

a.      5300 block of West Patterson Avenue ("Patterson"): Deteriorating sidewalk panels outside of the building where Ms. Haven's parents reside, just west of North Lockwood Avenue ("Lockwood"). Panels are broken and cracked with holes that are covered in vegetation, and badly deteriorating at the seams between the panels. The damaged sidewalks are also present on Lockwood north of Patterson.

b.      5200 block of West Nelson Street ("Nelson"): Badly deteriorating sidewalk panels just outside the home where Ms. Haven's family previously resided. Panels are upshifted and cracked at the seams, resulting in extreme grade changes and wide crevices. One panel has a large, deep hole with jagged edges, so badly damaged that there is little concrete remaining intact. Ms. Haven has gotten stuck in the hole, and needed to call her husband to push her out. There are no driveway curb cuts on this block, so she is unable to bypass the sidewalk damage by entering the street.

c.      Lockwood/West Barry Avenue ("Barry") intersection: Sidewalk panels on Barry at the northwest corner are sunken and deteriorating at the seams, with abrupt, excessive changes in level.

d.      Lockwood between Barry and West Fletcher Street ("Fletcher"): An alley apron in the pedestrian right of way on the west side of this block made of cracked, aging asphalt is not flush with the adjoining sidewalk, resulting in an excessive lip that Ms. Haven must

carefully avoid. There is another section of sidewalk where the panels are upshifted by adjacent trees, resulting in cross-sloping panels and excessive lips.

e.    <u>Lockwood/Fletcher intersection</u>: Sidewalks at the northwest corner that are heavily damaged in both directions. The sidewalk on Lockwood, just north of this corner, has a continuous segment of approximately six panels that are extremely damaged with deep holes and crevices. The sidewalk on Fletcher, just west of this corner, has a segment of four panels that are sunken, badly out of alignment, and cracked. At the northeast corner of this intersection, the aging west-facing ramp has a sudden bump at the bottom transition, and other lips and gaps across the ramp. On information and belief, the south-facing ramp at this corner was constructed between approximately September 2016 and May 2018, but the west-facing curb ramp was not constructed before that time and was not remediated along with the south-facing ramp.

f.    <u>Lockwood between Fletcher and West Belmont Avenue ("Belmont")</u>: On the west side this block, sidewalk panels that are badly upshifted resulting in excessive changes of level at the seams. The sidewalk also allows water to pool.

g.    <u>Barry between Lockwood and North Long Avenue ("Long")</u>: An array of damaged, decaying sidewalk panels along both sides of the street. Many of the panels are raised or sunken and out of alignment with each other, causing large lips at the seams.

h.    <u>Long/Belmont intersection</u>: Curb ramps at the southwest corner with a sunken landing, which is out of alignment with the adjoining ramp and sidewalk and which result in excessive changes in level that Ms. Haven must carefully navigate. The bottom transition is also badly cracked, resulting in a hazardous crevice at the bottom of the north-facing ramp. Other sidewalk panels at this corner are cracked and out of alignment. When Ms. Haven used a manual wheelchair, she was unable to cross this curb ramp independently and her husband had to push

her across it in a "wheelie" (tilting her wheelchair to the back two wheels only). On information and belief, these curb ramps were constructed between approximately April 2009 and August 2011. Additionally, the crosswalks along the Belmont commercial corridor in Belmont Cragin are constructed of decorative brick surfacing. The west crosswalk that crosses Belmont at this intersection has missing brick pavers, and the resulting gaps have deep cracks and holes in the paving material below.

        i.     <u>Belmont between Long and Lockwood</u>: A portion of sidewalk on the south side of this block, just east of Long, with sunken sidewalk panels, resulting in excessive changes in level at the seams. Ms. Haven must navigate this sidewalk carefully to get to Hands On Thai and Sushi, a restaurant at this location that she enjoys.

        j.     <u>Intersections of Long/West Melrose Street, Long/West School Street, and Long/West Roscoe Street ("Roscoe")</u>: In August 2024, curb ramp construction took place. During the construction, hazardous conditions, such as open trenches at the base of the curb ramps, were not marked and there were no detours or alternate routes posted for pedestrians. Additionally, the construction crews placed temporary filling in the trenches but left deep, poorly marked holes at the edges.

        k.     <u>Long between West Henderson Street and Roscoe</u>: Sidewalk panels on the west side of this block that are upshifted by an adjacent tree, resulting in excessive lips and considerable drop-offs between the panels, and additional panels that are badly cracked and have jagged holes.

        l.     <u>Long/Roscoe intersection</u>: The west-facing curb ramp at the northeast corner with a pronounced crack at the bottom transition and tactile surfacing that is not flush with the surrounding concrete, resulting in a drastic lip. Although the City remediated the other

curb ramp at this corner and other curb ramps at this intersection in August 2024, the City did not remediate this curb ramp at that time.

       m.    <u>Belmont/North Central Avenue ("Central") intersection</u>: Curb ramps at the southwest corner with a sunken landing, resulting in major level changes at the seams with the ramp sections and adjacent sidewalk panels. Other ramp panels are cracked and out of alignment with excessive lips. The adjoining crosswalk across Central has gaps where the brick pavers are missing, resulting in excessive changes in level.

       n.    <u>Belmont/North Laramie Avenue ("Laramie") intersection</u>: No adjoining sidewalk panel connected to the curb ramp at the southwest corner. Instead of a panel, there is just an empty space filled with gravel. On information and belief, this curb ramp was constructed in approximately 2014.

