**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| CHERLNELL LANE, ILIANA RIVERA HAVEN, MICHELE LEE, and KEVIN SULLIVAN on behalf of all others similarly situated,<br><br>       *Plaintiffs*,<br><br>    v.<br><br>CITY OF CHICAGO,<br><br>       *Defendant*. | Case No. 25-cv-10880<br><br>Hon. Georgia N. Alexakis |

**DEFENDANT CITY OF CHICAGO'S MEMORANDUM IN SUPPORT OF ITS RULE 12(B)(1) AND (6) MOTION TO DISMISS THE COMPLAINT**

TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................................... ii

BACKGROUND ................................................................................................................... 2

I.    ADA Title II And Pedestrian Facilities. ..................................................................... 2

    A.    Existing facilities. ............................................................................................. 3

    B.    Newly constructed and altered facilities. ......................................................... 4

II.    The City's Provision Of Accessible Pedestrian Facilities. ........................................ 6

    A.    CDOT's rules and regulations require compliance with the ADA. ................. 6

    B.    The City has implemented a multiyear, comprehensive transportation plan. ................. 8

    C.    Mayor's Office for People with Disabilities and Accessible Transportation Services.  12

III.    Plaintiffs' Allegations. .............................................................................................. 13

LEGAL STANDARDS ........................................................................................................ 15

ARGUMENT ...................................................................................................................... 15

I.    PLAINTIFFS FAIL TO ALLEGE THAT THEY HAVE BEEN INJURED BY PEDESTRIAN FACILITATIES THAT VIOLATE ADA REGULATIONS. ........................ 16

    A.    Plaintiffs lack standing to challenge facilities they have no personal knowledge of and intent to use. ............................................................................................. 17

    B.    Plaintiffs identify no enforceable regulation governing most of the facilities they challenge. ....................................................................................................... 18

    C.    Even where Plaintiffs identify an applicable regulation—28 C.F.R. § 35.151(i)—they do not allege facts establishing an ADA violation. ...................................... 20

II.    PLAINTIFFS FAIL TO STATE A CLAIM THAT THE PEDESTRIAN FACILITIES, VIEWED AS A WHOLE, ARE A "PROGRAM" THAT IS NOT "READILY ACCESSIBLE" UNDER TITLE II AND SECTION 504. ................................................. 22

    A.    Plaintiffs' challenge to pedestrian infrastructure as a single, inaccessible "program" fails as a matter of law. ................................................................... 22

    B.    Plaintiffs' "program access" claim is insufficiently pleaded. ..................... 31

III.    PLAINTIFFS LACK STANDING TO CHALLENGE THE PROVISION OF ACCESSIBLE TEMPORARY ROUTES, AND THE CLAIM LACKS MERIT. ................ 33

IV.    PLAINTIFFS' CLAIMS ALLEGING CDOT FAILED TO DESIGNATE AN ADA COORDINATOR, COMPLETE A SELF EVALUATION, AND PUBLISH A TRANSITION PLAN SHOULD BE DISMISSED BECAUSE THESE REGULATIONS ARE NOT PRIVATELY ENFORCEABLE. ....................................................................... 34

CONCLUSION ................................................................................................................... 35

**TABLE OF AUTHORITIES**

**Cases**                                                                                    **Pages**

*A.H. by Holzmueller v. Ill. High Sch. Ass'n*,
881 F.3d 587 (7th Cir. 2018)..................................................................................... 17, 20

*Ability Ctr. of Greater Toledo v. City of Sandusky*,
385 F.3d 901 (6th Cir. 2004)............................................................................................ 34

*Access Living of Metro. Chi. v. Uber Techs., Inc.*,
958 F.3d 604 (7th Cir. 2020)............................................................................................ 17

*Adams v. City of Indianapolis*,
742 F.3d 720 (7th Cir. 2014)............................................................................................ 31

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........................................................................................................ 34

*Am. Council of Blind of Metro. Chi. v. City of Chicago*,
667 F. Supp. 3d 767 (N.D. Ill. 2023) ............................................................................... 21

*Am. Council of Blind of N.Y., Inc. v. City of New York*,
495 F. Supp. 3d 211 (S.D.N.Y. 2020) .............................................................................. 20

*Ashby v. Warrick Cnty. Sch. Corp.*,
908 F.3d 225 (7th Cir. 2018)............................................................................................ 19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................... 15, 31

*Babcock v. Michigan*,
812 F.3d 531 (6th Cir. 2016)....................................................................................*passim*

*Babcock v. Michigan*,
No. 22-CV-12951, 2024 WL 6895830 (E.D. Mich. Mar. 30, 2024)................................ 18

*Barden v. City of Sacramento*,
292 F.3d 1073 (9th Cir. 2002)............................................................................... 23, 29–31

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) ........................................................................................................ 30

*Cal. Found. for Indep. Living Ctrs. v. Cty. of Sacramento*,
142 F. Supp. 3d 1035 (E.D. Cal. 2015) ........................................................................... 31

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
631 F.3d 939 (9th Cir. 2011).............................................................................. 17, 20, 28

*City and County of San Francisco v. EPA*,
604 U.S. 334 (2025) ...................................................................................... 2, 26–27, 30

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ........................................................................................................ 33

*Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*,
  765 F.3d 1205 (10th Cir. 2014) ................................................................................. 28

*Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*,
  770 F.3d 586 (7th Cir. 2014) ..................................................................................... 15

*Daubert v. Lindsay Unified Sch. Dist.*,
  760 F.3d 982 (9th Cir. 2014) ............................................................................. 25, 32

*Deck v. City of Toledo*,
  76 F. Supp. 2d 816 (N.D. Ohio 1999) ....................................................................... 35

*Faircloth v. McDonald's Corp. & McDonald's USA LLC*,
  No. 18 C 1831, 2018 WL 5921230 (N.D. Ill. Nov. 13, 2018) ................................... 18

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .................................................................................................. 33

*Fosnight v. Jones*,
  41 F.4th 916 (7th Cir. 2022) ....................................................................................... 6

*Frame v. City of Arlington*,
  657 F.3d 215 (5th Cir. 2011) ..................................................................................... 25

*Garcia-Castro v. Puerto Rico*,
  No. CV 20-1065 (JAG), 2021 WL 4979258 (D.P.R. Sept. 23, 2021) ....................... 18

*George v. Bay Area Rapid Transit*,
  577 F.3d 1005 (9th Cir. 2009) ................................................................................... 27

*Greer v. Richardson Indep. Sch. Dist.*,
  472 F. App'x 287 (5th Cir. 2012) .............................................................................. 25

*Hummel v. St. Joseph Cty. Bd. of Comm'rs*,
  817 F.3d 1010 (7th Cir. 2016) ............................................................................. 17, 33

*Iverson v. City of Boston*,
  452 F.3d 94 (1st Cir. 2006) ................................................................................. 25, 34

*Kinney v. Yerusalim*,
  812 F. Supp. 547 (E.D. Pa. 1993) ............................................................................. 18

*Kinney v. Yerusalim*,
  9 F.3d 1067 (3d Cir. 1993) ................................................................................. 17, 21

*Lacy v. Cook County*,
  897 F.3d 847 (7th Cir. 2018) ...................................................................... 2, 19, 23–24

*Liberty Res., Inc. v. City of Philadelphia*,
  No. CV 19-3846, 2020 WL 3642484 (E.D. Pa. July 6, 2020) ........................... *passim*

*Liberty Res., Inc. v. City of Philadelphia*,
  No. CV 19-3846, 2021 WL 4989700 (E.D. Pa. Oct. 27, 2021) ................... 21, 32, 34–35

*Lonberg v. City of Riverside*,
  571 F.3d 846 (9th Cir. 2009) ............................................................................. 34–35

iii

*Loper Bright Enterps. v. Raimondo*,
  603 U.S. 369 (2024) .................................................................................................... 30

*Love v. Westville Corr. Ctr.*,
  103 F.3d 558 (7th Cir. 1996)........................................................................................ 19

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................................... 17

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ...................................................................................................... 30

*Resnick v. Magical Cruise Co.*,
  148 F. Supp. 2d 1298 (M.D. Fla. 2001)........................................................................ 28

*Sarfaty v. City of Los Angeles*,
  No. 17-CV-3594 (SVW), 2020 WL 1078804 (C.D. Cal. Feb. 7, 2020) ....................... 20

*Scherr v. Marriott Int'l, Inc.*,
  703 F.3d 1069 (7th Cir. 2013)............................................................................ 17, 28–30

*Simic v. City of Chicago*,
  851 F.3d 734 (7th Cir. 2017)........................................................................................ 33

*United States v. Jicarilla Apache Nation*,
  564 U.S. 162 (2011)...................................................................................................... 29

**Statutes and Ordinances**

29 U.S.C. § 792............................................................................................................ 3–4

29 U.S.C. § 794................................................................................................................ 2

33 U.S.C. § 1311 ............................................................................................................ 26

42 U.S.C. § 12132............................................................................................................ 2

42 U.S.C. § 12133.......................................................................................................... 34

42 U.S.C. § 12134.................................................................................................... *passim*

42 U.S.C. § 12143.......................................................................................................... 27

42 U.S.C. § 12149.......................................................................................................... 27

42 U.S.C. § 12164.......................................................................................................... 27

42 U.S.C. § 12186.................................................................................................... 17, 28

42 U.S.C. § 12204............................................................................................................ 3

Municipal Code of Chicago, Ill. § 2-102-100........................................................... 6, 9

**Regulations**

28 C.F.R. Pt. 35 ..................................................................................................................... 4

28 C.F.R. § 35.101 ................................................................................................................ 3

28 C.F.R. § 35.104 ..................................................................................................... 3, 16, 30

28 C.F.R. § 35.105 ...................................................................................................... 14, 34–35