96.     As a result of the foregoing, Ms. Haven has been and continues to be denied full and equal access to the City's pedestrian rights of way. Moreover, Ms. Haven is deterred from using portions of the sidewalk or traveling to certain locations. She is often unable to visit friends, public facilities, or places of public accommodations due to the serious risks associated with traveling on inaccessible pedestrian rights of way.

97.     Ms. Haven often cannot avoid barriers in the City's pedestrian rights of way, and she must endure pain, difficulty, discomfort, and damage to her electric scooter. Ms. Haven also alters her route and takes longer routes to avoid barriers in the City's pedestrian rights of way. She is also often forced to risk her safety by traveling in the street with cars and buses in order to avoid these access barriers.

### ***Michele Lee***

98.     Michele Lee has a disability due to a spinal cord injury at the C-5 level. She uses a power wheelchair for mobility.

99.     Ms. Lee has lived in Chicago for over fifteen years and in Chicago's Streeterville neighborhood for over three years.

100.     Ms. Lee uses the City's pedestrian rights of way on a daily basis. She travels to attend medical appointments, shop for groceries, run errands, enjoy restaurants, and spend time with friends.

101.     Ms. Lee's primary method of travel is driving her wheelchair. When she needs to travel somewhere outside of rolling distance, Ms. Lee often takes the City bus, occasionally uses wheelchair-accessible rideshares or taxicabs, and infrequently rides in her partner's car.

102.     The pervasive barriers in the City's pedestrian rights of way directly impact Ms. Lee. She deliberately chose to live in Streeterville because she expected it to be more accessible than other areas of the City, given its proximity to hospitals and Shirley Ryan AbilityLab.

103.     Ms. Lee often feels trapped in her apartment and neighborhood because of the difficulties she experiences when attempting to travel to other areas of the City. While she strongly desires to travel to other Chicago neighborhoods to meet friends, try new restaurants, or otherwise explore the City, she fears doing so given the prevalence of access barriers. Ms. Lee instead asks friends to travel to her in Streeterville for social events. Ms. Lee's concern about Chicago's inaccessible pedestrian rights of way has also deterred her from applying for jobs that require her to work in person.

104.     Even in Streeterville, however, Ms. Lee encounters extensive barriers in the pedestrian rights of way. Ms. Lee is unable to work, shop, dine, run errands, and engage in everyday life without encountering defective and damaged sidewalks, curb ramps, and crosswalks in her power wheelchair. These barriers deny her full and equal access to the City's

pedestrian rights of way; cause her difficulty, pain, discomfort, and inconvenience; and deter her from using portions of the sidewalk and traveling to certain locations.

105.    Ms. Lee experiences severe discomfort and risks injury when she traverses the barriers in the pedestrian rights of way in her neighborhood and other parts of Chicago.

106.    Ms. Lee also is often forced to alter her route, take longer routes, and/or travel in the street to navigate around barriers in the pedestrian rights of way.

107.    Because of the challenges and risks posed by the barriers in the pedestrian rights of way in her neighborhood and throughout the City, Ms. Lee is often deterred from visiting stores, restaurants, and seeing friends and family members.

108.    Examples of specific instances and locations at which Ms. Lee has and continues to encounter barriers include, but are not limited, to:

    a.    Pedestrian Walkway Crossing DuSable Lake Shore Drive ("DLSD") at the East End of the River East Art Center Promenade ("Promenade"): A step along a pedestrian walkway crossing under DLSD, forcing Ms. Lee to cross under DLSD at East Illinois Street ("Illinois") or East Grand Avenue ("Grand"). Illinois and Grand are busy, expansive intersections with high vehicular traffic, and Ms. Lee would prefer to use the safer pedestrian walkway running from the east end of the Promenade connecting directly to the parks surrounding Navy Pier.

    b.    North McClurg Court ("McClurg") at the Promenade: A dangerously steep ramp entering the Promenade. The Promenade itself has multiple sidewalk panels that have abrupt changes in level at the seams that cause pain to Ms. Lee when she hits them in her wheelchair.