28 C.F.R. § 35.107 ...................................................................................................... 14, 34–35

28 C.F.R. § 35.149 ........................................................................................................... 23–24

28 C.F.R. § 35.150 ..................................................................................................... *passim*

28 C.F.R. § 35.151 ..................................................................................................... *passim*

36 C.F.R. § 1191 ............................................................................................................ 4, 33

45 C.F.R. § 84.6 ................................................................................................................. 14

45 C.F.R. § 84.22 .............................................................................................................. 14

56 Fed. Reg. 35408 (July 26, 1991) .................................................................................. 4

Nondiscrimination on the Basis of Disability in State and Local Government Services,
  56 Fed. Reg. 35694 (July 26, 1991) ............................................................................. 4

ADA Accessibility Guidelines for Buildings and Facilities,
  69 Fed. Reg. 44084 (July 23, 2004) ............................................................................. 4

Nondiscrimination on the Basis of Disability in State and Local Government Services,

  75 Fed. Reg. 56164 (Sept. 15, 2010) ............................................................................ 4

Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way" ("PROWAG"),
  88 Fed. Reg. 53604 (Aug. 8, 2023) .............................................................................. 5

**Exhibits and City Documents**

Exhibit A, CDOT Rules and Regs ................................................................................ 6–8

Exhibit B, CCE Procedural Guidelines........................................................................... 8

Accessible Transportation Information for People with Disabilities,

  https://www.chicago.gov/city/en/depts/mopd/supp_info/accessible_transportationinformationfo
  rpeoplewithdisabilities.html ........................................................................................ 13

Accessible Transit, RTA,

  www.rtachicago.org/riders/accessible-transit ............................................................ 13

Capital Improvement Program (CIP) 2025–2029,

  https://www.chicago.gov/content/dam/city/depts/obm/supp_info/CIP/City%20of%20Chicago
  %202025-2029%20Capital%20Improvement%20Plan.pdf................................................. 9–11

v

CDOT Strategic Plan,

   https://www.chicago.gov/city/en/depts/cdot/supp_info/cdotstrategicplan.html ......................... 8

Chicago Complete Streets,

   https://www.chicago.gov/city/en/sites/complete-streets-chicago/home.html ............................ 9

City of Chicago Grievance Procedure Under the ADA and Section 504,
   https://www.chicago.gov/content/dam/city/depts/mopd/comply/general/grievanceprocedure.10.
   7.21.pdf ...................................................................................................................... 12 –13

Mobility and Economic Hardship Index,

   https://www.chicago.gov/city/en/depts/cdot/supp_info/cdotstrategicplan/mobility-and-
   economic-hardship-index-.html ...................................................................................... 9

MOPD Accessibility Compliance,

   https://www.chicago.gov/city/en/depts/mopd/provdrs/comply.html ........................................ 12

MOPD Featured Services and Programs,

   https://www.chicago.gov/city/en/depts/mopd.html ................................................................... 12

MOPD Mission,

   https://www.chicago.gov/city/en/depts/mopd/auto_generated/mopd_mission.html. ................ 12

Pace Bus – ADA,

   www.pacebus.com/ada .............................................................................................................. 13

Pace's Taxi Access Program,

   www.pacebus.com/tap ............................................................................................................... 13

Press Release, July 22, 2025,

   https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2025/july/ADA-35th-
   anniversary.html ....................................................................................................................... 12

Strategic Plan for Transportation: Year 1 Update ......................................................................... 8–9

Strategic Plan for Transportation: Year 4 Update ......................................................................... 11

Plaintiffs' lawsuit challenging the City's pedestrian rights-of-way under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 fundamentally misunderstands the statutes and their implementing regulations. Because Congress knew that creating standards for the accessibility of public facilities required technical expertise, it directed the Architectural and Transportation Barriers Compliance Board ("Access Board") to develop concrete standards for facilities and required the Department of Justice ("DOJ") to implement those standards through regulations. 42 U.S.C. § 12134(a), (c). The result is a calibrated, two-part approach that distinguishes between public entities' facilities—physical infrastructure like sidewalks—and the programs, services, and activities public entities perform.

First, for facilities built before the ADA took effect, public entities must ensure that programs and services are accessible, but they need not make every facility accessible. 28 C.F.R. § 35.150(a). Second, newly constructed or altered facilities must comply with technical standards tied to the date of construction. *Id.* § 35.151(c). Since 1992, one standard has applied to public rights-of-way: public entities must install curb ramps when they construct or alter streets and sidewalks. *Id.* § 35.151(i). The Access Board has developed additional technical standards for pedestrian facilities. In August 2023, it finalized the Public Rights-of-Way Accessibility Guidelines ("PROWAG"). But those guidelines remain voluntary—DOJ has not yet adopted them as enforceable standards.

Plaintiffs' Complaint ignores this two-part framework, as well as the City's detailed regulations requiring new construction to comply with the ADA and its strategic plans and funding programs for public way construction and repair. Rather than identify specific facilities that allegedly violate ADA standards, Plaintiffs claim broadly that pedestrian facilities "throughout the City" are deficient. But Plaintiffs lack standing to challenge facilities they have

1

never encountered and do not intend to use. And even as to the specific facilities they identify, they fail to allege violations of enforceable standards.

Plaintiffs cannot plead around these defects by asking the Court to treat the City's entire pedestrian infrastructure—more than 7,400 miles of sidewalks, curb ramps, and crosswalks—as a single "program" subject to a vague "readily accessible" standard. This approach contradicts the ADA's plain text and disregards the careful two-part framework Congress and DOJ established. Such claims have been rejected by federal courts, and they are foreclosed by the Supreme Court's recent decision in *City and County of San Francisco v. EPA*, 604 U.S. 334 (2025), which confirms that Plaintiffs cannot enforce a vague statutory goal, where Congress directed DOJ to implement that goal by creating concrete technical requirements.

Plaintiffs' other theories of liability fail as well. They claim the City fails to provide accessible routes during construction, but they lack standing to pursue injunctive relief based on speculative future injuries. And they seek to enforce administrative regulations that are not privately enforceable. For these reasons, the Complaint should be dismissed in its entirety.

## BACKGROUND

### I.      ADA Title II And Pedestrian Facilities.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.[1]

---

[1] Section 504 states: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Because Title II was modeled after section 504, the elements of claims under the two provisions are nearly identical." *Lacy v. Cook Cnty.*, 897 F.3d 847, 852 n.1 (7th Cir. 2018) (cleaned up).

In addition to creating this requirement that programs, services, and activities be accessible, Title II separately addresses "facilities." *Id.* § 12134(c). The statute does not define "facilities," but Congress directed DOJ to adopt regulations to implement Title II, *id.* § 12134(a), "includ[ing] standards applicable to facilities" that are "consistent with the minimum guidelines and requirements issued by the [Access Board]," *id.* § 12134(c). In tandem, Congress required the Access Board to "establish and maintain . . . minimum guidelines and requirements for the standards issued pursuant to [Title II]." 29 U.S.C. § 792(b)(3)(B); *see also* 42 U.S.C. § 12204(a) (directing the Access Board to "issue minimum guidelines" under Title II).

DOJ's Title II regulations, 28 C.F.R. § 35.101 *et seq.*, define "facilities" as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, *roads, walks, passageways*, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located," *id.* § 35.104 (emphasis added). Thus, facilities encompass pedestrian infrastructure like sidewalks and curb ramps.

The regulations that implement Title II provide that accessibility of facilities, including pedestrian elements, will be achieved by a two-part process: (1) requiring existing facilities sufficient to render programs, services and activities readily accessible; and (2) mandating that newly constructed and altered facilities comply with accessible design standards.

### A. Existing facilities.

For facilities that existed when Title II was enacted, a public entity is not required to make each facility accessible to and usable by individuals with disabilities. *Id.* § 35.150(a)(1). Rather, the focus is on access to services, programs, or activities available at a facility. Accessibility is achieved if "the service, program, or activity, *when viewed in its entirety*, is readily accessible to and usable by individuals with disabilities." *Id*. § 35.150(a) (emphasis added).

### B.      Newly constructed and altered facilities.

For facilities constructed or altered after Title II was enacted, the ADA takes a different, more demanding approach. Accessibility is determined not by reference to the program, service, or activity serviced by the facility, but by specific technical design standards that govern the facility directly. Congress directed the Access Board to develop these standards and DOJ to implement them. *See* 42 U.S.C. § 12134(a), (c); 29 U.S.C. § 792(b)(3)(B).

On July 26, 1991, the Access Board published the first set of these standards—its ADA Accessibility Guidelines—which DOJ adopted the same day. *See* 56 Fed. Reg. 35408 (July 26, 1991); Nondiscrimination on the Basis of Disability in State and Local Government Services, 56 Fed. Reg. 35694 (July 26, 1991) (the "1991 Standards"). On July 23, 2004, the Access Board published updated standards. ADA Accessibility Guidelines for Buildings and Facilities, 69 Fed. Reg. 44084 (July 23, 2004); 36 C.F.R. Pt. 1191. Six years later, on September 15, 2010, DOJ adopted those standards (the "2010 Standards"). Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. 56164–65 (Sept. 15, 2010); 28 C.F.R. Pt. 35.

Thus, facilities constructed or altered after July 26, 1992 must comply with the standards adopted by DOJ, with the relevant standards tied to the date of construction. 28 C.F.R. § 35.151(c). The 2010 Standards currently apply to new construction. *Id.* § 35.151(c)(3). New construction must fully comply with the standards unless it would be "structurally impracticable" to do so. *Id.* § 35.151(a). For existing facilities, if an alteration could affect the usability of all or part of the facility, then it must comply with the 2010 Standards "to the maximum extent feasible." *Id*. § 35.151(b).