     c.    <u>East Ohio Street ("Ohio") and DLSD</u>: A dangerously steep pedestrian walkway at the eastern end of East Ohio Street. Ms. Lee desires to travel by wheelchair to the beach. While for pedestrians without disabilities, this walkway provides safe and easy access to the beach and Lakefront Trail and avoids vehicular intersections, the ramp is excessively steep, making it dangerous for Ms. Lee.

     d.    <u>North Mies Van Der Rohe Way and East Chestnut Street</u>: No curb ramp at the northwest corner of this intersection. On information and belief, the adjacent roadway surfaces were repaved in 2011, but a curb ramp was not constructed.

     e.    <u>North Fairbanks Court ("Fairbanks") and Ohio</u>: A curb ramp at the southwest corner this intersection that is excessively steep and riddled with cracks and dangerous holes. Ms. Lee regularly travels down Ohio to run errands, go to restaurants, and go shopping. Once she reaches the sidewalk, there is a gaping hole where a sidewalk panel is deteriorating at a seam with a metal grate in the path of travel. A portion of sidewalk is also challenging for Ms. Lee to navigate due to its excessive cross slope. On information and belief, the adjacent roadway surface was repaved in 2011 and again in 2024, but the curb ramp was not remediated.

     f.    <u>Grand between Fairbanks and McClurg</u>: An excessively steep driveway apron in the path of travel on the north side of this block, east of Fairbanks. Ms. Lee fears crossing the apron without assistance and alters her route to avoid this obstacle. On information and belief, this driveway apron was constructed between August 2015 and August 2016.

     g.    <u>North Michigan Avenue ("Michigan") and Ohio</u>: Excessively steep curb ramps along the path of travel on Michigan. For instance, the curb ramp at the northwest corner of this intersection is extremely steep and almost impossible for Ms. Lee to navigate without fear of tipping over in her wheelchair.

h.    <u>West Randolph Street ("Randolph") and North Green Street intersection</u>: An excessively steep curb ramp at the northwest corner with an excessive lip. Ms. Lee avoids visiting restaurants in this area by herself due to her fear that this barrier would cause her wheelchair to tip over.

i.    <u>Ohio between North LaSalle Drive ("North LaSalle") and Grand</u>: On the south side of this block, near the Best Western River North Hotel, sidewalk panels with cracked, uneven, and crumbling pavement.

j.    <u>East Randolph/North Columbus Drive intersection</u>: Mounds of unevenly sloped asphalt where curb ramps should be at the northeast and southeast corners of this intersection. At the southwest corner, the asphalt mound is cracked and there is an elevated lip where a metal expansion joint is not flush with the sidewalk panel.

k.    <u>North Desplaines Street/West Fulton Street ("Fulton") intersection</u>: An extremely cracked and deteriorated curb ramp at the northeast corner of this intersection. The ramp is so deteriorated that on one occasion, Ms. Lee's wheel got stuck in the ramp's cracked incline and she nearly fell out of her chair into traffic. Were it not for a passing Good Samaritan, Ms. Lee would have remained stuck on the ramp and at risk of serious injury or death.

l.    <u>North Jefferson Street between Randolph and West Washington Boulevard</u>: Alley apron in front of the restaurant Sepia with an excessive lip and no curb ramp.

m.    <u>North Clark Street between West Illinois Street and West Hubbard Street</u>: On the east side of this block, many restaurant patios and temporary signs reduce the amount of space available for pedestrians to travel down the sidewalk. The available sidewalk space is too narrow for Ms. Lee to travel in her wheelchair.

n.      <u>North State Street/East Superior Street</u>: At the southeast corner of this intersection, no west-facing curb cut. When traveling eastward across State, Ms. Lee arrived at the southeast corner only to discover that there was no curb cut. She was forced to drive her wheelchair towards oncoming traffic to access the north-facing curb cut, which is narrow due to a fire hydrant. The adjacent sidewalk panels are extremely narrow due to multiple utility boxes, a traffic signal, and a U.S. Postal Service mailbox.

o.      <u>Ohio, Fairbanks, Grand, McClurg, and East Ontario Streets ("Ontario")</u>: Sidewalk panels that are heavily damaged and ill-maintained, with sunken panels, cracks, and deep, wide holes, causing abrupt changes in level. These streets surround Ms. Lee's home, and Ms. Lee must be constantly vigilant to avoid these barriers, a difficult task in the best of circumstances, and a nearly impossible one when the sidewalk is crowded or it is dark outside. When Ms. Lee is unable to avoid a barrier, she experiences pain and discomfort. On several occasions, one of the wheels of her wheelchair has gotten stuck in the sidewalk and she has been unable to move until she receives assistance from others. If she is alone, she must seek help from strangers. This causes Ms. Lee to experience significant anxiety about leaving her home and traveling independently.

p.      <u>East Erie Street/North Wabash Avenue intersection</u>: A curb ramp at the northeast corner of this intersection where a significant amount of water accumulates at the base. Such water accumulation can cause Ms. Lee's power wheelchair to short out, which would leave her stranded and cause substantial damage to her wheelchair. As a result, Ms. Lee must avoid any curb ramps with water accumulation which, especially on days following rainstorms, severely restricts her ability to travel.