Importantly for this case, and as the Access Board has explained, the standards DOJ has adopted to date do not (with one exception discussed below) "specifically address[ ]" technical requirements that apply to "public rights-of-way," such as sidewalks. Accessibility Guidelines

4

for Pedestrian Facilities in the Public Right-of-Way" ("PROWAG"), 88 Fed. Reg. 53604, 53605 (Aug. 8, 2023). The Board explained that the guidelines it published in 1991 and 2004 "were developed primarily for buildings and facilities on sites," and "many issues specific to public rights-of-way were simply not addressed" in those guidelines, or in the 1991 and 2010 Standards that resulted from them. *Id.*

The one exception is that DOJ has adopted a regulation that addresses curb ramps in pedestrian facilities. Since January 26, 1992, public entities have been required, when they construct or alter their streets, to install "curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway." 28 C.F.R. § 35.151(i)(1). Likewise, "[n]ewly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways." *Id.* § 35.151(i)(2). Criteria for curb ramp design vary depending on when the adjacent street was constructed or altered. *Id.* § 35.151(c).

Standards governing the many other elements of pedestrian rights-of-way remain a work in progress. The Access Board "began developing accessibility guidelines for pedestrian facilities in public rights-of-way shortly after the ADA was enacted in 1990." PROWAG, 88 Fed. Reg. 53604, 53605. After more than three decades, on August 8, 2023, the Access Board finally published PROWAG, "issued pursuant to the ADA and the Rehabilitation Act." *Id.* at 53604. But DOJ has not yet adopted them. *Id.* at 53604–62. The PROWAG standards therefore "are voluntary," until they are adopted "as enforceable standards." *Id.* at 53609. If and once adopted by DOJ, the PROWAG standards can be used to evaluate whether a new or altered pedestrian facility complies with the ADA. *Id.* at 53604.

## II.     The City's Provision Of Accessible Pedestrian Facilities.

The Chicago Department of Transportation ("CDOT") manages "the maintenance and capital rehabilitation of the City of Chicago's transportation infrastructure[.]" Ex. A at 1-1 (CDOT Rules and Regs).[2] This includes regulating construction in the public way. *Id.*

### A.     CDOT's rules and regulations require compliance with the ADA.

By ordinance and CDOT rules, major transportation projects must consider the need for sidewalk repair. *See* Municipal Code of Chicago, Ill. ("MCC") § 2-102-100. Before construction begins, any sidewalk slated for repair must be surveyed, photographed, and documented. CDOT Rules & Regs. at 4-1. Sidewalk construction itself is subject to three sets of standards: (1) CDOT's design standards; (2) Article 424.01–424.07 of the Illinois Department of Transportation ("IDOT") Standard Specifications for Road & Bridge Construction; and (3) the ADA. *Id.* at 4-30. Within fourteen days of completing a project, any impacted sidewalk must be restored to compliance. *Id.*

As to the first of these, CDOT's own design standards require contractors to follow accessible design specifications. For instance, CDOT regulates: (1) the maximum grades for ramp and cross slope; (2) the level landing area prior to the ramp; (3) the transition from sidewalk to curb ramp; (4) the placement of infrastructure within the pedestrian right-of-way; (5) the distance between sidewalk plates; and (6) the types of connecting joints that should be used between sidewalk plates. *Id.* Appx. B, at Sheets B-1-1, B-1-2; *see also id.* Appx. A, at Sheets A-2-3C, A-3-2.

---

[2] Courts may take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). "It's well established that judges may take judicial notice of matters of public record when ruling on a motion to dismiss." *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022). The existence of these publicly available City documents is not subject to reasonable dispute, and they are available "from sources whose accuracy cannot reasonably be questioned." *Id.* (citation omitted).

6





Further, during construction, the permittee or contractor must abide by a "detour plan," reviewed and approved by CDOT. *Id.* at 4-42. Detours must follow IDOT's Highway Standards,

7

the Manual on Uniform Traffic Control Devices ("MUTCD"), standards set by the American Association of State Highway and Transportation Officials, and the ADA. *Id.* at 4-42–43. If necessary, temporary pedestrian walkways can be constructed. *Id.* Only if a temporary walkway is infeasible will CDOT consider approving a sidewalk closure. *Id.* at 4-43–44. When closing a sidewalk, signage must be posted at the nearest intersection; proposed detours and signage must meet ADA guidelines and the standards set by MUTCD, IDOT, and CDOT. *Id.*

CDOT has also developed a manual with general procedures for contractors to follow so that projects adhere to the City's construction standards. Ex. B (CCE Procedural Guidelines). Each project begins with a contractor submitting to CDOT relevant shop drawings, mix samples, construction plans, and other relevant documents, including ADA-compliance documents. *Id.* at 13, 189. CDOT utilizes multiple levels of review to ensure compliance with these rules. *Id.* at 18, 23. CDOT oversight continues through the construction process, during which CDOT may issue "Field Orders" to address any deviations from construction standards. *Id.* at 23–27. CDOT also conducts its own job-site inspections. *Id.* at 93–116, 160, 165.

**B.** **The City has implemented a multiyear, comprehensive transportation plan.**

In June 2021, the City published its Strategic Plan for Transportation, a four-year transportation plan prioritizing transportation equity and mobility justice.[3] As part of this plan, CDOT developed the Mobility and Economic Hardship Index ("MOBEC").[4] MOBEC uses data

---

[3] Strategic Plan for Transportation: Year 1 Update at 3, https://www.chicago.gov/content/dam/city/depts/cdot/CDOT%20Projects/Strategic_Plan/CDOT-Strategic-Plan-Year-1-Update.pdf.

[4] CDOT Strategic Plan, https://www.chicago.gov/city/en/depts/cdot/supp_info/cdotstrategicplan.html.

8

on disability, population density, poverty, employment, education, commute time, transportation cost, and other factors to focus CDOT's investments into underserved communities.[5]

The Strategic Plan for Transportation emphasized pedestrian safety. Year 1 Update, *supra* note 3, at 6. To that end, CDOT created the Collector Street Program to supplement the Aldermanic Menu Program ("AMP"), one of the City's primary funding sources for sidewalk repair. *Id.* at 7, 21. Under the AMP, each Alderperson for the City's fifty Wards is allocated $1.5 million annually to spend on infrastructure, including street and alley surfacing, street lighting, speed humps, and sidewalks. Compl. ¶ 58. Through the Collector Street Program, CDOT expands on the AMP by factoring in pavement condition, ADA accessibility, and MOBEC to target for repair or enhancement those streets in areas of the City with greater infrastructure needs. Year 1 Update, *supra* note 3, at 21. The new program also provided funding for an additional sixty miles of street and sidewalk resurfacing. *Id.*

CDOT's Strategic Plan for Transportation involved enacting the "Complete Streets" ordinance. MCC § 2-102-100.[6] The ordinance requires all major transportation projects to consider: (i) ADA accessible curb ramps and (ii) measures to enhance pedestrian safety. *Id.* In practice, this means that all major infrastructure-construction programs that affect the pedestrian right-of-way must address sidewalk repair.[7]

The "Complete Streets" requirement is reflected in the City's yearly infrastructure funding process. Each year in its Capital Improvement Program ("CIP") Report, the City outlines

---

[5] Mobility and Economic Hardship Index, https://www.chicago.gov/city/en/depts/cdot/supp_info/cdotstrategicplan/mobility-and-economic-hardship-index-.html.

[6] Chicago Complete Streets, https://www.chicago.gov/city/en/sites/complete-streets-chicago/home.html.

[7] Capital Improvement Program (CIP) 2025–2029, at 9–17, https://www.chicago.gov/content/dam/city/depts/obm/supp_info/CIP/City%20of%20Chicago%202025-2029%20Capital%20Improvement%20Plan.pdf.

9

its five-year plan for funding capital improvements through municipal bonds, state and federal programs, and local funding sources. *Id.* at 3–5. The CIP Report describes the City's infrastructure programs and the funding dedicated to fulfilling each program's directive.

As the 2025–2029 CIP Report details, multiple programs address sidewalk repair, both in name and in scope. For instance, the following programs all fund sidewalk repair: (1) the Bridge Improvement Program, which "maintains 243 bridges . . . in safe, operable condition," *id.* at 9; (2) the Transit/Bicycle/Pedestrian Program, which improves CTA facilities and furthers the Vision Zero Chicago program to reduce "fatalities and serious injuries from traffic crashes," *id.* at 10; (3) the Major Streets Program, which "provides for the resurfacing, reconstruction, or widening of the City's arterial streets," *id.*; (4) Intersection/Safety Improvements, which repair, replace, or create safe pedestrian crossings, *id.* at 11; (5) the Railroad Improvements Program, which addresses pedestrian rights-of-way near railroad crossings, *id.* at 11–12; (6) the AMP, described above, *id.*; (7) the Lighting Program, which replaces "deteriorated streetlight poles and bases," *id.* at 14; (8) the Residential Street Resurfacing Program, which improves the public right-of-way on residential streets, *id.* at 15; (9) the New Street Construction Program, which "replaces existing, unimproved streets" (AKA "WPA streets") originally constructed during the 1930s, *id.*; (10) the Streetscape Program, which "redesign[s] sidewalks, plazas, viaducts, crosswalks, bicycle lanes, public transportation stops, and pedestrian signals to prioritize safety and connectivity for all modes of transportation," *id.* at 16; (11) the Viaduct Improvement Program, which "upgrades viaduct structures and addresses lighting, sidewalk, roadway, and clearance issues," *id.*; (12) the Other Economic Projects Program, which involves joint financing with the Federal Government, State of Illinois, Chicago Park District, and the private sector to improve public right-of-way infrastructure, *id.* at 17; and (13) the City Space Program, which

10

protects natural spaces in the City, including by creating multi-use pedestrian trails, *id.* at 22. As with all construction projects, each program must abide by CDOT's rules and regulations, which require compliance with the ADA. *Supra*, at 6–8.