109.  <u>Ohio between Fairbanks and McClurg</u>: Inaccessible curb ramps during street resurfacing. On or around August 28, 2024, Defendant began to repave this street and, in so doing, rendered all four curb ramps completely unusable. Ms. Lee had a medical appointment, which she feared she would miss due to these barriers. Ultimately, she had no choice but to travel on the street, exiting the sidewalk from a driveway apron, and relying on construction workers to assist her as she traveled through the street. As Defendant continued the construction process, it placed tar on the corners of the intersection, presumably to create a makeshift ramp, but this did not create a safe route as the tar was bumpy, sticky, uneven, and steep. Ms. Lee could not travel without fear of tipping over. The curb ramps were not restored for several weeks.

110.  As a result of the foregoing, Ms. Lee has been and continues to be denied full and equal access to the City's pedestrian rights of way. Moreover, Ms. Lee is deterred from using portions of the sidewalk or traveling to certain locations. She is often unable to visit friends, public facilities, or places of public accommodations due to the serious risks associated with traveling on inaccessible pedestrian rights of way.

111.  Ms. Lee often cannot avoid barriers in the City's pedestrian rights of way, and she must endure pain, difficulty, discomfort, and risks damage to her wheelchair. Ms. Lee also alters her route and takes longer routes to avoid barriers in the City's pedestrian rights of way. She is also often forced to risk her safety by traveling in the street with cars and buses in order to avoid these access barriers.

### *Kevin Sullivan*

112.  Kevin Sullivan has arthrogryposis multiplex congenita, which affects the range of movement of his arms and legs such that he can only walk short distances. He uses both a power wheelchair and a manual wheelchair, but uses his power wheelchair more frequently.

113. From July 10, 2017, to March 16, 2020, Mr. Sullivan commuted daily from his suburban home to his Chicago office on the Metra. Mr. Sullivan no longer works in Chicago but continues to visit on a regular basis to socialize with friends, go sightseeing, and attend sporting events, festivals, and museums.

114. When Mr. Sullivan worked in the City and on these more recent trips, he risked and continues to risk injury to himself when he traverses the barriers in the City's pedestrian rights of way.

115. Mr. Sullivan is often forced to alter his route, take longer routes, and/or travel in the street and bike lanes to navigate around barriers in the pedestrian rights of way.

116. Because of the barriers in the pedestrian rights of way, Mr. Sullivan is often deterred from visiting stores, restaurants, bars, and seeing friends.

117. Examples of specific instances and locations at which Mr. Sullivan has and continues to encounter barriers include, but are not limited, to:

    a.    North Halsted Street ("Halsted") between West Hubbard Street and West Wayman Street: Several areas of damaged sidewalk, including:

        i.    A section of sidewalk on the east side of Halsted that is cracked and crumbling, poorly patched, and not flush with a metal expansion joint. Mr. Sullivan also must cross a cracked and crumbling driveway apron at this location. On information and belief, the section of sidewalk immediately south of the expansion joint was constructed in April 2009.

        ii.    A cracked, sunken section of sidewalk on the east side of Halsted. Mr. Sullivan is unable to traverse the abrupt, excessive changes in level at these locations

without assistance, and must seek help from others to push his power wheelchair through these barriers.

      b.     <u>West Randolph Street ("Randolph"), east of the I-90/I-94 expressway:</u> A disintegrating, cracked, and crumbling crosswalk on the south side of this block just east of the I-90/I-94 expressway. Mr. Sullivan must traverse the deteriorated asphalt of the crosswalk, which jostles his wheelchair, very slowly and carefully, especially as he approaches the narrow curb ramp on the west side of the crosswalk, so that his wheelchair does not tip off of the curb. On information and belief, this crosswalk was altered in approximately 2008.

      c.     <u>Randolph/I-90/I-94 expressway intersection</u>: A curb ramp on the south side that is partially blocked by large concrete roadway barriers. The barriers block about half of the ramp, rendering it completely impassable for Mr. Sullivan in his power wheelchair. On information and belief, this curb ramp was constructed between April 2009 and June 2011, and the concrete barriers were placed thereafter but have been in place since at least 2013.

      d.     <u>North Canal Street south of West Kinzie Street</u>: Narrow sidewalks on both sides of the street that are constricted even further by utility and sign poles. At the north end of the block, a train track crosses the street and sidewalks, which results in a series of bumps because the tracks and surrounding asphalt are not level with the adjoining sidewalk sections. Mr. Sullivan filed a sidewalk inspection request via the 311 system on August 15, 2019. On information and belief, the barriers at this location remain even though the sidewalk inspection request is listed as complete.