In addition to these infrastructure programs that include sidewalk repair in the scope of work, the City dedicates funding specifically for sidewalk work. The Sidewalk Construction Program includes three sub-programs: "the Shared Cost Sidewalk Program ['SCSP'], hazardous repairs, and the vaulted sidewalk repairs." CIP 2025–2029, *supra* note 7, at 14. Through the SCSP, "[t]he City and property owners each pay part of the construction costs needed for sidewalk improvements." *Id.* Hazardous repairs are made after individuals report a broken sidewalk; CDOT then inspects and repairs any identified damage. *Id.* "Vaulted sidewalk repairs involve filling in deteriorated vaulted sidewalks," installed in "some Chicago neighborhoods at the time when streets and sidewalks were raised five to six feet to avoid flooding due to the high-water table." *Id.*

Through these coordinated programs, the City addresses infrastructure needs in the public right-of-way by leveraging multiple funding sources. Indeed, in 2025 alone, CDOT expected to "[c]omplete over 3,000 hazardous sidewalk repairs, and install 6,000 ADA ramps."[8]

Across its programs, the City prioritizes community involvement. The Chicago Mobility Collaborative ("CMC") is CDOT's largest public forum related to walking, biking, transit, public spaces, mobility justice, and accessibility. *Id.* at 61. CMC meets four times a year, bringing together residents and community organizations to inform CDOT's infrastructure strategy. *Id.*

---

[8] Strategic Plan for Transportation: Year 4 Update at 29,
https://www.chicago.gov/content/dam/city/depts/cdot/StrategicPlan/Chicago_Strategic%20Plan%20Updat
e_Yr%204_FULL_FINAL.pdf.

11

To help prioritize these repair efforts, along with input from local officials, CDOT relies on the 311 System. Individuals may use 311 to lodge a sidewalk-inspection request with the City. Compl. ¶ 42. CDOT then catalogues the request, inspects the portion of sidewalk, and determines under which program or programs any repair should be conducted. *Id.* ¶¶ 43, 50.

### C. Mayor's Office for People with Disabilities and Accessible Transportation Services.

As part of its commitment to accessibility, the City created the Mayor's Office for People with Disabilities ("MOPD") in 1990, shortly after the enactment of the ADA; Chicago was the first city to establish a cabinet-level department strictly dedicated to the needs of residents with disabilities.[9] MOPD works to ensure full participation and equal opportunities for people with disabilities across all aspects of city life. Its mission is "to ensure the rights of the disability community are equitably represented across City services, initiatives, and policies."[10] To that end, MOPD provides Chicagoans with services such as accessible housing modification, career, and independent living services.[11] The Commissioner of MOPD serves as the City's ADA coordinator, ensuring that the City's programs, services, and facilities are in compliance with the ADA.[12] The Commissioner also reviews, investigates, and resolves "complaint[s] alleging discrimination on the basis of disability in the provision of services, activities, programs, or

---

[9] Press Release, July 22, 2025, https://www.chicago.gov/city/en/depts/mayor/press_room/press_releases/2025/july/ADA-35th-anniversary.html.

[10] MOPD Mission, https://www.chicago.gov/city/en/depts/mopd/auto_generated/mopd_mission.html.

[11] MOPD Featured Services and Programs, https://www.chicago.gov/city/en/depts/mopd.html.

[12] MOPD Accessibility Compliance, https://www.chicago.gov/city/en/depts/mopd/provdrs/comply.html.

benefits by the City of Chicago."[13] MOPD also offers information about accessible public transportation and paratransit options.[14]

### III.       Plaintiffs' Allegations.

Plaintiffs Cherlnell Lane, Iliana Rivera Haven, Michele Lee, and Kevin Sullivan are residents of or visitors to Chicago who use a power wheelchair or electric scooter due to a disability. Compl. ¶¶ 15–18. They seek to bring claims on behalf of all those with mobility disabilities who use the City's pedestrian facilities. *Id*. ¶¶ 119–26. Plaintiffs generally allege that pedestrian facilities citywide, like curb ramps, sidewalks, and crosswalks, are "inaccessible to people with mobility disabilities." *Id*. ¶ 1. They allege that damaged or missing curb ramps, deteriorated sidewalks, and curb ramps and crosswalks with excessive slopes "impede travel," necessitate alternative routes, and are hazardous. *Id*. ¶¶ 3–5. Plaintiffs claim that pedestrian facilities have been constructed or repaired in violation of "applicable disability access standards, including the 2010 Americans with Disabilities Act Standards for Accessible Design, the 1991 Americans with Disabilities Act Accessibility Guidelines, and the Uniform Federal Accessibility Standards," to which they refer collectively as "Disability Access Standards." *Id*. ¶ 10. They

---

[13] City of Chicago Grievance Procedure Under the Americans with Disabilities Act of 1990 and the Rehabilitation Act of 1973,
https://www.chicago.gov/content/dam/city/depts/mopd/comply/general/grievanceprocedure.10.7.21.pdf.

[14] Accessible Transportation Information for People with Disabilities,
https://www.chicago.gov/city/en/depts/mopd/supp_info/accessible_transportationinformationforpeoplewithdisabilities.html.

The Pace Bus Service provides an "ADA Paratransit Service." Pace Bus – ADA, Pace Bus, www.pacebus.com/ada. Riders who cannot use the Chicago Transit Authority or Regional Transit Authority's ADA-accessible, fixed-route services can request specific pick-up and drop-off service for a $3.25 fare. *Id.* Pace's Taxi Access Program ("TAP"), www.pacebus.com/tap, is a taxi subsidy program for ADA eligible riders choosing to use Chicago taxis. A rider can call a taxi dispatch service to request a ride for the same fare as the Paratransit Service: $3.25. *Id.* For individuals able to access the City's public transportation services, 100 percent of bus and train cars are accessible to individuals with disabilities. Accessible Transit, RTA, www.rtachicago.org/riders/accessible-transit.

allege that the City fails to adequately maintain pedestrian facilities, timely address complaints, keep facilities free of obstructions, and provide accessible routes during construction. *Id.*

Plaintiffs allege that they have encountered deficient pedestrian facilities in several neighborhoods, *see id.* ¶¶ 80–118, when attempting to shop, dine, visit stores and bars, go to medical appointments, attend events, and see friends and family, *e.g.*, *id.* ¶¶ 81, 83–84, 107, 116.

Plaintiffs complain that the City lacks a comprehensive system to ensure pedestrian facilities are accessible. *Id.* ¶ 34. They note that various entities are involved: CDOT, other City agencies, Alderpersons, private property owners, and third-party contractors, *id.* ¶ 35, and that the City has multiple initiatives to repair its pedestrian facilities, *id.* ¶ 36, which Plaintiffs assert are insufficiently coordinated, *id.* ¶ 37. Plaintiffs criticize the City's reliance on sidewalk inspection requests through its 311 system, *id.* ¶¶ 41, 45, complaining that requests take too long to resolve, *id.* ¶¶ 47, 49. Finally, Plaintiffs allege that CDOT has failed to comply with federal regulations by designating an ADA Coordinator, *id.* ¶ 38 (citing 28 C.F.R. § 35.107(a)); or conducting a Self-Evaluation and publishing a Transition Plan, *id.* ¶ 39 (citing 28 C.F.R. § 35.105; 45 C.F.R. § 84.6; 28 C.F.R. § 35.150(d)(1)–(2); 45 C.F.R. § 84.22(e)).

Plaintiffs ask for a declaration that the City "has violated and continues to violate" Title II and Section 504. *Id.* at 54 ¶ 1 (prayer for relief). They seek injunctive relief requiring the City to ensure future construction and alterations conform to "Disability Access Standards"; promptly repair damaged or non-compliant new construction or alterations to comply with "Disability Access Standards"; "[c]onstruct, remediate, repair, and maintain curb ramps, sidewalks, crosswalks, and other elements in the City's pedestrian rights of way such that, when viewed in its entirety, the pedestrian rights of way program is readily accessible to and usable by individuals with mobility disabilities"; "[p]rovide accessible pedestrian rights of way around

14

construction sites and at temporary buildings and facilities"; and adopt "methods, policies, and practices," including designating an ADA Coordinator and "publishing a Self-Evaluation and Transition Plan regarding the accessibility of the City's pedestrian rights of way." *Id.* at 55 ¶ 2.

## LEGAL STANDARDS

A Rule 12(b)(1) motion to dismiss challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The party asserting jurisdiction has the burden to establish that requirements for jurisdiction are met. *Ctr. for Dermatology & Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588–89 (7th Cir. 2014). A Rule 12(b)(6) motion to dismiss tests whether a complaint states a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). To survive dismissal, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Conclusory allegations and legal conclusions are insufficient to withstand dismissal. *Id.*

## ARGUMENT

Although the Complaint asserts two causes of action, one under Title II of the ADA and the other under Section 504, it appears to advance four theories of liability. Each fails for independent reasons. *First*, Plaintiffs' challenge to pedestrian facilities throughout the entire City, Compl. ¶¶ 135–43, fails because they lack standing. To have standing to challenge a facility, a plaintiff must have personal knowledge of it and intend to use it. But Plaintiffs do not (and could not plausibly) allege that they know the condition of every sidewalk and other pedestrian facility throughout the City, much less than they intend to use them. And as to particular sidewalks or other facilities they identify and say they intend to use, Plaintiffs' claims fail on the merits, for they do not allege facts showing a violation of enforceable ADA standards. Indeed, apart from the curb ramp requirement in 28 C.F.R. § 35.151(i), they point to no enforceable standard. And they fail to allege facts establishing a violation of § 35.151(i).