      e.     <u>South Federal Street/West 35th Street intersection</u>: A curb ramp at the northeast corner with detached, missing tactile panels, leaving only a gravel-filled trench. Mr. Sullivan cannot avoid the gravel, which jostles his wheelchair. The curb ramp at the northwest

corner, near the 35th Street-Lou Jones Metra Station, has an elevated tactile panel, resulting in an excessive lip. Mr. Sullivan cannot navigate over the lip without help. On information and belief, this curb ramp was constructed between May 2009 and May 2011.

    f.  North Green Street ("Green")/Randolph intersection: A curb ramp at the northwest corner with a very steep grade that Mr. Sullivan cannot safely traverse in his wheelchair. He must travel on the street instead. On information and belief, the adjoining sections of Green and Randolph were repaved between September 2013 and May 2014, and June 2011 and September 2013, respectively, but this curb ramp was not remediated in conjunction with either paving project. Mr. Sullivan filed a sidewalk inspection request via the 311 system on August 12, 2019. On information and belief, the inspection request was canceled and the barrier at this location has not been addressed.

    g.  Green/West Chicago Avenue intersection: No curb ramp at the southwest corner of this intersection. Mr. Sullivan cannot access crosswalks from the sidewalk at this corner without a curb ramp. On information and belief, the adjoining stretch of West Chicago Avenue was repaved between August 2019 and July 2021, but a curb ramp was not constructed during this repaving.

    h.  North Jefferson Street/Fulton intersection: No curb ramp at the northwest corner of this intersection. Mr. Sullivan cannot access crosswalks from the sidewalk at this corner without a curb ramp. On information and belief, the adjoining stretch of Fulton was repaved in two projects between approximately May 2014 and September 2017, but a curb ramp was not constructed during this repaving. Mr. Sullivan filed a sidewalk inspection request via the 311 system in 2018. On information and belief, the inspection request was canceled and the barriers at this location have not been addressed.

i. <u>Randolph between North Clinton Street and North Jefferson Street</u>: At an alley crossing on the south side of this block, a curb ramp that is too short and steep. Mr. Sullivan must traverse the curb ramp slowly and carefully or risk getting stuck.

j. <u>North Clark Street/West Wacker Drive intersection</u>: A sidewalk on the northwest corner with elevated metal expansion joints and a gap between concrete panels where the expansion joint goes underground. The southwest corner curb ramps are not graded properly, requiring Mr. Sullivan to slow down. There is another metal expansion joint on the northeast corner of this intersection that has an elevated lip where the metal meets the concrete panel. Mr. Sullivan must navigate each of these barriers with caution for fear that the tires of his power wheelchair will get caught in the gap or on the metal lip of the expansion joint.

k. <u>Halsted/West Ohio Street intersection</u>: Curb ramps at the northwest and northeast corners with steep running slopes that Mr. Sullivan must carefully navigate. He also encounters crosswalks that are riddled with cracks.

l. <u>Halsted south of West Erie Street</u>: Cracked sidewalk panels and a crumbling driveway apron on the east side this block. Mr. Sullivan is unable to traverse the gravel-like driveway apron without assistance.

m. <u>North Avondale Avenue ("Avondale") (the Irving Park Metra station)</u>: An alley apron with cracks, excessive gaps, and no crosswalk. To access the accessible path of travel to this station, Mr. Sullivan must use the sidewalk on the south side of Avondale and cross the street at an alley apron. The sidewalk on the north side of Avondale does not connect to the accessible route because it is filled with barriers like street signs, telephone poles, and trees.

n. <u>Halsted/West Chicago Avenue intersection</u>: A crumbling curb ramp with a large crack in the middle and a triangle-shaped hole in the concrete at the northeast corner of this

intersection. The curb ramp is also too steep and there are grade breaks that are not perpendicular to the direction of travel. On information and belief, the adjoining section of West Chicago Avenue was repaved between October 2014 and August 2015, but this curb ramp was not remediated.

118.     As a result of the foregoing, Mr. Sullivan has been and continues to be denied full and equal access to the City's pedestrian rights of way. Moreover, Mr. Sullivan is deterred from using portions of the sidewalk and traveling to certain locations. He is often unable to visit friends, public facilities, or places of public accommodations in order to remain safe from the serious risks associated with traveling on the City's inaccessible pedestrian rights of way.

## CLASS ALLEGATIONS

119.     Plaintiffs bring this action individually and on behalf of all other persons similarly situated and seek class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) for declaratory and injunctive relief.

120.     Plaintiffs seek to represent the following class: All residents of Illinois with mobility disabilities who use wheelchairs, scooters, canes, or other mobility aids and who use, will use, or desire to use the City of Chicago's pedestrian rights of way.