15

*Second*, Plaintiffs claim that the City's pedestrian rights of way are a "program," and thus subject to the general "readily accessible" standard that applies to programs, fails as a matter of law. *See* Compl. ¶¶ 144–46. The ADA and its regulations treat facilities and programs as distinct, and the regulations categorize pedestrian rights-of-way as facilities. *See* 28 C.F.R. § 35.104. As courts have recognized, treating facilities as a "program" would yield absurd results, because the regulations impose different standards for facilities based on when they were built or modified: existing facilities (which must be accessible only as required to provide access to programs) and new construction or alterations (which must meet technical design standards). Moreover, even if Plaintiffs could challenge the City's pedestrian infrastructure as a "program," they fail to allege facts showing that the City's pedestrian infrastructure, viewed in its entirety, is not readily accessible—their anecdotal allegations about a tiny fraction of the City's 7,400 miles of sidewalks are insufficient to state a citywide claim.

*Third*, Plaintiffs lack standing to challenge the City's provision of accessible routes around construction, Compl. ¶¶ 147–50, as they allege no impending injury to support injunctive relief. And the claim lacks merit because they identify no regulation the City violated.

*Fourth*, Plaintiffs cannot enforce the regulations requiring designation of an ADA Coordinator, completion of a Self-Evaluation, and publication of a Transition Plan. *See id.* at 55 ¶ 2(f). Federal courts have held that these regulations are not privately enforceable.

## I.     PLAINTIFFS FAIL TO ALLEGE THAT THEY HAVE BEEN INJURED BY PEDESTRIAN FACILITATIES THAT VIOLATE ADA REGULATIONS.

Plaintiffs allege that the City is required to "construct, alter, and maintain" its pedestrian facilities "in a manner that complies with applicable Disability Access Standards." *Id.* ¶¶ 23–24. They allege generally that sidewalks "throughout the City" are damaged, too narrow, or blocked

16

by obstacles, *id.* ¶ 31, and "many crosswalks are deteriorated or damaged," *id.* ¶ 32. This broad claim fails for lack of standing and failure to plead a plausible ADA violation.

        **A.      Plaintiffs lack standing to challenge facilities they have no personal knowledge of and intent to use.**

First, Plaintiffs lack standing to bring a claim that facilities "throughout the City" are deficient. Plaintiffs have standing to bring claims for injunctive relief under the ADA only if they establish: (1) personal knowledge of the barriers to access at a given facility, and (2) a plausible intention or desire to return to the place but for the barriers to access. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073–75 (7th Cir. 2013); *Access Living of Metro. Chi. v. Uber Techs., Inc.*, 958 F.3d 604, 613–15 (7th Cir. 2020). As the Seventh Circuit explained in those ADA Title III cases,[15] plaintiffs "need not engage in the 'futile gesture' of traveling to each" location, but they do need to have actual knowledge that the location is inaccessible. *See Scherr*, 703 F.3d at 1075; *Access Living*, 958 F.3d at 615. And they "must assert an intent to return to the particular place (or places) where the violations are alleged to be occurring." *Scherr*, 703 F.3d at 1075; *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (calling speculative "'some day' intentions" insufficient to establish an injury). Plaintiffs do not have standing to pursue ADA and Rehabilitation Act claims if they have no concrete intent to return to the allegedly inaccessible facility. *Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1017 (7th Cir. 2016) (plaintiffs lacked standing because they had no "plans to return" to non-compliant courthouse).[16]

---

[15] Title II and Title III of the ADA are effectively parallel provisions, with Title II covering public entities and Title III covering private entities. *See A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) (noting that Title III and Title II employ the same standard). Congress directed DOJ to issue regulations "that include standards applicable to facilities" covered by Title III, 42 U.S.C. 12186(b), "consistent with the minimum guidelines and requirements issued by the [Access Board]," *id.* § 12186(c). Congress intended the "titles be read consistently," so analyses "of the parallel provision in Title III" can be "helpful" to understand Title II. *Kinney v. Yerusalim*, 9 F.3d 1067, 1073 & n.6 (3d Cir. 1993).

[16] Courts around the country have rejected claims when plaintiffs lacked personal knowledge that a facility is inaccessible and an intent to use it. *E.g.*, *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939,

Here, Plaintiffs make sweeping allegations that pedestrian facilities "throughout the City" are deficient. *See* Compl. ¶¶ 3–5, 31. As Plaintiffs allege, there are "more than 7,400 miles of public sidewalks, curb ramps, and crosswalks." *Id.* ¶ 7. But, with a handful of exceptions comprising only a tiny fraction of pedestrian facilities in the City, Plaintiffs do not identify which facilities they personally know are inaccessible and which they intend to use in the future. They lack standing to challenge pedestrian facilities citywide.

**B.      Plaintiffs identify no enforceable regulation governing most of the facilities they challenge.**

Even as to sidewalks or other facilities Plaintiffs specifically identify, they fail to state a claim. "[F]acility accessibility is not, standing alone, a cognizable claim under Title II's private right of action." *Babcock v. Michigan*, 812 F.3d 531, 536 (6th Cir. 2016). Rather, facilities only need to be accessible under certain circumstances. As explained above, existing facilities must be sufficient to ensure that each "service, program, or activity" they host is accessible, 28 C.F.R. § 35.150(a), but a public entity does not have to make "each of its existing facilities accessible," *id.* § 35.150(a)(1); *see, e.g.*, *Kinney v. Yerusalim*, 812 F. Supp. 547, 548 (E.D. Pa. 1993) (recognizing that existing facilities need not be modified unless necessary to ensure access to a public entity's services, programs, and activities). New and altered facilities must comply with standards that vary depending on the date of construction, 28 C.F.R. § 35.151(c), unless it would be "structurally impracticable" to do so, *id.* § 35.151(a). Altered facilities must comply with those standards "to the maximum extent feasible." *Id.* § 35.151(b).

---

955 (9th Cir. 2011) (plaintiff may not "perform a wholesale audit of the defendant's premises" without establishing standing as to each barrier); *Babcock v. Michigan*, No. 22-CV-12951, 2024 WL 6895830, at *12 (E.D. Mich. Mar. 30, 2024) (plaintiffs could not challenge buildings they did not attempt to access); *Faircloth v. McDonald's Corp. & McDonald's USA LLC*, No. 18 C 1831, 2018 WL 5921230, at *4 (N.D. Ill. Nov. 13, 2018) (dismissing challenge to inaccessible late-night drive-thru where plaintiff did not allege need to use it); *Garcia-Castro v. Puerto Rico*, No. CV 20-1065 (JAG), 2021 WL 4979258, at *2 (D.P.R. Sept. 23, 2021) (plaintiffs lacked "knowledge of the facilities' alleged non-compliance").

Plaintiffs do not claim that they are denied access to a City service, program, or activity. They allege that their ability to access shops, restaurants, bars, and friends' homes is impeded, but those private businesses and homes are not *City* programs and services. Courts have recognized that programs under Title II are events and functions that "the public entity itself is doing, providing, or making available." *Ashby v. Warrick Cnty. Sch. Corp.*, 908 F.3d 225, 232 (7th Cir. 2018) (holding that event sponsored by private museum was not subject to Title II). For example, in the prison context, the Seventh Circuit has listed prison church services, substance abuse programs, and college classes as examples of programs, because they are offered by the public entity running the prison. *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 560 (7th Cir. 1996). Although Plaintiff Lane claims that sidewalks along Michigan Avenue impede access to her polling place, she does not allege that she cannot vote. *See* Compl. ¶ 83(d). She mentions a Chicago Public Library branch, *id.*, but likewise, she does not allege that she cannot access its programs. Plaintiffs therefore do not state a claim that any pedestrian facilities that were in existence as of January 26, 1992 violate Title II by denying them access to City programs.

Nor do Plaintiffs state a claim as to any pedestrian facilities built after January 26, 1992. For one, except for a handful of facilities for which Plaintiffs estimate a date of construction or alteration "on information and belief," *see, e.g., id.* ¶¶ 83(a), (e), 117, Plaintiffs do not allege that the facilities they challenge were built after January 26, 1992, such that the construction was required to be compliant with ADA standards, *see Lacy.*, 897 F.3d at 868 ("[T]he ADA does not require public entities to renovate facilities built before 1992.").

More importantly, Plaintiffs fail to explain what ADA compliance would require for these facilities. They refer vaguely to "Disability Access Standards" without invoking specific regulations, apart from the curb ramp requirement (discussed below). And as we have explained,

19

except for the curb ramp regulation, there are no enforceable regulations specifically governing pedestrian facilities. The PROWAG standards are not applicable here because they "have not yet been adopted by the DOJ, the agency responsible for implementing ADA regulations." *Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F. Supp. 3d 211, 227 (S.D.N.Y. 2020) (declining to consider PROWAG); *see also Sarfaty v. City of Los Angeles*, No. 17-CV-3594 (SVW), 2020 WL 1078804, at *5 (C.D. Cal. Feb. 7, 2020).

Plaintiffs thus leave the City to guess what enforceable standard is allegedly violated at what location, and the Court to sort through the regulations to determine which Plaintiffs think apply. More is required to state an ADA claim. *See Chapman*, 631 F.3d at 958 (Smith, J., concurring) ("An ADA plaintiff must show his injury is caused by a violation of the objective ADAAG standards . . . .").

Finally, Plaintiffs do not explain how many of their allegations amount to barriers to accessibility. To state an ADA claim, plaintiffs must allege that, "but for" their disability, they "would have been able to access the services or benefits desired." *A.H. by Holzmueller*, 881 F.3d at 593. For some allegations, Plaintiffs admit the sidewalk is *not* an access barrier. *E.g.*, Compl. ¶ 94(d) & (e). For other allegations, Plaintiffs allege only that they must travel carefully or use an alternative route, or they are silent as to how the sidewalk impacts them. *E.g.*, *id.* ¶ 83(j)–(l). Again, more is required to state an ADA claim.