121.     Each member of the proposed class is a qualified person with a disability, as defined by the ADA and Section 504.

122.     The members of the proposed class are so numerous that joinder is impracticable and the disposition of their claims in a class action is beneficial to the parties and to the Court. According to the U.S. Census American Community Survey 2023 one-year estimate, over 176,000 non-institutionalized Chicago residents have an ambulatory difficulty. This number does not include the many Illinois residents with mobility disabilities who use wheelchairs, scooters, canes, or other mobility aids and who work in or visit Chicago but are not Chicago residents.

46

123. All members of the class have been and continue to be denied their civil rights to full and equal access to the City's pedestrian rights of way. The common questions of law and fact shared by the named Plaintiffs and all class members include:

a. Whether Defendant is violating Title II of the ADA and/or Section 504 by failing to make the City's pedestrian rights of way readily accessible to and useable by people with mobility disabilities;

b. What, if any, parts of the City's pedestrian rights of way constructed or altered after June 3, 1977, comply with applicable Disability Access Standards;

c. Whether Defendant has remediated any parts of the City's pedestrian rights of way that were constructed or altered after January 26, 1992, in a manner such that they did not comply with applicable Disability Access Standards, as required by 28 C.F.R. § 35.151(c)(5), at the time of construction;

d. Whether Defendant has maintained the City's pedestrian rights of way so that they are readily accessible to persons with mobility disabilities as required by the ADA and Section 504;

e. Whether Defendant has ensured that the City's pedestrian rights of way, when viewed in their entirety, are readily accessible to persons with mobility disabilities as required by the ADA and Section 504;

f. Whether Plaintiffs and the putative class members have been injured by Defendant's acts and omissions; and,

g. Whether Plaintiffs and the putative class members are entitled to declaratory and injunctive relief, and the nature of such relief.

124. The named Plaintiffs' claims are typical of those of the proposed class because:

      a.      They are members of the proposed class;

      b.      Their claims arise from the same uniform policies, procedures, practices, and course of conduct (or lack thereof), namely, the fact that Defendant does not operate a comprehensive, systematic process to ensure that the City's pedestrian rights of way are correctly constructed, altered, and maintained to be accessible for people with mobility disabilities;

      c.      Their claims are based on the same legal and remedial theories under Title II of the ADA and Section 504 as those of the proposed class and involve similar factual circumstances regarding their lack of full and equal access to the City's pedestrian rights of way;

      d.      Their injuries are similar to the injuries suffered by the proposed class members; and

      e.      The injunctive and declaratory relief sought will benefit the named Plaintiffs and all class members alike.

125. The named Plaintiffs will fairly and adequately represent the interests of the proposed class. They have no interests adverse to the interests of other members of the class and have retained counsel who are competent and experienced in litigating complex class actions, including large-scale disability rights class actions.

126. The proposed class meets the requirements of Federal Rule of Civil Procedure 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to the class. Specifically, Defendant has failed to provide people with mobility disabilities with full and equal access to the City's pedestrian rights of way. And it has failed to adopt, implement or enforce appropriate policies, procedures, and/or practices necessary to ensure that people with mobility disabilities are provided with full and equal access to the City's pedestrian rights of way. Thus, final injunctive or declaratory relief for the class as a whole is appropriate.

## FIRST CAUSE OF ACTION

### Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12101 *et seq.*

127.     Plaintiffs incorporate by reference every allegation contained in the foregoing paragraphs.

128.     When enacting the ADA, Congress found that "individuals with disabilities continually encounter various forms of discrimination, including . . . the discriminatory effects of architectural . . . barriers." 42 U.S.C. § 12101(a)(5).

129.     Congress further declared that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

130.     To address these findings, Congress enacted the ADA to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1)-(2).

131.     Title II of the ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

132.     Defendant is a public entity within the meaning of Title II of the ADA. *See* 42 U.S.C. § 12131(1); 28 C.F.R. § 104.

133.     Plaintiffs are qualified individuals with disabilities, as defined in Title II of the ADA, who meet the essential eligibility requirements to participate in the City's pedestrian rights of way program. *See* 42 U.S.C. § 12131(2); 28 C.F.R. § 104.

49

134.     Defendant's pedestrian rights of way and the construction, alteration, maintenance, and regulation thereof constitute a program, service, or activity within the meaning of Title II of the ADA. *Am. Council of Blind of Metro. Chicago v. City of Chicago*, 667 F. Supp. 3d 767, 775 (N.D. Ill. 2023); *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002); 28 C.F.R. § 35.704.

**Defendant Is in Violation of the ADA for Failing to Ensure Newly Constructed or Altered Facilities Are Readily Accessible to and Usable by People with Mobility Disabilities**

135.     Under Title II of the ADA, as of January 26, 1992, when a public entity newly constructs facilities or alters any existing facilities in any manner that affects the usability of such facilities, the public entity must make newly constructed or altered portions accessible to and usable by individuals with disabilities. 28 C.F.R. §§ 35.151(a), (b).