Plaintiffs' claims that the City's pedestrian facilities violate the ADA should be dismissed.

**C.      Even where Plaintiffs identify an applicable regulation—28 C.F.R. § 35.151(i)—they do not allege facts establishing an ADA violation.**

The only specific, binding regulation Plaintiffs cite is the curb ramp requirement. *E.g. id.* ¶ 138. Since January 26, 1992, the Title II regulations have required public entities to install curb ramps when they construct or alter streets and sidewalks, 28 C.F.R. § 35.151(i)(1), under

20

standards that vary depending on when the construction or alteration occurred, *id.* § 35.151(c); *see also Kinney*, 9 F.3d at 1071 (explaining that existing facilities are governed by the "more lenient provisions" in § 35.150).

Plaintiffs vaguely allege that "curb ramps are missing at locations where they are legally required" and that some existing curb ramps "violate applicable Disability Access Standards." Compl. ¶ 30. This level of generality is insufficient. As a Pennsylvania district court held, a plaintiff "must establish that the City has failed to meet legal obligations as to specific curb ramps." *Liberty Res., Inc. v. City of Philadelphia*, No. CV 19-3846, 2021 WL 4989700, at *4 (E.D. Pa. Oct. 27, 2021) (*Liberty Res. II*). The court explained that "§ 35.151 requires site-specific proof" and that "general allegations of citywide disability discrimination are simply incompatible with the level of specificity that proving a violation of § 35.151 requires." *Id.*

Critically, this is not a case where curb ramps are simply missing everywhere. *Cf. Am. Council of Blind of Metro. Chi. v. City of Chicago*, 667 F. Supp. 3d 767, 776–77 (N.D. Ill. 2023) (noting that the City had installed few accessible pedestrian signals). The City has installed many thousands of curb ramps. Plaintiffs themselves allege that the City has spent $140 million since 2007 to install curb ramps. Compl. ¶ 27. They assert without support that the City has "discontinued" policies and "reverted" to noncompliance "with federal law." *Id.* ¶ 29. But as explained above, the City requires curb ramps when work is done on streets and pedestrian facilities, and it sets aside substantial funds for curb ramp installation. *See supra* at 9–10. Plaintiffs' conclusory allegations, weighed against the City's large-scale efforts to comply with the curb ramp requirement, fail to state a claim.

21

Because Plaintiffs fail to identify curb ramps they need to use, which standard applies, and how that standard is allegedly violated, the City and the Court cannot evaluate whether a violation is plausible. Plaintiffs' curb ramp claims should be dismissed.

II. **PLAINTIFFS FAIL TO STATE A CLAIM THAT THE PEDESTRIAN FACILITIES, VIEWED AS A WHOLE, ARE A "PROGRAM" THAT IS NOT "READILY ACCESSIBLE" UNDER TITLE II AND SECTION 504.**

Unable to plead specific violations of the ADA as to particular pedestrian facilities, Plaintiffs characterize the City's pedestrian rights-of-way as a single "program," Compl. ¶ 133, and claim that they have been denied "participat[ion]" in that program because it is not "readily accessible to and useable by people with mobility disabilities," *id.* ¶ 146. Based on this framing, they ask the Court to order the City to "[c]onstruct, remediate, repair, and maintain curb ramps, sidewalks, crosswalks, and other elements in the City's pedestrian rights of way such that, when viewed in its entirety, the pedestrian rights of way program is readily accessible to and usable by individuals with mobility disabilities." *Id.* at 55 ¶ 2(d).

Plaintiffs cannot avoid the defects in their challenge to the City's pedestrian facilities by recasting those facilities collectively as a "program" under Title II. *Id.* ¶ 134. This claim is legally deficient in two ways—because pedestrian infrastructure is not a "program," and because Congress required accessibility of facilities to be evaluated under technical design standards, not a vague goal like "readily accessible." And even under an analysis that treats the City's pedestrian infrastructure collectively as a single "program," Plaintiffs' allegations do not show that the City's pedestrian facilities, viewed in their entirety, are not accessible.

A. **Plaintiffs' challenge to pedestrian infrastructure as a single, inaccessible "program" fails as a matter of law.**

Plaintiffs' "program" claim is defective, as a matter of law, for two reasons. First, the plain text of the ADA and its regulations treat pedestrian infrastructure elements—including

22

sidewalks, curb ramps, and crosswalks—not as "programs," but as "facilities" that are a *means* to access programs. Second, the ADA and the DOJ regulations define accessibility for new or altered facilities with reference to concrete technical design standards, which Congress directed the Access Board to develop and DOJ to adopt by regulations. Plaintiffs' claim that all pedestrian facilities, viewed in the aggregate, must be "readily accessible" disregards this framework. Furthermore, the primary case they cite to support their claim—*Barden v. City of Sacramento*—has been rejected and conflicts with fundamental principles of statutory interpretation.

### 1. The ADA and the DOJ regulations distinguish facilities, like pedestrian infrastructure, from programs.

To begin, the ADA and the DOJ regulations draw a clear distinction between "facilities" and "programs"—facilities are a *means* of accessing programs, not programs themselves. This distinction appears repeatedly in the regulations. Section 35.149, for instance, states in relevant part that "no qualified individual with a disability shall, because a public entity's *facilities* are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, *programs*, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R. § 35.149 (emphases added).

Similarly, Section 35.150(a) states that "each service, *program*, or activity" must be operated so that, "when viewed in its entirety," it is "readily accessible to and usable by individuals with disabilities," *id*. § 35.150(a), but clarifies that this does not "[n]ecessarily require a public entity to make each of its existing *facilities* accessible to and usable by individuals with disabilities," *id*. § 35.150(a)(1) (emphasis added). As the Seventh Circuit recognized, "the regulations provide flexible compliance options for facilities built before 1992 and unaltered since." *Lacy*, 897 F.3d at 853 (citing 28 C.F.R. § 35.150(b)(1)); *see id*. at 853–54 ("When public entities offer services at inaccessible facilities built before 1992, it is clear that

23

they can comply with Title II by making reasonable modifications to their policies, practices, or procedures.").

And section § 35.150(b)(1) illustrates that a program may be made accessible through a variety of methods, which may not entail use of facilities at all: accessibility may be achieved through "reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities." *Id.* § 35.150(b)(1). Like section 35.150(a)(1), section (b)(1) makes clear that "[a] public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section." *Id.*

Multiple courts have taken care to honor this distinction between facilities and programs. For instance, in *Babcock*, the Sixth Circuit compared 28 C.F.R. §§ 35.149 and 35.151, and concluded that the "regulations for construction and alteration of structures differentiate between a facility and an activity conducted in that facility," 812 F.3d at 535–36 (discussing distinction in the context of an office building). Subjecting facilities to the same accessibility requirement that apply to "services, programs, or activities" would lead to absurd results by eliminating this distinction and, in effect, impose on cities an obligation to immediately reconstruct all their facilities—a mandate Congress deliberately chose not to impose. *Id.* at 537. It further noted that, in a different portion of Title II—Part B, which governs public transportation agencies— Congress chose to include facilities in the same textual group containing programs, services, and activities, and to subject all of them to an overall accessibility requirement. Its decision to take a different approach in Part A, the portion of the ADA at issue here, shows that Congress intentionally treated facilities differently from services, programs, or activities. *Id.* at 537–38 (Congress could have "prohibit[ed] local governments from denying disabled individuals equal

24

access to *all* 'facilities, services, programs, or activities.' It did not.") (citing *Frame v. City of Arlington*, 657 F.3d 215, 234–45 (5th Cir. 2011) (en banc) (Jolly, J., dissenting in part and concurring in part)).

In the same vein, the First Circuit rejected a claim alleging that Boston, because of the condition of its sidewalks and curb ramps, failed to provide equal access to its services, programs, and activities. It explained that the plaintiffs failed to explain how "the conditions of municipal streets and sidewalks" denied anyone "access to any public service, program, or activity." *Iverson v. City of Boston*, 452 F.3d 94, 102–03 (1st Cir. 2006).

The Ninth and Fifth Circuits have also recognized the ADA's distinction between facilities and programs. The Ninth Circuit held that Title II required a school only to provide "access to its football games"—the relevant "program" under the ADA. It held that the school was not required to provide access to all facilities where games occurred, like stadium bleachers, and rejected the plaintiff's "contention that the relevant 'program' is the south-side bleachers," because that would confuse facilities with programs. *Daubert v. Lindsay Unified Sch. Dist.*, 760 F.3d 982, 988 (9th Cir. 2014). The Fifth Circuit agreed that program access to football games does not require access to a specific facility (in that case, the general admission public bleachers). *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 293 (5th Cir. 2012).

District courts have taken the same approach. In *Liberty Resources, Inc. v. City of Philadelphia*, No. CV 19-3846, 2020 WL 3642484, at *4 (E.D. Pa. July 6, 2020) (*Liberty Res. I*), the Eastern District of Pennsylvania explained that calling pedestrian rights-of-way a "program" would nullify the regulatory provisions allowing public entities to provide program access without making all facilities accessible. *Id.* The court therefore held that pedestrian facilities are not a "service, program, or activity." *Id.*

25

In sum, Title II and its regulations distinguish between "facilities" (physical structures like buildings and sidewalks) and "programs" (services, activities, or functions that may be offered at those facilities), requiring that programs be accessible but allowing public entities to achieve this through flexible methods that do not require making every facility accessible. By labeling pedestrian facilities a program, Plaintiffs wrongly collapse that distinction.

### 2. Congress intended that accessibility for new or altered facilities be defined by technical standards, not vague end results.