136.     The elements of the City's pedestrian rights of way, including sidewalks, walkways, curb ramps, and crosswalks, are facilities within the meaning of 28 C.F.R. § 35.104, which defines "facility" broadly to include "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."

137.     Since January 26, 1992, Defendant has constructed, altered, or repaired curb ramps, sidewalks, crosswalks, and other elements of the pedestrian rights of way and, through administrative methods, policies, and practices (or lack thereof), has failed to ensure they are readily accessible to and usable by people with mobility disabilities in accordance with applicable Disability Access Standards.

138.     Under Title II, public entities that construct or alter sidewalks, streets, roads, and/or highways at any intersection after January 26, 1992, are required to install curb ramps that

50

are compliant with applicable Disability Access Standards. 28 C.F.R. § 35.151. A public entity's street resurfacing project is considered an alteration, which triggers its obligation to install accessible curb ramps. *Kinney v. Yerusalim*, 9 F.3d 1067, 1073-74 (3d Cir. 1993).

139.     On information and belief, Defendant's resurfacing strategy has led to the resurfacing of all arterial and residential streets since 1990.

140.     Since January 26, 1992, through administrative methods, policies, and practices (or lack thereof), Defendant has constructed or altered sidewalks, streets, roads, and/or highways without installing curb ramps that are compliant with applicable Disability Access Standards.

### Defendant Is in Violation of the ADA for Failing to Maintain the City's Pedestrian Rights of Way Constructed or Altered After 1992

141.     Title II of the ADA requires public entities to "maintain in operable working condition those features of facilities . . . required to be readily accessible to and usable by persons with disabilities." 28 C.F.R. § 35.133.

142.     The elements of Defendant's public rights of way, including curb ramps, sidewalks, and crosswalks, are facilities that must be maintained. 28 C.F.R. § 35.104; 28 C.F.R. § 35.133(a); *Cohen v. City of Culver City*, 754 F.3d 690, 699 (9th Cir. 2014).

143.     Defendant has failed and continues to fail to maintain the facilities of the City's pedestrian rights of way. Through administrative methods, policies, and practices (or lack thereof), Defendant fails to fix damaged, deteriorating, uneven, and heaving pavement and concrete, remove protruding and/or moveable obstructions, ensure a sufficiently wide path of travel, and correct excessive slopes and cross-slopes, and otherwise maintain accessible facilities.

**Defendant Is in Violation of the ADA for Failing to Operate the
City's Pedestrian Rights of Way Program so that It Is Readily
Accessible to and Usable by People with Mobility Disabilities**

144.     Title II of the ADA requires public entities to operate their programs, services, or

activities "so that, when viewed in its entirety, it is readily accessible to and useable by

individuals with disabilities." 28 C.F.R. § 35.150; *see also* 28 C.F.R. §§ 35.149, 35.151.

145.     Defendant's pedestrian rights of way and the construction, alteration,

maintenance, and regulation thereof constitute a program, service, or activity within the meaning

of Title II. *Am. Council of Blind of Metro. Chicago*, 667 F. Supp. 3d at 775; *Barden*, 292 F.3d at

1073; 28 C.F.R. § 35.704.

146.     Through administrative methods, policies, and practices (or lack thereof),

Defendant has failed and continues to fail to ensure that the City's pedestrian rights of way

program, when viewed in its entirety, is readily accessible to and useable by people with

mobility disabilities.

**Defendant Is in Violation of the ADA for Failing to Ensure Access
to the City's Pedestrian Rights of Way During Construction**

147.     Under Title II, a public entity's obligation to comply with Disability Access

Standards extends "to temporary and permanent buildings and facilities." 36 C.F.R. Pt. 1191 app.

B. 201.3.

148.     Through administrative methods, policies, and practices (or lack thereof),

Defendant has failed and continues to fail to provide and maintain accessibility for temporary

facilities or provide accessible paths of travel when the permanent route is eliminated due to

construction for extended periods of time.

149.     As a direct and proximate result of the aforementioned acts and/or omissions,

Plaintiffs have been and continue to be injured.

150.    Defendant's conduct (or lack thereof) constitutes an ongoing and continuous violation of Title II of the ADA and, as a result, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees, expenses, and costs.

## SECOND CAUSE OF ACTION

### Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. § 794 *et seq.*

151.    Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs.

152.    Section 504 of the Rehabilitation Act of 1973 provides: "[N]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance[.]" 29 U.S.C. § 794.

153.    Plaintiffs are individuals with disabilities who are otherwise qualified to participate in the relevant services, programs, or activities that are provided to individuals in the City. 29 U.S.C. § 705(20)(B); 29 U.S.C. § 794(b); 34 C.F.R. § 104.3(k).