Plaintiffs' attempt to apply a vague "readily accessible" standard to the City's pedestrian facilities by calling them a "program" fails for a second reason: it ignores that, under the ADA and DOJ regulations, accessibility of new or altered facilities is evaluated with reference to specific design standards. 28 C.F.R. § 35.151(c). Congress required DOJ to issue "standards applicable to facilities" that are "consistent with the minimum guidelines and requirements issued by the [Access Board]." 42 U.S.C. § 12134(c); *see supra*, at 2–5. Thus, Congress singled out facilities, tasked the Access Board with developing technical standards for them, and instructed DOJ to implement the standards. Plaintiffs' approach pretends that none of this exists.

*City and County of San Francisco v. EPA*, 604 U.S. 334 (2025), holds that where, as here, Congress directed an agency to implement a general statutory requirement through promulgation of specific technical requirements, liability is determined by reference to those regulations, and not the statute's more general "end result" goals. In that case, the EPA issued water discharge permits that made the receiving entities responsible for achieving a statutory water quality goal without telling them how to achieve that result. *Id*. at 341–43. But the Clean Water Act ("CWA") contained a directive that EPA "impose requirements to 'implement' water quality standards." *Id*. at 347 (citing 33 U.S.C. § 1311(b)(1)(C)). The Court held that the word "implement" required EPA to establish concrete *steps* an entity could follow to achieve a result, not just the end-result;

26

it explained that "implementation" means taking actions designed "to give practical effect to and ensure of actual fulfillment by concrete measures." *Id.* (quoting Webster's Third New International Dictionary, at 1134). EPA thus had to "implement" the CWA by giving permittees notice of how to control their discharges. *Id*. at 337, 340–41.

Title II of the ADA mirrors the CWA by providing, "[DOJ] shall promulgate regulations in an accessible format that *implement* this part." 42 U.S.C. § 12134(a) (emphasis added). It instructs DOJ that implementing regulations "shall include standards applicable to facilities . . . consistent with" guidelines issued by the Access Board. *Id.* § 12134(c). Under the Supreme Court's reading of "implement," *San Francisco*, 604 U.S. at 347, DOJ was required to prescribe "concrete" steps cities could follow to achieve ADA compliance for new or altered facilities. As *San Francisco* makes clear, where design specifications are critical to assessing a facility's ADA compliance, they cannot be bypassed by appealing to a generalized accessibility goal.

Indeed, even before *San Francisco*, courts addressing Title II and III claims have recognized that the ADA is designed to provide regulated entities with specific standards to follow. Departing from the logic of its earlier *Barden* decision (which Plaintiffs rely on and which we address below), the Ninth Circuit stated that because "readily accessible" is a "vague phrase," a public entity is only required to comply with technical requirements set out in the Title II regulations. *George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1010 (9th Cir. 2009) (applying the DOT's Title II regulations).[17] It emphasized that courts are otherwise "ill-equipped . . . to make what amount to engineering, architectural, and policy determinations as to whether a particular design feature is feasible and desirable." *Id.* at 1012.

---

[17] Congress directed the Secretary of Transportation to issue regulations implementing the portion of Title II concerning public transportation. *See* 42 U.S.C. §§ 12143(b), 12149, 12164.

27

Similarly, courts interpret Title III's accessibility requirements for facilities by analyzing the technical standards Congress directed DOJ to issue. *See* 42 U.S.C. § 12186(b). For example, in *Scherr*, the Seventh Circuit recognized that because Congress delegated DOJ responsibility to issue regulations to enforce Title III, consistent with guidelines developed by the Access Board, these standards "determine compliance as a matter of law." 703 F.3d at 1076. Accordingly, the court scrutinized the applicable standards to determine whether a door hinge in a hotel room violated the ADA. *Id.* at 1077–78. It took care to avoid a result that would "render superfluous" the specific technical provisions. *Id.* at 1078; *see also Chapman*, 631 F.3d at 945 (explaining that accessibility under Title III "is defined" by the standards adopted in DOJ regulations).

And the Tenth Circuit likewise held that "Design Standards specifically addressing an issue are a better benchmark than more general prohibitions found in the statute itself," and that "[a] public accommodation that 'complies with these guidelines' is deemed 'accessible.'" *Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1220 (10th Cir. 2014). The court held that it was error to evaluate the design of stores based on "overarching aims" of the ADA, rather than considering whether the design complied with DOJ regulations. *Id.* at 1224; *see also Resnick v. Magical Cruise Co.*, 148 F. Supp. 2d 1298, 1305 (M.D. Fla. 2001) ("[B]uilders, owners, and proprietors of cruise ships have not been afforded notice of the standards with which they are required to comply, and absent such standards may not be subjected to abstract suits such as the instant matter.").

Thus, when Congress directs an agency to "implement" statutory requirements through specific technical standards (as it did for the accessibility of new or altered facilities), courts determine compliance based on those concrete regulatory standards, not vague statutory goals.

### 3. Plaintiffs ignore Title II's statutory and regulatory framework.

Plaintiffs' attempt to classify pedestrian facilities, in toto, as a "program" subject to a general "readily accessible" standard conflicts with both features of the ADA described above. Treating pedestrian facilities as a program, Plaintiffs ignore the text of the ADA singling out facilities and the regulatory provisions that (1) exempt existing facilities from accessibility requirements and (2) require new or altered facilities to be assessed by reference to specific technical design standards developed by an expert body. *See* 42 U.S.C. § 12134(c); 28 C.F.R. § 35.151(c); *supra* at 2–5. Plaintiffs cannot substitute a vague end-result of "readily accessible" for this carefully designed scheme. Courts "should hesitate to adopt 'an interpretation of a congressional enactment which renders superfluous another portion of that same law.'" *Scherr*, 703 F.3d at 1077 (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011)).

To support their program access claim, Plaintiffs cite *Barden v. City of Sacramento*, 292 F.3d 1073 (9th Cir. 2002), and a district court case citing it, Compl. ¶¶ 134, 145. But *Barden* does not rescue their claim. The Ninth Circuit's cursory opinion held that Sacramento's existing public sidewalks were a "program" and therefore subject to Title II's program access requirement. 292 F.3d at 1074. *Barden*'s reasoning has been rejected by later decisions. *E.g.*, *Babcock*, 812 F.3d at 536; *Liberty Res. I*, 2020 WL 3642484, at *4 n.2. Its analysis is also flawed in three crucial ways.

First, *Barden* declined to examine the text of the ADA or DOJ regulations, asserting that "[a]ttempting to distinguish which public functions are services, programs, or activities . . . would disintegrate into needless 'hair-splitting arguments.'" 292 F.3d at 1076. Instead, the court said that Title II encompasses "anything a public entity does," like maintaining sidewalks, *id.*, and deemed its broad reading consistent with "the ADA's fundamental purpose," *id.* at 1077.

29

*Barden*'s refusal to engage with the statutory text—dismissing it as "hair-splitting"— violates basic principles of statutory interpretation. Courts "interpret statutes," using "traditional tools of statutory construction, not individual policy preferences." *Loper Bright Enterps. v. Raimondo*, 603 U.S. 369, 403 (2024). A court cannot just "choose a construction of the statute" that it believes "effectuates Congress' 'overriding purpose.'" *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 458 (2002). The Ninth Circuit should have applied the principle that courts do not read a statute to render parts of it meaningless. *See Scherr*, 703 F.3d at 1077. Instead, it ignored that "facilities" is a distinct concept, defined to include pedestrian rights-of-way, *see* 42 U.S.C. § 12134(c); 28 C.F.R. § 35.104, and that Title II's regulations distinguish facilities and programs.[18]

Second, *Barden* admitted the regulations "do[ ] not specifically address the accessibility of sidewalks," but called its interpretation "consistent with the tenor of § 35.150," and an implied "general concern for the accessibility of public sidewalks." 292 F.3d at 1077. That was wrong, too. Section 35.150—which addresses existing facilities as a means to access *programs*—does not impose a sweeping obligation to make all sidewalks accessible. Nor did the court explain why it was proper to rewrite the regulation based on its "tenor" or an implied "concern." It was not. Because "it is a commonplace of statutory construction that the specific governs the general," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992), the specific requirements of § 35.150 must control, not a court's perception of the regulation's general "tenor" or unstated "concerns." And as *San Francisco* explained, such vague end-results cannot be substituted for concrete standards required to "implement" a statute. 604 U.S. at 347.

---

[18] The Sixth Circuit has also pointed out that facilities are not something a public entity "does"; they are locations where programs or services occur. *Babcock*, 812 F.3d at 540.

30

Third, *Barden* stated that "the conclusion that sidewalks are subject to the accessibility regulations is the position taken by [DOJ]." 292 F.3d at 1077. On its face, that statement does not suggest sidewalks are a "program." Regardless, courts reject "administrative guidance that conflicts with the statutory language it purports to implement." *San Francisco*, 604 U.S. at 355.

In sum, this Court should decline to follow *Barden*, adopt the sounder reasoning of courts that have rejected attempts to impose a vague "program" accessibility requirement on facilities like pedestrian infrastructure, and dismiss Plaintiffs' "program" claim.

### B. Plaintiffs' "program access" claim is insufficiently pleaded.

Even on Plaintiffs' view that the City has a pedestrian rights-of-way "program" within the meaning of Title II, Compl. ¶ 146, Plaintiffs fail to allege that the City's pedestrian facilities, viewed "in their entirety," are not readily accessible, *see* 28 C.F.R. § 35.150(a).

Plaintiffs offer no theory as to how to quantify such a claim. But by any measure, their allegations fall far short of demonstrating that the City's pedestrian facilities, viewed as a whole, are not readily accessible. They offer anecdotal accounts of some areas with cracked pavement, uneven sidewalks, and missing or difficult-to-use curb ramps. Compl. ¶¶ 80–118. But they admit that the City has over 7,400 miles of sidewalk. *Id.* ¶ 7. Plaintiffs make no attempt to weigh their allegations against the City's miles of ADA-compliant City sidewalks. Thus, Plaintiffs cannot plausibly show that the City's pedestrian rights-of-way, viewed on a citywide basis, violate the ADA. "The ADA does not require perfection." *Cal. Found. for Indep. Living Ctrs. v. Cty. of Sacramento*, 142 F. Supp. 3d 1035, 1063 (E.D. Cal. 2015) (cleaned up).