154.    Defendant is a direct recipient of federal financial assistance and thus subject to Section 504 coverage, having received federal financial assistance at all times relevant to the claims asserted in this Complaint. 29 U.S.C. § 794(b); 34 C.F.R. §§ 104.3(f), (h).

155.    Defendant's pedestrian rights of way and the construction, alteration, maintenance, and regulation thereof constitute a program, service, and/or activity within the meaning of Section 504 and its implementing regulations.

156.    The elements of Defendant's pedestrian rights of way, including sidewalks, curb ramps and crosswalks, are facilities within the meaning of 49 C.F.R. § 27.5, which defines

"facility" broadly to include "all or any portion of buildings, structures, vehicles, equipment, roads, walks, parking lots, or other real or personal property or interest in such property."

157.    Defendant has violated and continues to violate Section 504 by failing to construct curb ramps compliant with applicable Disability Access Standards at intersections throughout the City, where they have newly constructed or altered sidewalks, streets, roads or highways since June 3, 1977.

158.    Defendant has violated and continues to violate Section 504 by excluding Plaintiffs from participation in, denying Plaintiffs the benefits of, and subjecting Plaintiffs to discrimination in the benefits and services of Defendant's pedestrian rights of way program, based solely on their disabilities.

159.    As a direct and proximate result of the aforementioned acts and/or omissions, Plaintiffs have been and continue to be injured.

160.    Defendant's conduct (or lack thereof) constitutes an ongoing and continuous violation of Section 504 and, as a result, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees, expenses, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows, including but not limited to:

1.    A declaration that Defendant's conduct has violated and continues to violate Title II of the ADA and Section 504 of the Rehabilitation Act.

2.    An order and judgment enjoining Defendant from violating Title II of the ADA and Section 504 of the Rehabilitation Act and requiring Defendant to undertake remedial measures to mitigate the effects of their past and ongoing violations including, at a minimum to:

a.      Ensure all future new construction and alterations to the City's pedestrian rights of way fully comply with Disability Access Standards so that they are readily accessible to and usable by people with mobility disabilities;

b.      Undertake prompt measures to remediate non-compliant new construction and alterations to the City's pedestrian rights of way to bring them into compliance with Disability Access Standards;

c.      Undertake prompt measures to remediate all damaged or deteriorated sidewalks, curb ramps, crosswalks, and other elements of the pedestrian rights of way so that they are readily accessible to persons with mobility disabilities in compliance with Disability Access Standards;

d.      Construct, remediate, repair, and maintain curb ramps, sidewalks, crosswalks, and other elements in the City's pedestrian rights of way such that, when viewed in its entirety, the pedestrian rights of way program is readily accessible to and usable by individuals with mobility disabilities;

e.      Provide accessible pedestrian rights of way around construction sites and at temporary buildings and facilities; and

f.      Adopt and implement administrative methods, policies, and practices that are sufficient to ensure the City's pedestrian rights of way are constructed, altered and maintained to be compliant with Disability Access Standards by, among other actions, designating an employee to serve as the ADA Coordinator and preparing and publishing a Self-Evaluation and Transition Plan regarding the accessibility of the City's pedestrian rights of way.

3.     Remain under this Court's jurisdiction until Defendant fully complies with the

Orders of this Court;

4.     Award Plaintiffs reasonable attorneys' fees, costs, and litigation expenses; and

5.     Such other and further relief as the Court deems just and proper.


Dated: September 10, 2025                          Respectfully submitted,

*/s/ Rachel M. Weisberg*

Rachel M. Weisberg (IL Bar No. 6297116)          Eric R. Swibel (IL Bar No. 6297743)
Emily Roznowski (IL Bar No. 6333265)             Jack M. McNeily (IL Bar No. 6332140)
DISABILITY RIGHTS ADVOCATES                      Dylan Glenn (IL Bar No. 6326952)
300 South Wacker, Floor 32                        LATHAM & WATKINS LLP
Chicago, IL 60606                                 330 North Wabash Avenue, Suite 2800
Telephone (332) 217-2319                          Chicago, IL 60611
Facsimile: (212) 644-8636                          Telephone: (312) 876-7700
Email: rweisberg@dralegal.org                     Facsimile: (312) 993-9767
        eroznowski@dralegal.org                    Email:   eric.swibel@lw.com
                                                            jack.mcneily@lw.com
Scott Gordon*                                               dylan.glenn@lw.com
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Third Floor
Berkeley, CA 94704
Telephone: (510) 665-8644
Facsimile: (510) 665-8511
Email: sgordon@dralegal.org

Eliana Fisher**
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, Suite 2619
New York, NY 10017
Telephone: (212) 644-8644
Facsimile: (212) 644-8636
Email: efisher@dralegal.org

* Pro Hac Vice Application Pending
** Application for Admission Pending