Plaintiffs also offer conclusory allegations that "substantial portions" of sidewalks, Compl. ¶ 7, or "many sidewalks," *id.* ¶ 4, are inaccessible. Plaintiffs cannot rely on conclusory allegations to state a claim. *See Iqbal*, 556 U.S. at 678. Nor is it enough to allege that the "City's pedestrian rights of way program, when viewed in its entirety, is [not] readily accessible to and

31

useable by people with mobility disabilities." Compl. ¶ 146. A claim cannot be based on "bare legal conclusions." *Adams v. City of Indianapolis*, 742 F.3d 720, 733 (7th Cir. 2014).

Plaintiffs' problem is not only quantitative, but also qualitative. Not only do they identify no concrete standards to measure accessibility, they do not explain how many of their allegations amount to access barriers at all. For instance, the Complaint is bereft of allegations explaining how CDOT's precise sidewalk diagrams do not provide adequate guidance to contractors for constructing ADA-complaint sidewalks. *Supra* at 12–13. And because the City's pedestrian rights-of-way must be viewed in their entirety, Plaintiffs must address why the public transit and paratransit options the City provides, *id.* at 11–12, are not viable alternatives to overcome access barriers that do exist. These are the sorts of "other methods" that can satisfy program access when facilities are inaccessible. 28 C.F.R. § 35.150(b)(1); *see Daubert*, 760 F.3d at 988 (holding that football games met program access standard despite inaccessible bleachers).

Finally, Plaintiffs are not helped by alleging that the City lacks a "coordinated, proactive system" to manage pedestrian facility repairs "and relies, instead, on complaint-based" approaches, Compl. ¶ 8, or complaining that the various programs the City uses to manage and pay for repairs are insufficient, *id*. ¶¶ 34–37, 40–79. Plaintiffs overlook many of the City's programs and funding streams for pedestrian facilities. *See supra* at 6–12. But regardless, these allegations do not suggest that the City has violated any statutory duty under Title II or Section 504. "[L]iability against the City cannot be imputed based on its general policies without reference to specific violations of the ADA." *Liberty Res. II*, 2021 WL 4989700, at *4.

For all these reasons, Plaintiffs fail to state a claim that the City's pedestrian rights-of-way, viewed in their entirety, are not readily accessible.

32

### III.   PLAINTIFFS LACK STANDING TO CHALLENGE THE PROVISION OF ACCESSIBLE TEMPORARY ROUTES, AND THE CLAIM LACKS MERIT.

Plaintiffs claim that the City has failed "to provide and maintain accessibility for temporary facilities or provide accessible paths of travel when the permanent route is eliminated due to construction for extended periods of time." Compl. ¶ 148. As explained above, the City's policy is to provide access during construction. *Supra*, at 6–8. But accepting Plaintiffs' factual allegations as true, Plaintiffs' claim should be dismissed for two reasons.

First, no Plaintiff has standing to challenge the accessibility of a temporary route. To enjoin future conduct, a plaintiff must show a "sufficient likelihood" of a future injury. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). It must be "certainly impending," not just possible. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "[A] past injury alone is insufficient to establish standing for purposes of prospective injunctive relief." *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017). For example, the Seventh Circuit has rejected a claim that a lack of snow removal might prevent plaintiffs with disabilities from attending court appearances as too speculative to establish standing. *Hummel*, 817 F.3d at 1019.

Plaintiffs allege no impending injury. They identify no site that currently fails to comply with any identified regulation. Plaintiff Haven alleges that in August 2024, she was aware of an allegedly "hazardous" curb ramp construction site, Compl. ¶ 95(j), but does not allege that she was injured by or even required to navigate it. Plaintiff Lee alleges that she once had to "rely on construction workers" to help her detour around a site, *id.* ¶ 109, but alleges no injury. Based on these allegations and given the City's policy to require accessible temporary routes, Plaintiffs' claims are purely speculative. They therefore lack standing.

Second, Plaintiffs fail to allege a plausible ADA or Section 504 claim because, as noted, they do not identify any regulation that the City has violated. The regulation cited, 36 C.F.R.

33

§ 1191, App'x B, § 201.3, makes the ADA applicable "to temporary and permanent buildings and facilities," *see* Compl. ¶ 147. Plaintiffs do not explain how the facts they allege establish a violation of this regulation. For this reason, too, the Court should dismiss their claim that the City fails to comply with the ADA by providing accessible routes during construction.

## IV. PLAINTIFFS' CLAIMS ALLEGING CDOT FAILED TO DESIGNATE AN ADA COORDINATOR, COMPLETE A SELF EVALUATION, AND PUBLISH A TRANSITION PLAN SHOULD BE DISMISSED BECAUSE THESE REGULATIONS ARE NOT PRIVATELY ENFORCEABLE.

Plaintiffs ask this Court to require CDOT to comply with 28 C.F.R. §§ 35.105, 35.150(d), and 35.107(a) by designating an ADA Coordinator and "publishing a Self-Evaluation and Transition Plan regarding the accessibility of the City's pedestrian rights of way." Compl. at 55 ¶ 2(f). This is not a remedy available to Plaintiffs. Although Title II and Section 504 create a private right of action, 42 U.S.C. § 12133, it does not extend to all implementing regulations. *See Alexander v. Sandoval*, 532 U.S. 275, 286–87, 291 (2001) (Title VI does not create a private right of action to enforce regulations). A regulation is privately enforceable if it prohibits conduct that the statute itself forbids; other obligations are not privately enforceable. *Id.* at 284–85.

Applying *Sandoval*, courts have deemed the Self-Evaluation and Transition Plan regulations not privately enforceable. *Lonberg v. City of Riverside*, 571 F.3d 846, 851–52 (9th Cir. 2009); *Iverson*, 452 F.3d at 101–02; *Ability Ctr. of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 913–15 (6th Cir. 2004). The First, Sixth, and Ninth Circuits held that the Transition Plan regulation, § 35.150(d)(1)–(2), is not privately enforceable because the ADA does not require such plans; a violation of § 35.150(d) does not deny program access; and its enforcement would not remedy discrimination. *Lonberg*, 571 F.3d at 852; *Iverson*, 452 F.3d at 10; *Ability Center*, 385 F.3d at 913. The First Circuit further held that § 35.105, which directs a public entity to undertake a Self-Evaluation of services, policies, and practices, is not privately enforceable.

34

*Iverson*, 452 F.3d at 101. Because a public entity could comply with Title II without following § 35.105, it is beyond the statutory cause of action. *Id.*; *see also Liberty Res. I*, 2020 WL 3642484, at *6 (rejecting request for injunction requiring a Self-Evaluation and Transition Plan); *Deck v. City of Toledo*, 76 F. Supp. 2d 816, 823 (N.D. Ohio 1999) ("[T]here is no private right of action to enforce the self-evaluation and transition plan requirements set forth in the regulations.").

The same reasoning applies to the claim that § 35.107(a) requires the City to designate an ADA Coordinator. *See* Compl. at 55 ¶ 2(f). Failure to do so does not exclude anyone from participation in a program, service or activity; deny benefits; or discriminate. This is simply an administrative requirement designed to help public entities organize their compliance efforts.

Plaintiffs seek injunctive relief requiring the City to comply with §§ 35.150(d), 35.105, and 35.107(a). Compl. at 55 ¶ 2(f). Plaintiffs are unable to privately enforce these regulations and cannot make an end-run around *Sandoval* by seeking such relief. These claims should be dismissed with prejudice and the accompanying prayer for relief stricken from the Complaint.[19]

## CONCLUSION

Plaintiffs' Complaint seeks declaratory and injunctive relief that exceeds the scope of Title II and Section 504. The Complaint fails to allege that any pedestrian facility violates statutory and regulatory requirements. Further, Plaintiffs do not allege the denial of access to any City service, program, or activity. And Plaintiffs' other claims are not privately enforceable. The Complaint should therefore be dismissed in its entirety, with prejudice.

---

[19] The City complies with these regulations. The MOPD Commissioner is its ADA Coordinator. *Supra*, at 11–12. Both MODP and the 311 system accept access barrier complaints and grievances. *See id.* And CDOT employs strategic planning to address sidewalk repairs, curb ramps, and upgrades to pedestrian facilities. *Supra*, at 8–11. Further, the Self-Evaluation regulation does not require a public entity to evaluate *facilities*, but instead "its current services, policies, and practices." 28 C.F.R. § 35.105(a).

35

Dated: February 13, 2026

Respectfully submitted,

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of Chicago

By: */s/ Ellen Wight McLaughlin*
  Chief Assistant Corporation Counsel

ANDREW WORSECK
andrew.worseck@cityofchicago.org
ELLEN WIGHT MCLAUGHLIN
ellen.mclaughlin@cityofchicago.org
IVAN PARFENOFF
ivan.parfenoff@cityofchicago.org
ALEXANDRA GISELLE BELZLEY
alexandra.belzley@cityofchicago.org
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
2 N. LaSalle Street, Ste. 520
Chicago, Illinois 60602
(312) 744-7129 / 742-5147 / 744-4439 / 744-4216

MATTHEW PAYNE
mpayne@foxrothschild.com
JOHN HANSBERRY
jhansberry@foxrothschild.com
Fox Rothschild LLP
321 N. Clark Street, Ste. 1600
Chicago, IL 60654
(312) 517-9200
*Attorneys for Defendant City of Chicago*