**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHERLNELL LANE, ILIANA RIVERA HAVEN, and KEVIN SULLIVAN on behalf of themselves and all others similarly situated,** | ) ) ) ) | **Case No. 1:25-cv-10880** |
| | ) | |
| **Plaintiffs,** | ) | **Judge Georgia N. Alexakis** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF CHICAGO,** | ) ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT
CITY OF CHICAGO'S MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ........................................................................................................1

STATUTORY AND REGULATORY BACKGROUND......................................................2

ARGUMENT...............................................................................................................4

I.      PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS ....................................4

II.     THE COURT SHOULD DENY THE CITY'S REQUEST TO LOOK PAST
        PLAINTIFFS' WELL-PLEADED ALLEGATIONS AND CONSIDER
        EXTRANEOUS MATERIALS ....................................................................................7

III.    PLAINTIFFS ADEQUATELY PLEAD CLAIMS FOR VIOLATION OF THE
        ADA AND SECTION 504 ......................................................................................12

        A.      The Relevant Service, Program, or Activity Is the City's Construction,
                Alteration, Maintenance, and Regulation of Its Pedestrian Rights of Way ..........13

        B.      Plaintiffs Adequately Plead All Elements of Their Claims ...................................17

                1.      Plaintiffs adequately plead that the City fails to ensure newly
                        constructed and altered facilities in the pedestrian rights of way
                        are readily accessible to and usable by people with mobility
                        disabilities. ...................................................................................19

                        a.      Plaintiffs adequately plead a claim for both curb ramps
                                and other facilities..........................................................20

                                (1)     Curb Ramps ..................................................20

                                (2)     Other Facilities.............................................22

                        b.      Plaintiffs adequately plead barriers to accessibility.......................26

                2.      Plaintiffs adequately plead that the City fails to maintain newly
                        constructed and altered facilities in the pedestrian right of way................28

                3.      Plaintiffs adequately plead that, with respect to existing
                        facilities, the City fails to operate the pedestrian rights of way
                        program so that it is readily accessible to and usable by people
                        with mobility disabilities when viewed in its entirety. ............................30

                4.      Plaintiffs adequately plead that the City fails to ensure access to
                        the pedestrian rights of way during construction. ....................................32

IV.     PLAINTIFFS' PRAYER FOR RELIEF IS PROPER ......................................................33

CONCLUSION............................................................................................................35

i

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Access Living of Metro. Chi., Inc. v. City of Chicago*,
372 F. Supp. 3d 663 (N.D. Ill. 2019) ............................................................................ 21

*Access Living of Metro. Chi., Inc. v. City of Chicago*,
752 F. Supp. 3d 922 (N.D. Ill. 2024) ............................................................................ 18

*Access Living of Metro. Chi., Inc. v. Uber Techs., Inc.*,
351 F. Supp. 3d 1141 (N.D. Ill. 2018) ............................................................................ 6

*Access Living of Metro. Chi., Inc. v. Uber Techs., Inc.*,
958 F.3d 604 (7th Cir. 2020) ..................................................................................... 5, 7

*Am. Council of the Blind of Metro. Chi. v. City of Chicago* ("*ACBMC I*"),
461 F. Supp. 3d 820 (N.D. Ill. 2020) ......................................................................... 5, 6

*Am. Council of the Blind of Metro. Chi. v. City of Chicago* ("*ACBMC II*"),
667 F. Supp. 3d 767 (N.D. Ill. 2023) ................................. 3, 15, 17, 22, 25, 26, 30, 31

*Am. Council of the Blind of Metro. Chi. v. City of Chicago* ("*ACBMC III*"),
2025 WL 4694007 (N.D. Ill. May 29, 2025) ................................................................ 34

*Babcock v. Michigan*,
812 F.3d 531 (6th Cir. 2016) ........................................................................................ 16

*Barden v. City of Sacramento*,
292 F.3d 1073 (9th Cir. 2002) ........................................................................... 14, 15, 16

*Bassilios v. City of Torrance*,
166 F. Supp. 3d 1061 (C.D. Cal. 2015) ........................................................................ 28

*Berardi v. City of Pekin*,
2021 WL 1535409 (C.D. Ill. 2021) .............................................................................. 20

*Blink v. Union Pac. R.R. Co.*,
2026 WL 396343 (N.D. Ill. Feb. 12, 2026) .................................................................. 11

*Block v. HZ Ops Holdings, Inc.*,
2020 WL 9749412 (N.D. Ill. Oct. 27, 2020) .................................................................. 7

*Bowers v. Dart*,
2017 WL 4339799 (N.D. Ill. Sept. 29, 2017), *aff'd*, 1 F.4th 513 (7th Cir. 2021) ...................... 25

*Bryant v. Compass Grp. USA, Inc.*,
958 F.3d 617 (7th Cir. 2020) .......................................................................................... 4

ii

**Page(s)**

*C.B. ex rel. W.B. v. Moreno Valley Unified Sch. Dist.*,
   2024 WL 3259034 (C.D. Cal. June 28, 2024) .................................................. 34

*Californians for Disability Rts., Inc. v. Cal. Dep't of Transp.*,
   2009 WL 2982847 (N.D. Cal. Sept. 14, 2009) .............................................. 32

*Carter v. City of Chicago*,
   520 F. Supp. 3d 1024 (N.D. Ill. 2021) ...................................................... 6, 31

*Celeste v. E. Meadow Union Free Sch. Dist.*,
   373 F. App'x 85 (2d Cir. 2010) ..................................................................... 31

*Chapman v. Pier 1 Imports (U.S.) Inc.*,
   631 F.3d 939 (9th Cir. 2011) ........................................................................ 24

*City & County of San Francisco v. EPA*,
   604 U.S. 334 (2025) ...................................................................................... 26

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) .......................................................................................... 4

*Classen v. Ali's Invs., LLC*,
   2024 WL 4286116 (E.D. Wis. Sept. 25, 2024) ............................................ 23

*Cohan v. Medline Indus., Inc.*,
   2014 WL 4244314 (N.D. Ill. Aug. 27, 2014) ................................................. 7

*Cohen v. City of Culver City*,
   754 F.3d 690 (9th Cir. 2014) .................................................................. 14, 29

*Colo. Cross Disability Coal. v. Abercrombie & Fitch Co.*,
   765 F.3d 1205 (10th Cir. 2014) .................................................................... 26

*Culvahouse v. City of LaPorte*,
   679 F. Supp. 2d 931 (N.D. Ind. 2009) .................................................... 14, 16

*Curran v. City of Oakland*,
   2025 WL 3485360 (N.D. Cal. Dec. 4, 2025) ................................................ 23

*Daniel v. Cook County*,
   833 F.3d 728 (7th Cir. 2016) .......................................................................... 9

*Deck v. City of Toledo*,
   76 F. Supp. 2d 816 (N.D. Ohio 1999) .......................................................... 35

*Disabled in Action v. Bd. of Elections in City of N.Y.*,
   752 F.3d 189 (2d Cir. 2014) .............................................................. 28, 30, 34

**Page(s)**

*Doss v. Clearwater Title Co.*,
   551 F.3d 634 (7th Cir. 2008) ........................................................................... 10, 11

*Dunmore v. Shicker*,
   2020 WL 65057 (S.D. Ill. Jan. 7, 2020) ................................................................ 25

*Ellison v. U.S. Postal Serv.*,
   84 F.4th 750 (7th Cir. 2023) ......................................................................... 27, 31

*Ennenga v. Starns*,
   677 F.3d 766 (7th Cir. 2012) ................................................................................. 9

*Evans v. City of Chicago*,
   2001 WL 1028401 (N.D. Ill. Sept. 6, 2001) ........................................................ 35

*Fortyune v. City of Lomita*,
   766 F.3d 1098 (9th Cir. 2014) .................................................................... 15, 25

*Fosnight v. Jones*,
   41 F.4th 916 (7th Cir. 2022) ............................................................................... 10

*Frame v. City of Arlington*,
   657 F.3d 215 (5th Cir. 2011) ............................................................... 14, 15, 16

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
   503 U.S. 60 (1992) ............................................................................................... 34

*Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*,
   128 F.3d 1074 (7th Cir. 1997) ............................................................................... 9

*George v. Bay Area Rapid Transit*,
   577 F.3d 1005 (9th Cir. 2009) ............................................................................. 26

*Goodlaxson v. Mayor of Baltimore*,
   776 F. Supp. 3d 311 (D. Md. 2025)..................................................................... 23

*Hamer v. City of Trinidad*,
   441 F. Supp. 3d 1155 (D. Colo. 2020) .......................................................... 14, 15

*Hishon v. King & Spalding*,
   467 U.S. 69 (1984) ................................................................................................. 8

*Hispanics United of DuPage Cnty. v. Village of Addison*,
   248 F.3d 617 (7th Cir. 2001) ............................................................................... 22

*Hummel v. St. Joseph County Board of Commissioners*,
   817 F.3d 1010 (7th Cir. 2016) ......................................................................... 6, 33

**Page(s)**

*Iverson v. City of Boston*,
452 F.3d 94 (1st Cir. 2006) ................................................................................... 16

*Jaros v. Ill. Dep't of Corr.*,
684 F.3d 667 (7th Cir. 2012) ................................................................................ 17

*Kaper v. Pa. Game Comm'n*,
2024 WL 4437645 (M.D. Pa. Oct. 7, 2024) ........................................................ 21

*Kinney v. Yerusalim*,
9 F.3d 1067 (3d Cir. 1993) ................................................................................... 20

*Kirola v. City & County of San Francisco*,
860 F.3d 1164 (9th Cir. 2017) ............................................................................. 23

*Lacy v. Cook,*
897 F.3d 847 (7th Cir. 2018) ............................................................................... 18

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ............................................................................... 16

*Levenstein v. Salafsky*,
164 F.3d 345 (7th Cir. 1998) ................................................................................. 9

*Liberty Resources, Inc. v. City of Philadelphia* ("*Liberty Resources I*"),
2020 WL 3642484 (E.D. Pa. July 6, 2020) ......................................................... 17

*Liberty Resources, Inc. v. City of Philadelphia* ("*Liberty Resources II*"),
2021 WL 4989700 (E.D. Pa. Oct. 27, 2021) ........................................................ 22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................................... 4

*Mason v. City of Huntsville*,
2012 WL 4815518 (N.D. Ala. Oct. 10, 2012) ..................................................... 14

*McDaniel v. Syed*,
115 F.4th 805 (7th Cir. 2024) .............................................................................. 17

*Mich. Paralyzed Veterans of Am., Inc. v. Mich. Dep't of Transp.*,
2017 WL 5132912 (E.D. Mich. Nov. 6, 2017) .................................................... 14

*Moore v. W. Ill. Corr. Ctr.*,
89 F.4th 582 (7th Cir. 2023) ................................................................................ 17

*Mote v. City of Chelsea* ("*Mote I*"),
252 F. Supp. 3d 642 (E.D. Mich. 2017) .............................................................. 17

**Page(s)**

*Mote v. City of Chelsea* ("*Mote II*"),
   284 F. Supp. 3d 863, 883 (E.D. Mich. 2018) .......................................................... 14

*N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*,
   63 F.3d 449 (7th Cir. 1998) ...................................................................................... 8

*Oconomowoc Residential Progs. v. City of Milwaukee*,
   300 F.3d 775 (7th Cir. 2002) .................................................................................. 13

*Payton v. County of Kane*,
   308 F.3d 673 (7th Cir. 2002) .................................................................................... 6

*Proft v. Raoul*,
   944 F.3d 686 (7th Cir. 2019) .................................................................................... 8

*REM Props. v. ExxonMobil Oil Corp.*,
   2023 WL 5152665 (N.D. Ill. Aug. 10, 2023) ................................................ 10, 11, 33

*Resnick v. Magical Cruise Co.*,
   148 F. Supp. 2d 1298 (M.D. Fla. 2001) ................................................................... 26

*Richburg v. Conagra Brands, Inc.*,
   2023 WL 1818561 (N.D. Ill. 2023) ......................................................................... 10

*Robles v. Domino's Pizza, LLC*,
   913 F.3d 898 (9th Cir. 2019) .................................................................................. 35

*Scherr v. Marriott Int'l, Inc.*,
   703 F.3d 1069 (7th Cir. 2013) ....................................................................... 5, 6, 7, 26

*Scott v. Jeffreys*,
   2022 WL 2715802 (N.D. Ill. July 13, 2022) ........................................................... 15

*Shotz v. Cates*,
   256 F.3d 1077 (11th Cir. 2001) ..................................................................... 27, 30, 31

*Simmons v. Village of Minier*,
   2022 WL 3048115 (C.D. Ill. Aug. 2, 2022) ............................................................ 25

*Sparks v. City of Peoria*,
   2009 WL 3764032 (C.D. Ill. Nov. 10, 2009) .......................................................... 25

*Steimel v. Wernert*,
   823 F.3d 902 (7th Cir. 2016) ............................................................................ 33, 34

*Straw v. Village of Streamwood*,
   734 F. App'x 344 (7th Cir. 2018) ............................................................................ 29

**Page(s)**

*Tamayo v. Blagojevich,*
   526 F.3d 1074 (7th Cir. 2008) ................................................................. 8

*Tennessee v. Lane,*
   541 U.S. 509 (2004) ................................................................. 2, 25

*Tex. Hill Country Landscaping, Inc. v. Caterpillar, Inc.,*
   522 F. Supp. 3d 402 (N.D. Ill. 2021) ................................................................. 7

*Thomas v. Kohl's Corp.,*
   2018 WL 704691 (N.D. Ill. Feb. 5, 2018) ................................................................. 25

*Trivette v. Tenn. Dep't of Corr.,*
   739 F. Supp. 3d 663 (M.D. Tenn. 2024) ................................................................. 35

*Walsh v. Dania Inc.,*
   716 F. Supp. 3d 655 (N.D. Ill. 2024) ................................................................. 27

*Willits v. City of Los Angeles,*
   925 F. Supp. 2d 1089 (C.D. Cal. 2013) ................................................................. 14

**STATUTES**

29 U.S.C. § 794 ................................................................. 14, 17, 18

29 U.S.C. § 795a ................................................................. 33

42 U.S.C. § 12101 ................................................................. 2, 3, 4

42 U.S.C. § 12132 ................................................................. 2, 12, 13, 17

42 U.S.C. § 12133 ................................................................. 33

42 U.S.C. § 12183 ................................................................. 24

42 U.S.C. § 2000d-7 ................................................................. 33

**OTHER AUTHORITIES**

H.R. Rep. No. 101-485, pt. 2, reprinted 1990 U.S.C.C.A.N. 303 ................................................................. 4

Public Right-of-Way Accessibility Guidelines,
   88 Fed. Reg. 53604, 53605 (Aug. 8, 2023) ................................................................. 24

**RULES**

Fed. R. Civ. P. 10 ................................................................. 8

Fed. R. Civ. P. 12 ................................................................. 9

**Page(s)**

Fed. R. Civ. P. 8 ...................................................................................................... 8

Fed. R. Evid. 201 ................................................................................................. 8, 9

Fed. R. Evid. 201(b) advisory committee's note ............................................... 11, 12

## REGULATIONS

28 C.F.R. § 35.104 .......................................................................................... 2, 24, 30

28 C.F.R. § 35.130 .................................................................................................... 2

28 C.F.R. § 35.133 .............................................................................................. 28, 29

28 C.F.R. § 35.149 .................................................................................................... 2

28 C.F.R. § 35.150 ............................................................................. 2, 3, 30, 31, 32, 35

28 C.F.R. § 35.151 ............................................................................... 2, 3, 4, 20, 24

28 C.F.R. pt. 35, App. A ......................................................................................... 13

36 C.F.R. pt. 1190, App. ........................................................................................... 3

36 C.F.R. pt. 1191, App. B 201.3 .......................................................................... 32

**INTRODUCTION**

Sidewalks are the gateway to public life. The Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504") promise people with mobility disabilities equal access to that gateway—and Plaintiffs Cherlnell Lane, Iliana Rivera Haven, and Kevin Sullivan filed this putative class action to vindicate that promise in the City of Chicago. Across more than 150 paragraphs and over fifty pages, Plaintiffs' First Amended Complaint ("FAC," Dkt. 39) catalogs in granular detail the broken curb ramps, impassable panels, obstructed crossings, and other sidewalk barriers that violate the ADA and Section 504. Those allegations easily establish both Plaintiffs' standing and their claims of unequal access to the City's pedestrian rights of way. The Court must allow this case to proceed unless no relief could be granted under *any* set of facts consistent with the Complaint. Plaintiffs clear that threshold.

Unable to meet Plaintiffs' allegations on their own terms, the City tries to raise the bar. Its brief leans heavily on facts drawn not from the pleadings but from the hundreds of pages appended to its motion. The City says the Court can take judicial notice of the countless "facts" in these voluminous materials, but binding Seventh Circuit precedent and the plain text of Federal Rule of Evidence 201 say otherwise. Judicial notice is not a back door to summary judgment, and the Court should disregard the City's extraneous materials and the arguments built on them.

Even if the Court considers these materials (it should not), the City's arguments fail at every turn. It challenges Plaintiffs' standing but misapprehends how Article III operates in a class action—named Plaintiffs plead concrete, recurring, redressable injuries, and that is all they must do at this stage. The City's merits attack fares no better. The City's position that maintenance of its sidewalks is not a "program" runs headlong into the overwhelming weight of authority, including a recent decision of this district. Its catalog of supposed pleading deficiencies ignores the detailed factual allegations of the Amended Complaint and the case law confirming those

1

allegations more than suffice. Plaintiffs plausibly plead multiple, independent violations of the ADA and Section 504. The motion should be denied.

## STATUTORY AND REGULATORY BACKGROUND

Congress enacted the ADA in 1990 to establish "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. The Supreme Court has recognized that Congress enacted Title II in response to "pervasive unequal treatment in the administration of state services and programs," including the denial of fundamental rights. *Tennessee v. Lane*, 541 U.S. 509, 524 (2004). The statute's implementing regulations further define this nondiscrimination mandate. Under those regulations, a public entity may not afford "a qualified individual with a disability an opportunity to participate in or benefit from an aid, benefit, or service that is not *equal* to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii).[1]

These principles apply with full force to claims involving physical access to government programs and services. *See id.* §§ 35.149–51. The regulations provide that "no qualified individual with a disability shall, because a public entity's facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity." *Id.* § 35.149. Facilities are defined broadly to include "all or any portion of . . . roads, walks, passageways, [and] parking lots." *Id.* § 35.104.

The ADA's regulations impose distinct obligations on public entities depending on whether the relevant facility is newly constructed, altered, or existing. For facilities newly

---

[1] Unless otherwise indicated all emphasis is added.

constructed after January 26, 1992, Title II requires that "[e]ach facility or part of a facility constructed . . . be designed and constructed" to be "readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.151(a)(1). Facilities altered in a manner that affects or could affect their usability after January 26, 1992, must be "readily accessible to and usable by individuals with disabilities . . . to the maximum extent feasible." *Id.* § 35.151(b)(1).

New construction and alterations must comply with applicable, enforceable design standards, which vary depending on the date of construction. *Id.* § 35.151(c). These standards are the Uniform Federal Accessibility Standards ("UFAS"), the ADA Accessibility Guidelines ("ADAAG"), and the 2010 Standards for Accessible Design ("ADAS"), collectively referred to as the "Disability Access Standards." In 2023, the U.S. Access Board published the Public Rights of Way Accessibility Guidelines ("PROWAG"), which the Department of Justice has not yet adopted as enforceable standards. *See* 36 C.F.R. pt. 1190, App. Yet the absence of a formally adopted design standard does not relieve a public entity of its underlying obligation to ensure that newly constructed and altered facilities are readily accessible to and usable by people with disabilities. *Am. Council of the Blind of Metro. Chi. v. City of Chicago*, 667 F. Supp. 3d 767, 777–78 (N.D. Ill. 2023) ("*ACBMC II*").

For existing facilities, Title II requires public entities to operate each service, program, or activity so that, "when viewed in its entirety," it is "readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). The regulations contemplate that "alteration of existing facilities and construction of new facilities" is one of the methods public entities may employ to meet this requirement. *Id.* § 35.150(b)(1).

The ADA ensures individuals with disabilities have access to the public right of way. *See, e.g.*, 42 U.S.C. § 12101(a)(3) (recognizing that discrimination persists in "transportation" and

"access to public services"); *id*. § 12101(a)(5) (noting "discriminatory effects of architectural, transportation, and communication barriers"); *see also* 28 C.F.R. § 35.151(i)(2) ("Newly constructed or altered street level pedestrian walkways must contain curb ramps . . . ."). As the House Report accompanying the ADA explained, the Act's guarantees would be "meaningless" if individuals with disabilities "were not afforded the opportunity to travel on and between the streets." H.R. Rep. No. 101-485, pt. 2, at 84, reprinted 1990 U.S.C.C.A.N. 303, 367.

## ARGUMENT

The City's motion makes four principal requests of the Court: (1) to dismiss Plaintiffs' Amended Complaint for lack of standing; (2) to take judicial notice of facts in hundreds of pages of appended materials; (3) to dismiss Plaintiffs' Amended Complaint for failure to state a claim; and (4) to strike certain aspects of Plaintiffs' requested relief. *See* Def.'s Mem. Supp. Mot. to Dismiss (Dkt. 48-1) ("Mem."). The Court should deny each request.

## I.     PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS

Plaintiffs adequately plead Article III standing, including for the injunctive relief they seek. To have Article III standing, a plaintiff must show (1) "an actual or imminent, concrete and particularized injury-in-fact"; (2) "a causal connection between her injury and the conduct complained of"; and (3) "a likelihood that this injury will be redressed by a favorable decision." *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 620–21 (7th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). To have standing to seek injunctive relief, a plaintiff must face a "real and immediate threat of injury," as opposed to a threat that is "conjectural" or "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102–03 (1983).

Plaintiffs easily satisfy these requirements. They plead in detail how the structural barriers alleged—missing or unusable curb ramps, excessive slopes, abrupt level changes, gaps and holes, and construction-related obstructions—regularly impede their access to the City's pedestrian rights

4

of way, forcing them into the street, onto longer routes, or to forego trips altogether. FAC ¶¶ 81–86 (detailing the barriers faced by Plaintiff Lane), ¶¶ 87–98 (barriers faced by Plaintiff Rivera Haven), ¶¶ 99–105 (barriers faced by Plaintiff Sullivan). These injuries flow from the City's deficient maintenance and oversight and can be redressed by the policy and operational changes Plaintiffs seek. *Id.* ¶¶ 35–80.

Plaintiffs also allege a real and immediate threat of future injury. They continue to encounter barriers throughout the neighborhoods where they live, work, obtain medical care, shop, and visit family. *Id.* ¶¶ 82–86, 90–94, 100–05. Courts routinely find such allegations sufficient under Title II and Section 504. *See, e.g.*, *Am. Council of the Blind of Metro. Chi. v. City of Chicago*, 461 F. Supp. 3d 820, 823 (N.D. Ill. 2020) ("*ACBMC I*") ("[T]here is no dispute that the individual plaintiffs—all of whom are blind and claim injuries caused by the City's failure to provide [accessible pedestrian signals] adapted for blindness—have standing[.]").

The City contends Plaintiffs lack standing because they (1) fail to plead an "intent to return" to the inaccessible pedestrian rights of way, and (2) plead facts about only a "fraction of the City's pedestrian infrastructure." Both arguments fail. By arguing Plaintiffs failed to plead an "intent to return," the City ignores the detailed allegations in Plaintiffs' Amended Complaint about Plaintiffs' regular, ongoing, and required use of the City's pedestrian rights of way as part of their everyday life. *See* FAC ¶¶ 82–83, 90–94, 101–03, 105. The City, moreover, relies on cases deciding fundamentally different allegations relevant to an intent to return, and even in those decisions, courts found plaintiffs established a likelihood of future harm in situations far less certain than the one here. *See* Mem. at 15 (citing *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073–75 (7th Cir. 2013); *Access Living of Metro. Chi., Inc. v. Uber Techs., Inc.*, 958 F.3d 604, 613–15 (7th Cir. 2020)).

Contrary to the City's suggestion, Plaintiffs are not akin to the plaintiffs in *Scherr v. Marriott International, Inc.* for which the court denied standing on the basis that a wish to "some day" return to an isolated location is insufficient for intent to return. Mem. at 15 (quoting *Scherr*, 703 F.3d at 1074). Instead, Plaintiffs use and rely on the City's pedestrian rights of way each time they go anywhere in Chicago. Plaintiffs' claims are also different from those in *Hummel v. St. Joseph County Board of Commissioners*, where the individual plaintiff failed to show an intent to return to a very specific location—county courthouses—not an entire network of sidewalks. 817 F.3d 1010, 1019–23 (7th Cir. 2016). And while Plaintiffs' claims are dissimilar from the plaintiffs' in *Access Living of Metropolitan Chicago, Inc. v. Uber Technologies, Inc.*, even there, the court found two individual plaintiffs demonstrated a likelihood of future harm based on their desire to use Uber, despite never even downloading the mobile app. 351 F. Supp. 3d 1141, 1150–51 (N.D. Ill. 2018) (finding two plaintiffs had standing to sue based on their desire to use Uber, despite never downloading the mobile app). Here, Plaintiffs face an immediate threat of future harm that is not speculative given their regular reliance on the City's pervasive pedestrian right of way program. In such cases, standing is easily established. *See, e.g.*, *ACBMC I*, 461 F. Supp. 3d at 823 (holding that plaintiffs had standing to sue under Title II and Section 504 regarding program barriers to the City's network of pedestrian signals); *Carter v. City of Chicago*, 520 F. Supp. 3d 1024, 1031 (N.D. Ill. 2021) (holding that plaintiff had standing to sue under Title II and Section 504 regarding program barriers to City's emergency shelters).

The City's other argument—that Plaintiffs must plead an "intent to return" to locations across the City and identify deficiencies across the entire city—misapprehends standing in a putative class action. Before certification, standing is assessed based on the named plaintiffs' own injuries. *See Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (individual standing

6

should not be conflated with class certification); *Cohan v. Medline Indus., Inc.*, 2014 WL 4244314, at *2 (N.D. Ill. Aug. 27, 2014) (named plaintiff need not show standing for the "class as a whole" before class certification). Because class actions are a device to consolidate common claims, the question of "whether the named plaintiffs may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but . . . [a] Rule 23" issue. *Tex. Hill Country Landscaping, Inc. v. Caterpillar, Inc.*, 522 F. Supp. 3d 402, 408 (N.D. Ill. 2021) (citation modified); *see also Block v. HZ Ops Holdings, Inc.*, 2020 WL 9749412, at *3 (N.D. Ill. Oct. 27, 2020) (holding plaintiff established individual standing by pleading as to his personal experience with accessibility barriers at one location and defendants' other arguments implicated only class standing). To accept the City's position to the contrary would subvert Rule 23's rationale by requiring named plaintiffs to plead the specific facts of the entire class's injuries before certification. *See Cohan*, 2014 WL 4244314, at *2 ("Standing in the class action context can and should be evaluated with respect to the individual named-plaintiff and later—in the event a class is certified—with respect to the class as a whole."). Tellingly, none of the cases the City cites is a class action. *See Scherr*, 703 F.3d at 1069, 1073; *Access Living*, 958 F.3d at 604, 606–07. Nor does the City cite any case supporting its claim that the Seventh Circuit "routinely" rejects allegations like Plaintiffs'. Mem. at 16.

Because Plaintiffs plead facts sufficient to show standing for their own injuries, the Court should deny the City's motion to dismiss for lack of jurisdiction.

## II. THE COURT SHOULD DENY THE CITY'S REQUEST TO LOOK PAST PLAINTIFFS' WELL-PLEADED ALLEGATIONS AND CONSIDER EXTRANEOUS MATERIALS

Before turning to the City's arguments that Plaintiffs' allegations fail to state a claim, the City's motion asks the Court to look past the well-pleaded allegations of Plaintiffs' Amended Complaint and instead consider more than 500 pages of extraneous materials, including the

7

Chicago Department of Transportation Rules and Regulations (315 pages) and the Consultant Construction Engineer Procedural Guidelines (199 pages). *See* Mem. at 5, 7, 19. The City's sole support for that extraordinary request is a single footnote reciting the standard for judicial notice and its own *ipse dixit* that the records satisfy it. *Id.* at 5 n.5 (quoting Fed. R. Evid. 201(b)(2)). The City's request seeks to subvert the purpose of judicial notice to have the Court prematurely make factual determinations at the motion-to-dismiss stage. The City has not shown that the records are appropriate for judicial notice, and the Court should disregard them.

The standard of review for a motion to dismiss is straightforward and familiar. A court must "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). The complaint need only provide a "'short and plain statement of the claim showing that [Plaintiff is] entitled to relief,' sufficient to provide the defendant with 'fair notice' of the claim and its basis." *Tamayo*, 526 F.3d at 1081 (quoting Fed. R. Civ. P. 8(a)(2)). Courts should therefore deny a motion to dismiss unless "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

The Court's review at the motion-to-dismiss stage is limited to the "pleadings"—"the complaint, the answer, and any written instruments attached as exhibits" to those documents. *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (citing Fed. R. Civ. P. 10(c)). There are narrowly prescribed circumstances in which a court may consider materials outside the pleadings: where the court takes judicial notice of certain adjudicative facts under Federal Rule of Evidence 201, where the documents are referenced in the complaint and are

8

central to the plaintiff's claim, or where the court elects to convert the motion to dismiss into a motion for summary judgment under Federal Rule of Civil Procedure 56. *See Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). Where none of the circumstances apply, the court must disregard such materials. *See id*. Here, the City does not contend that its exhibits are referenced in the Amended Complaint or central to the claims therein. Thus, the City's attempt to rely on the materials turns on whether they are subject to judicial notice.[2] They are not.

"Judicial notice is a powerful tool that must be used with caution." *Daniel v. Cook County*, 833 F.3d 728, 742 (7th Cir. 2016). Under Federal Rule of Evidence 201, courts can notice facts that are "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b). Courts are to "strictly adhere to these criteria," and apply judicial notice "narrow[ly]." *Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080–81 (7th Cir. 1997). Indeed, courts are to reserve judicial notice for "universal truth[s]" that "establish[] that the plaintiff cannot satisfy the 12(b)(6) standard." *Id*. at 1081. As a result, courts in this circuit typically take judicial notice only of facts of "common knowledge," and do so sparingly, reserving judicial notice for discrete, readily verifiable facts, such as the contents of public court records. *See, e.g.*, *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012) (taking judicial notice of the dates on which certain actions were taken or were required to be taken in the earlier state court litigation).

Although it offers little explanation for its request, the City's position appears to be that documents are judicially noticeable because they are publicly available government-created documents. *See* Mem. at 5 n.5. That is incorrect and would upend courts' approach to judicial

---

[2] If the Court elects to consider the City's extraneous materials by converting its motion to one for summary judgment, it must provide Plaintiffs with a "reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

notice. The City cites only a single case, *Fosnight v. Jones*, 41 F.4th 916 (7th Cir. 2022), which does not support the City's purported standard. Mem. at 5 n.5. That case does not describe the scope of judicial notice, nor does it address the kind of blanket request the City makes in its brief. *See Fosnight*, 41 F.4th at 922. Instead, it simply recites the general proposition that "judges may take judicial notice of matters of public record when ruling on a motion to dismiss." *Id.*

The City's position is squarely contradicted by authority in this circuit. Courts routinely decline to take judicial notice of facts contained within publicly available records, including those created and maintained by the government. *See, e.g.*, *REM Props. v. ExxonMobil Oil Corp.*, 2023 WL 5152665, at *5–6 (N.D. Ill. Aug. 10, 2023) (declining to take judicial notice of 264 pages of Illinois Secretary of State records and exhibits and explaining that, while the public report's existence may be judicially noticed, "its contents need not be taken as 'universal truth' at this stage in the case's proceeding"); *see also Doss v. Clearwater Title Co.*, 551 F.3d 634, 639–40 (7th Cir. 2008) (holding that the district court erred by taking judicial notice of a publicly recorded deed to resolve disputed factual issues). When courts do take judicial notice of governmental records, that notice is typically confined to specific facts that are not subject to reasonable dispute. *See, e.g.*, *Richburg v. Conagra Brands, Inc.*, 2023 WL 1818561, at *3 (N.D. Ill. 2023) (taking judicial notice of a report produced by the Food and Drug Administration in part because its accuracy could not reasonably be questioned). In those situations, courts take judicial notice of public records because they originated from authoritative sources that held credible expertise in the facts to be noticed, and in so doing, consider the credibility of each document as to the respective purpose for which the party seeks its notice. *See REM*, 2023 WL 5152665, at *5 (holding judicial notice "is typically rooted in the documents' authority on the subject matter"). They do not—as the City contends— take judicial notice of entire documents because they are publicly available from government

sources. *See id*. (stressing judicial notice of government documents is not based on "their mere accessibility").

Indeed, the City's position is unworkable in practice. If it were correct that all government-created public documents were judicially noticeable, the government could routinely upend the pleadings-driven standard of review for motions to dismiss in litigation against it by leveraging any manner of public, government-created documents. Such an approach would allow the City the benefit of summary-judgment factual determinations at the motion-to-dismiss stage before discovery—an outcome routinely rejected. *See, e.g.*, *Doss*, 551 F.3d at 639–40 (holding that the district court erred by taking judicial notice of a deed of sale at the motion-to-dismiss stage); *Blink v. Union Pac. R.R. Co.*, 2026 WL 396343, at *2 (N.D. Ill. Feb. 12, 2026) (Alexakis, J.) (declining to take judicial notice of internal company memoranda); *see also* Fed. R. Evid. 201(b) advisory committee's note (advising "dispensing with traditional methods of proof only in clear cases").

The City's brief and the supporting exhibits for which it seeks judicial notice illustrate the dangers of such a broad approach. The City seeks judicial notice of more than 500 pages of records without addressing *any* of the specific facts within those records or the basis for why those facts are sufficiently trustworthy to qualify for judicial notice. Then, over six pages in its brief, the City repeatedly cites facts from those exhibits to make sweeping declarations about the construction and maintenance of its sidewalks. *See* Mem. at 5–11. It cites regulations and guidelines from its exhibits, assumes that those regulations and guidelines have been satisfied, and argues that those exhibits thereby discredit Plaintiffs' allegations. *See id.* Among other examples, the City says that:

- "CDOT utilizes multiple levels of review to ensure compliance," *id.* at 7;
- CDOT's Strategic Plan for Transportation "means that construction programs that affect the pedestrian right-of-way must address sidewalk repair," *id.* at 8–9;
- its "Transit/Bicycle/Pedestrian Program . . . improves CTA Facilities," *id.* at 9;

11

- its "Intersection/Safety Improvements" program "repair[s], replace[s], or create[s] safe pedestrian crossings," *id.*;
- "[t]hrough . . . coordinated programs, the City addresses infrastructure needs in the public right-of-way by leveraging multiple funding sources," *id.* at 10; and
- through the 311 program, "CDOT . . . catalogues . . . request[s]" for repair to portions of the sidewalk, then "inspects the portion of sidewalk, and determines under which program or programs any repair should be conducted," *id.*

None of these assertions (or the statements from the City's regulations that underlie them) are "so universally known that they cannot reasonably be the subject of dispute" as to qualify for judicial notice. Fed. R. Evid. 201(b) advisory committee's note. Indeed, the City offers nothing at all to support a finding that Rule 201's requirements are satisfied. Of course, the purported facts the City seeks to introduce are disputed; the actions taken by the City with respect to sidewalk maintenance are the very heart of this dispute. The City cannot answer Plaintiffs' allegations that it has failed to meet its obligations with respect to sidewalk maintenance simply by pointing at the list of regulations and guidelines it purports to fulfill.[3] The Court should therefore decline to take judicial notice of the more than 500 pages of exhibits the City attached to its motion and disregard the arguments relying on those materials.

## III.     PLAINTIFFS ADEQUATELY PLEAD CLAIMS FOR VIOLATION OF THE ADA AND SECTION 504

The Court should likewise deny the City's motion to dismiss for failure to state a claim. The City's motion raises two related questions. The first is the threshold question of whether the City's construction, alteration, maintenance, and regulation of its pedestrian rights of way is a service, program, or activity under 42 U.S.C. § 12132. As the overwhelming majority of courts to consider the question have confirmed, it is. The City's contrary view—that pedestrian rights of way are mere "facilities" that do not constitute a program—is only supported by a single,

---

[3] One of the exhibits, the Consultant Construction Engineer Procedural Guidelines (Dkt. 48-3), does not appear to be publicly available, dooming it even under the City's proffered standard.

12

unpublished, out-of-circuit decision that is wrongly decided and that the Court should disregard. Once the relevant program is properly defined, the second question is whether Plaintiffs adequately plead the elements of their ADA and Section 504 claims with respect to that program. They have. Plaintiffs' detailed allegations of program barriers meet the applicable standard in four independent ways, discussed in turn below. In response to each, the City rests its arguments on misstatements of the governing standards, demands for evidentiary detail unsuited to the pleading stage, and improper reliance on facts outside the Amended Complaint. None of the City's arguments warrant dismissal of Plaintiffs' claims.

### A. The Relevant Service, Program, or Activity Is the City's Construction, Alteration, Maintenance, and Regulation of Its Pedestrian Rights of Way

The ADA prohibits public entities from denying the benefits of their "services, programs, or activities" to people with disabilities. 42 U.S.C. § 12132. The phrase "services, programs, or activities" is broadly construed and "applies to anything a public entity does." *Oconomowoc Residential Progs. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002) (quoting 28 C.F.R. pt. 35, App. A). Here, the relevant ADA service or program is the City's network of pedestrian rights of way and the "construction, alteration, maintenance, and regulation thereof." FAC ¶ 135.[4] The overwhelming majority of courts to consider whether the construction, alteration, maintenance, and regulation of sidewalks fits the broad definition of a service, program, or activity under Title

---

[4] The City argues in passing, that "public transit and paratransit options" must be considered as part of the City's pedestrian rights of way, such that Plaintiffs must plead why such transit options are not sufficient alternatives to the barriers alleged. Mem. at 31. That is wrong. The City's paratransit and public transportation systems are separate programs; riding in an accessible van or taking a train is fundamentally different from traveling via public sidewalks, including because at the end of the van or train ride, the Plaintiffs would still need to return to the sidewalks. The City cannot skirt its obligations to maintain accessible sidewalks by pointing to other, independent services. *See Wright v. Bd. of Comm'rs of Cap. Area Transit Sys.*, 2022 WL 17574078, at *2 (M.D. La. Dec. 9, 2022) (availability of paratransit did not obviate City's duty to maintain accessible bus stops); *cf. Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503–05 (4th Cir. 2016) (rejecting defendant's overly broad definition, and holding that the program at issue was "absentee voting," not just the ability to vote).

II have held that it does. *See, e.g.*, *Frame v. City of Arlington*, 657 F.3d 215, 226 (5th Cir. 2011) (en banc); *Barden v. City of Sacramento*, 292 F.3d 1073, 1074 (9th Cir. 2002); *Cohen v. City of Culver City*, 754 F.3d 690, 695 (9th Cir. 2014); *Mote v. City of Chelsea*, 284 F. Supp. 3d 863, 883 (E.D. Mich. 2018) ("*Mote II*"); *Culvahouse v. City of LaPorte*, 679 F. Supp. 2d 931, 939 (N.D. Ind. 2009); *Hamer v. City of Trinidad*, 441 F. Supp. 3d 1155, 1170 (D. Colo. 2020); *Mich. Paralyzed Veterans of Am., Inc. v. Mich. Dep't of Transp.*, 2017 WL 5132912, at *11 (E.D. Mich. Nov. 6, 2017); *Willits v. City of Los Angeles*, 925 F. Supp. 2d 1089, 1093 (C.D. Cal. 2013); *Mason v. City of Huntsville*, 2012 WL 4815518, at *8 (N.D. Ala. Oct. 10, 2012). This Court should do the same.

*Barden v. City of Sacramento* and *Frame v. City of Arlington* are particularly instructive. In *Barden*, the Ninth Circuit examined the text and legislative history of the ADA in conjunction with the DOJ's implementing regulations and concluded that the "ADA's broad language" covered "anything a public entity does," including the maintenance of sidewalks. 292 F.3d at 1076. If sidewalks were not covered by the ADA, the court recognized, the DOJ's requirement to install curb ramps in newly constructed sidewalks would be meaningless—the accessible curb ramp could lead to an inaccessible sidewalk. *See id.* at 1077. The court's holding was in harmony with the Rehabilitation Act's antidiscrimination provisions, which Title II extends to state and local governments. That Act expressly defines "program or activity" as "all of the operations of" a qualifying local government. *Id.* (quoting 29 U.S.C. § 794(b)(1)(A)). Because maintaining public sidewalks was a part of the City of Sacramento's operations, the *Barden* court concluded that its sidewalks are a service, program, or activity. 292 F.3d at 1077. Nine years later, in 2011, the Fifth Circuit, sitting en banc, performed its own analysis of the text of the ADA and reached the same conclusion. *See Frame*, 657 F.3d at 223–31. The *Frame* court's reasoning was robust; it carefully

14

evaluated the phrase "services, programs, or activities" as well as the language of surrounding provisions, DOJ regulations, the Rehabilitation Act, and the Supreme Court's ADA precedents. *See id*. It held the plain meaning of the term "services" includes "the performance of work commanded or paid for by another" and "an act done for the benefit or at the command of another." *Id*. at 226. As the court explained, constructing and altering a sidewalk is "work commanded by another (i.e., voters and public officials), paid for by another (i.e., taxpayers), and done for the benefit of another (e.g., pedestrians and drivers)." *Id.*; *see also Hamer*, 441 F. Supp. 3d at 1167 (recognizing that sidewalks are provided by local governments for the benefit of residents). Constructing, altering, and maintaining sidewalks therefore come within the plain meaning of "services." *Frame*, 657 F.3d at 226; *see also id*. at 228–31 (explaining why the ADA's surrounding provisions and the legislative history also confirm that sidewalks are services).

The City's attempts to sidestep *Barden*, *Frame*, and the long history of courts holding that the provision of sidewalks is a service, program, or activity under the ADA all fail. First, the City argues that these cases are all erroneous because pedestrian rights of way are "facilities" under the ADA. Mem. at 23–25. But that argument ignores that it is well-settled that something can be both a facility and a program under the ADA. *See, e.g.*, *ACBMC II*, 667 F. Supp. 3d at 774–75 ("All agree that pedestrian signals are facilities, but that does not mean that the City's network of signals cannot also be a program or service"); *Scott v. Jeffreys*, 2022 WL 2715802, at *3 (N.D. Ill. July 13, 2022) ("facilities that provide necessities to inmates like meals and showers are . . . 'services, programs, or activities' within the meaning of the ADA"); *Fortyune v. City of Lomita*, 766 F.3d 1098, 1102 (9th Cir. 2014) (provision of on-street parking characterized as both program and facility). As the *ACBMC II* court observed, there is no explanation for how thousands of traffic signals could exist without being part of a City program or service. 667 F. Supp. 3d at 774–75. So

15

too here: the individual sidewalk panels and curb ramps could not exist without being part of a City program or service. *See also Culvahouse*, 679 F. Supp. 2d at 939, 942 (holding that sidewalks are services, programs, or activities and also acknowledging that sidewalks are facilities).

Second, the City unsuccessfully argues that *Barden* is wrongly decided. It dismisses *Barden* as failing to engage with the ADA's text, Mem. at 29, but it never addresses that the court's decision "kept with . . . precedent[,]" which had established the "broad construction of the phrase, 'services, programs, or activities,'" 292 F.3d at 1076 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) *overruled on other grounds*). Even if *Barden*'s statutory analysis could be considered lacking, *Frame*'s cannot. That court meticulously examined Title II's plain language before investigating texts of related provisions and statutes as well as legislative history and intent, and it reached the same conclusion as the *Barden* court. *See Frame*, 657 F.3d at 223–31.

Third, the City invokes two inapposite cases: *Babcock v. Michigan* and *Iverson v. City of Boston*. Neither addressed whether sidewalks are a service, program or activity under the ADA. *Babcock* addressed handrails and held that handrails are not "services" because they are "intended" only for "a subset for the general population" using the building. 812 F.3d 531, 532–33, 538 n.5 (6th Cir. 2016); *see also Mote II*, 284 F. Supp. 3d at 883–84 (holding that sidewalks are services under the ADA and that *Babcock* did not decide that question). In *Iverson*, the plaintiff did not plead a barrier-removal claim, and the court did not consider whether sidewalks are a service, program, or activity. 452 F.3d 94, 102 (1st Cir. 2006) (noting that the complaint "at *one* point decried the condition of city streets and sidewalks" which was "too inscrutable a reference to state a barrier removal claim").

Fourth, the City cites just *one* case where the court concludes pedestrian rights of way are not a program under Title II. *See* Mem. at 25. That district-court case, *Liberty Resources, Inc. v.*

16

*City of Philadelphia*, is unpublished, out-of-circuit, and wrongly decided. 2020 WL 3642484 (E.D. Pa. July 6, 2020) ("*Liberty Resources I*"). The *ACBMC II* court in this district reviewed that decision and found its reasoning lacking, and ultimately held, as detailed above, that the installation and maintenance of the City's accessible pedestrian signals was a program under Title II. *See* 667 F. Supp. 3d at 775 n.6. The Court should similarly disregard *Liberty Resources I* in favor of the great weight of authority opposing it and find that the City's pedestrian rights of way are a program.

At bottom, "[i]t is simply common sense: If disabled pedestrians cannot access the sidewalks, then they can hardly access anything else that a city has to offer." *Mote v. City of Chelsea*, 252 F. Supp. 3d 642, 654 (E.D. Mich. 2017) ("*Mote I*"). "Any sensible reading of ADA Title II" therefore "compels the conclusion that maintaining public pedestrian thoroughfares for citizens to get around a city—and access the many public services and businesses located within— is the archetypal example of the most fundamental of public services." *Id.* The City's network of pedestrian rights of way and the "construction, alteration, maintenance, and regulation thereof," FAC ¶ 135, is thus a service or program under the ADA. 42 U.S.C. § 12132.

### B.      Plaintiffs Adequately Plead All Elements of Their Claims

To state a claim under Title II or Section 504, plaintiffs must sufficiently allege that (1) they are qualified individuals with disabilities; (2) they were denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination (3) that such denial or discrimination occurred on the basis of their disability. *See Moore v. W. Ill. Corr. Ctr.*, 89 F.4th 582, 594 (7th Cir. 2023); 42 U.S.C. § 12132; 29 U.S.C. § 794(a). For Section 504, Plaintiffs must also allege that the City receives federal financial assistance. *Jaros v. Ill. Dep't of Corr.*, 684 F.3d 667, 671 (7th Cir. 2012). The same analysis governs Plaintiffs' ADA and Section 504 claims. *See McDaniel v. Syed*, 115 F.4th 805, 822 (7th Cir. 2024).

The City does not dispute, nor could it, that Plaintiffs plead that they are qualified individuals with disabilities. *See* FAC ¶¶ 81, 87, 99, 107 (describing Plaintiffs' disabilities and use of mobility devices); *id*. ¶¶ 18, 108, 121, 143 (describing Plaintiffs' qualifications to use the City's pedestrian right of way facilities and program). Nor does the City dispute that it is a "public entity" and a "recipient of federal financial assistance." *Id*. ¶¶ 20, 144; 42 U.S.C. § 12131(1)(A)–(B); 29 U.S.C. § 794(a); *see also Access Living of Metro. Chi., Inc. v. City of Chicago*, 752 F. Supp. 3d 922, 928 (N.D. Ill. 2024) (holding Chicago is a public entity under the ADA and a recipient of federal funds under Section 504). Or that Plaintiffs' asserted discrimination was *by reason* of their disabilities. *Lacy v. Cook,* 897 F.3d 847, 853 (7th Cir. 2018).[5]

Thus, the only disputed issue is whether Plaintiffs adequately plead that they were denied the benefits of the services, programs, or activities of a public entity or otherwise subjected to discrimination. Plaintiffs plead this in four distinct ways, each of which independently states a claim under the ADA and Section 504. Plaintiffs plead that the City: (1) fails to ensure newly constructed and altered facilities in the pedestrian rights of way are readily accessible to and usable by people with mobility disabilities; (2) fails to maintain newly constructed and altered facilities in the pedestrian rights of way; (3) with respect to existing facilities, fails to operate the pedestrian rights of way program so that it is readily accessible to and usable by people with mobility disabilities when viewed in its entirety; and (4) fails to ensure access to the pedestrian rights of

---

[5] To the extent the City challenges whether Plaintiffs adequately plead causation, the City cites the wrong standard and fails to support this argument. To plead causation, plaintiffs must allege denial of access "on the basis of" disability, *Lacy*, 897 F.3d at 853—not "but for" their disability as the City states, Mem. at 21. Regardless of the standard, the City's argument lacks support. The City cites just two paragraphs of the Amended Complaint that it says fail to allege causation because Plaintiffs state only that the sidewalk was difficult to navigate rather than completely unnavigable. *See id.* (citing FAC ¶¶ 95(d)–(e), 84(k)–(m)). But as explained below in Section III.B.1.b, Plaintiffs need not allege complete exclusion from the pedestrian rights of way to state a claim. And even if they did, the City never argues that all Plaintiffs' allegations taken together fail to meet this standard. *See infra* § III.B.1.b. The City cannot cherry pick two allegations it finds lacking to try to throw out Plaintiffs' entire case.

18

way during construction. FAC ¶¶ 115–50. The City asks this Court to reject well-settled principles in disability-rights law and embrace a narrow construction that would undermine the ADA's goals. The City's arguments should be rejected.

> **1. Plaintiffs adequately plead that the City fails to ensure newly constructed and altered facilities in the pedestrian rights of way are readily accessible to and usable by people with mobility disabilities.**

Plaintiffs state a claim that the City fails to ensure that newly constructed and altered facilities are readily accessible to and usable by people with disabilities. As Plaintiffs plead, City sidewalks, curb ramps, and other elements of pedestrian rights of ways are facilities, FAC ¶ 124, and the City newly constructed and altered *all* of its curb ramps and *substantial portions* of its sidewalks, crosswalks, and other pedestrian passages since January 26, 1992—the trigger date for Title II claims regarding new construction. *Id*. ¶¶ 131–132. Where Plaintiffs have additional information about the relevant date of construction, Plaintiffs plead those dates. *See id*. ¶¶ 84(a)(iv), 84(f), 84(j), 84(n), 84(p), 84(r), 84(u), 95(b), 96(e), 96(h), 96(j), 96(l), 96(n), 104(a)(i), 104(b)–(h), 104(n)–(o), 125.

Plaintiffs reference specific barriers, where they are located, why Plaintiffs need/want to use these facilities, and how the barriers impact them. *See, e.g.*, *id*. ¶¶ 81–105. For example, Plaintiff Sullivan alleges that the City altered intersections without constructing curb ramps making such crosswalks unavailable to him. *Id*. ¶ 104(g)–(h). Plaintiff Lane similarly alleges that certain newly constructed curb ramps are unusable and/or dangerous due to water accumulation, changes in level, and excessive cross-slopes. *Id*. ¶ 84. Ms. Lane even alleges that she was thrown from her wheelchair when attempting to navigate a dangerous curb ramp. *Id*. ¶ 84(a)(ii). Plaintiffs' allegations include references to other barriers in newly constructed and altered curb ramps. *See, e.g.*, *id*. ¶¶ 84(j) (excessive slope), 84(p) (water accumulation), 84(u) (large, seam and abrupt change of level), 95(a) (excessive bumps and gaps), 95(d) (hazardous conditions from shoeprint-

shaped gouges), 104(f) (dangerously steep slope). These problems are due to the City's policies or practices, including its failure to effectively design new construction and/or inspect construction, especially in areas requiring complex design and installations. *See id*. ¶¶ 8, 41–57.

The City tries to undermine Plaintiffs' claims in two ways. *See* Mem. at 14, 18–21. First, it distinguishes Plaintiffs' claims related to curb ramps from Plaintiffs' assertions about other facilities in the pedestrian right of way, but Plaintiffs sufficiently state a claim regarding both. Second, the City argues Plaintiffs failed to adequately plead barriers to accessibility, but the City misconstrues the ADA to apply only when an individual endures a total denial of access.

### a. Plaintiffs adequately plead a claim for both curb ramps and other facilities.

### (1) Curb Ramps

Contrary to the City's argument, Plaintiffs sufficiently plead a claim for inaccessibility of newly constructed or altered curb ramps. The City admits it has an obligation to install "curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway" when constructing or altering its streets. 28 C.F.R. § 35.151(i)(1); *Kinney v. Yerusalim*, 9 F.3d 1067, 1073–74 (3d Cir. 1993); *Berardi v. City of Pekin*, 2021 WL 1535409, at *2 (C.D. Ill. 2021) (citing 28 C.F.R. § 35.151(i)).[6] Curb ramps constructed or altered after January 26, 1992, must therefore comply with the applicable Disability Access Standard. Mem. at 5; 28 C.F.R. § 35.151(c).

The City faults Plaintiffs for not "identify[ing] a date of construction triggering a compliance requirement," Mem. at 18, but the City ignores that Plaintiffs plead: the City's

---

[6] Despite the City's suggestion to the contrary, Mem. at 18, Plaintiffs do not suggest that street resurfacing requires the City to alter sidewalks that existed before 1992 and do not cite *Kinney* for that proposition. Plaintiffs' reference to *Kinney* in the FAC focuses exclusively on the installation of curb ramps. FAC ¶¶ 126–28 (alleging the City failed to properly construct "curb ramps").

"resurfacing strategy has led to the resurfacing of all arterial and residential streets since 1990," FAC ¶ 127; all curb ramps were newly constructed or altered since 1992, *id*. ¶ 131; and that since the class action settlement in 2007, the City installed "thousands of curb ramps," *id*. ¶ 2. As the City admits, Plaintiffs include specific references to the date of construction when this information was ascertainable via publicly available sources. *Id*. ¶¶ 84(a)(iv), 84(f), 84(j), 84(p), 84(r), 84(u), 96(e), 96(h), 96(j), 96(n), 104(a)(i), 104(c); 104(e). At the pleading stage, before Plaintiffs have had the benefit of discovery to seek specific information about the date of construction, this is enough. *See Kaper v. Pa. Game Comm'n*, 2024 WL 4437645, at *4–5 (M.D. Pa. Oct. 7, 2024) (noting "courts have denied motions to dismiss programmatic access claims when the pleading of record omits the dates facilities were constructed or last altered" especially where defendants have exclusive possession of that information) (collecting cases).

Still, the City suggests that Plaintiffs have failed to meet their obligation to specifically "identify an applicable, enforceable regulation[.]" Mem. at 18. But they do: Plaintiffs plead the details of the Disability Access Standards and how barriers have impeded their access to the City's curb ramps, in violation of the Standards. FAC ¶¶ 25, 81–105. At this stage, that—again—is enough. *See Access Living of Metro. Chi., Inc. v. City of Chicago*, 372 F. Supp. 3d 663, 672 (N.D. Ill. 2019) ("*ACBMC I*") (rejecting Chicago's argument that plaintiffs must provide "development-by-development" or "unit-by-unit level detail" of the identified barriers claims at the pleading stage).

The City's other arguments regarding Plaintiffs' curb-ramp allegations similarly confuse the pleading standard. It asks the Court to go outside the four corners of the complaint to "weigh" Plaintiffs' allegations against "the City's large-scale efforts to comply with the curb ramp requirement," the City says are shown in the extraneous materials it appends to its motion. Mem.

at 21. But as discussed above, the Court should deny the City's request to take judicial notice of those materials, and regardless, it is improper to weigh competing facts on a motion to dismiss. *See, e.g.*, *Nationwide Agribusiness Ins. Co. v. USG Corp.*, 713 F. Supp. 3d 503, 522 (N.D. Ill. 2024) ("[I]t is not the court's role to assess the parties' credibility or weigh these competing versions of events at this [motion-to-dismiss] stage."). Indeed, it is telling that the cases the City cites in support of this argument are at the summary-judgment and post-liability stages. *See* Mem. at 20–21 (citing *Liberty Res., Inc. v. City of Philadelphia*, 2021 WL 4989700, at *4 (E.D. Pa. Oct. 27, 2021) ("*Liberty Resources II*"), *ACBMC II*, 667 F. Supp. 3d at 776–77, and *Hispanics United of DuPage Cnty. v. Village of Addison*, 248 F.3d 617, 620 (7th Cir. 2001)). When reviewed with the proper pleading standard, Plaintiffs' extensive allegations sufficiently state a claim for the City's failure to ensure its newly constructed and altered curb ramps are readily accessible to and usable by people with mobility disabilities.

### (2) Other Facilities

In addition to its claim related to curb ramps, Plaintiffs also sufficiently plead a Title II claim for other newly constructed or altered facilities. The City attempts to escape liability for the inaccessibility of its other facilities by arguing: (1) Disability Access Standards do not apply to any pedestrian facilities other than curb ramps *and* (2) without applicable standards, the City cannot be held liable under the ADA. The City's attempt to narrowly construe the law to avoid any liability is at odds with the ADA's broad remedial principles; indeed, the City's argument disregards that courts have held that the Standards apply to pedestrian facilities *and* that public entities can be liable for ADA violations even without existing technical design standards.

Contrary to the City's position, Disability Access Standards apply to pedestrian facilities other than curb ramps. In *Kirola v. City & County of San Francisco*, the Ninth Circuit overturned a lower court's decision for failing to apply ADAAG, one of the Disability Access Standards, to

newly constructed facilities in the public rights of way. 860 F.3d 1164, 1179 (9th Cir. 2017). There, the court reasoned that: although ADAAG does not include guidelines particular to those types of facilities, "the [general] feature-specific requirements apply." *Id*. The *Kirola* court, like others, correctly recognized that many of the fundamental requirements in Disability Access Standards apply regardless of the specific type of facility at issue. *See also Mote II*, 284 F. Supp. 3d at 882 (finding it "beyond dispute that the ADAAG guidelines promulgated under the ADA that govern the construction of public facilities built or altered after 1992" apply to sidewalks); *Classen v. Ali's Invs., LLC*, 2024 WL 4286116, at *5 (E.D. Wis. Sept. 25, 2024) (applying ADAS requirement for "clear width of walking surfaces" to defendant's sidewalks in analogous Title III context).

Indeed, Disability Access Standards are regularly incorporated in consent decrees, underscoring their value as workable standards for regulating accessibility in the pedestrian right of way. *See* Dardarian Decl. Supp. Joint Mot. Prelim. Approval Partial Consent Decree, Ex. 1 at 3–4, *Goodlaxson v. Mayor of Baltimore*, No. 21-cv-01454 (D. Md. filed Nov. 27, 2024), Dkt. 123 (defining accessible as compliant with 2010 ADA Standards) (attached as Ex. A); *Goodlaxson*, 776 F. Supp. 3d 311, 327 (D. Md. 2025) (granting motion for final approval of partial consent decree); Dardarian Decl. Supp. Joint Mot. Prelim. Approval Class Action Settlement, Ex. 1 at 4, *Curran v. City of Oakland*, No. 23-cv-02354 (N.D. Cal. filed July 30, 2025), Dkt. 40-1 (defining accessibility standards in terms of 2010 ADA Standards) (attached as Ex. B); *Curran*, 2025 WL 3485360, *9 (N.D. Cal. Dec. 4, 2025) (granting motion for final approval of consent decree).

The City's argument that the Disability Access Standards do not apply relies on a misreading of the relevant regulations and interpreting authority. In particular, the City's description of the ADA's regulatory framework, Mem. at 3–5, bypasses the provision that requires each newly constructed or altered facility to be "readily accessible to and usable by individuals

23

with disabilities." The City also cites language from the Final Rule for PROWAG, published by the U.S. Access Board, *id.* at 4, that does not credibly validate its position. The statement that Disability Access Standards "were developed *primarily* for buildings and facilities on site," does not, as the City argues, mean that the Standards never apply to pedestrian facilities, as the term *primarily* does not connote exclusivity of other kinds of facilities. The City's citation that "many issues specific to public rights-of-way were simply not addressed" omits the first part of that sentence that reads, "*some of the requirements can be readily applied to pedestrian facilities in the public right-of-way.*" PROWAG, 88 Fed. Reg. 53604, 53605 (Aug. 8, 2023). This language recognizes that certain, feature-specific requirements apply to the pedestrian right of way.

The City's remaining arguments are also unpersuasive. The City's focus on the definition of "facility" in the Disability Access Standards overlooks the broader definition of "facility" in the Title II regulations, which underpin a public entity's obligations. 28 C.F.R. § 35.104 (broadly defining facility as: "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, *walks*, *passageways*, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."). It also argues that pedestrian facilities pose unique challenges due to existing infrastructure such as fire hydrants, utility poles, and traffic signals. Mem. at 19. Yet the ADA already accounts for situations where strict compliance is "structurally impracticable." 42 U.S.C. § 12183(a)(1); 28 C.F.R. § 35.151(a)(2). The City cites the concurring decision in *Chapman v. Pier 1 Imports (U.S.) Inc.*, which, when read in context, does not address the binding nature of ADAAG. 631 F.3d 939, 958 (9th Cir. 2011) (Smith, J. concurring) (discussing "ADAAG standards" in the context of standing, not application of standards to public infrastructure).

Even if the City is correct that Disability Access Standards do not apply (it is not),

24

Plaintiffs' claims can still proceed. At this early stage, there is no need for the Court to decide whether Disability Access Standards strictly apply to facilities in the City's pedestrian rights of way because Plaintiffs can state a claim regardless of this determination. *See, e.g.*, *Sparks v. City of Peoria*, 2009 WL 3764032, at *5 (C.D. Ill. Nov. 10, 2009) (finding plaintiff's factual allegations—that the sidewalks and curb ramps at City Hall were not wheelchair accessible—established a Title II claim); *Simmons v. Village of Minier*, 2022 WL 3048115, at *3 (C.D. Ill. Aug. 2, 2022) ("Plaintiff's claim that Minier did not provide ADA-compliant aisles and parking is sufficient to state a colorable ADA claim . . . at least at the pleadings stage").

In fact, Plaintiffs need not show a violation of an existing technical design standards to plead a violation of the ADA. *See Bowers v. Dart*, 2017 WL 4339799, at *5 (N.D. Ill. Sept. 29, 2017) (citing *Lane*, 541 U.S. at 531), *aff'd*, 1 F.4th 513 (7th Cir. 2021); *see also Dunmore v. Shicker*, 2020 WL 65057, at *14 (S.D. Ill. Jan. 7, 2020) (holding that "'[r]eadily accessible' and 'usable' mean that the facility must be designed, constructed or altered in strict compliance with specific architectural accessibility standards"). To the contrary, enforceable technical design standards are not necessary to establish liability. *See Fortyune*, 766 F.3d at 1102 ("Recognizing the broad reach of the ADA, we have held that Title II requires public entities to maintain accessible public sidewalks, notwithstanding the fact that no implementing regulations specifically addressed sidewalks" and noting that "the lack of specific regulations cannot eliminate a statutory obligation"); *Thomas v. Kohl's Corp.*, 2018 WL 704691, at *3 (N.D. Ill. Feb. 5, 2018) (finding plaintiffs stated a claim despite "no express spacing requirement for moveable display racks").

The City already unsuccessfully pursued this very same argument regarding accessible pedestrian signals in *ACBMC II*. *See* 667 F. Supp. 3d at 777–78. The City argued that "the fact that no regulation explicitly requires [accessible pedestrian signals] means that it cannot be liable under

25

the ADA or the Rehabilitation Act for its failure to provide [accessible pedestrian signals] at more than an insignificant number of its signalized intersections." *Id*. at 777. The court found the City's argument to be "at odds with the broad reach of the statutes at issue." *Id*. at 778.

None of the cases cited by the City change this conclusion. The City relies on cases where notwithstanding undisputed application of and compliance with Disability Access Standards, the plaintiffs sought relief beyond what the Standards required. *See George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1011 (9th Cir. 2009) (seeking contrast striping on stairs not required by specific accessibility standards); *Scherr*, 703 F.3d at 1077 (considering whether a door hinge should close more slowly than specified in the standard). The City's reliance on *Colorado Cross Disability Coalition v. Abercrombie & Fitch Co.*, 765 F.3d 1205, 1220 (10th Cir. 2014), and *Resnick v. Magical Cruise Co.*, 148 F. Supp. 2d 1298, 1305 (M.D. Fla. 2001), fail for the same reason. Here, Plaintiffs do not argue that the City should have gone beyond the technical requirements established by the Standards, such as having wider sidewalks or a *more gradual* slope, for example.

And the City misreads *City & County of San Francisco v. EPA*, 604 U.S. 334 (2025). There, the Court held that the Environmental Protection Agency could not shirk Congress's directive to "implement" the Clean Water Act by issuing permits that say "comply with the statute" without providing concrete steps to do so. *Id*. at 355. This holding did not signify that technical design specifications adopted by a statute's implementing agency become the *only* standard for liability under the broad statute it implements, as the City asserts. *See* Mem. at 26–27. Plaintiffs sufficiently plead a Title II claim for all newly constructed and altered facilities.

### b. Plaintiffs adequately plead barriers to accessibility.[7]

For all newly constructed or altered facilities covered by Plaintiffs' complaint, Plaintiffs

---

[7] To the extent the City is arguing Plaintiffs failed to adequately plead access barriers beyond their new construction and alteration claims, Plaintiffs' response applies equally to their other claims also.

sufficiently plead they were denied access to the City's pedestrian rights of way. Plaintiff Lane, for instance, plead that barriers in the City's pedestrian rights of way: "cause her injuries, pain, difficulty, and discomfort; and deter her from using portions of the sidewalk or traveling to certain locations." FAC ¶ 82. She is "often forced to take longer routes and/or travel in the street in her power wheelchair to avoid barriers in the pedestrian rights of way" and "risks injury to herself and damage to her power wheelchair when she traverses the defects and damage in the pedestrian rights of way." *Id.* ¶ 83. Finally, she is "often deterred from visiting nearby stores, restaurants, and other locations in her neighborhood." *Id.* Plaintiffs Haven and Sullivan plead similar injuries resulting from structural barriers in the City's pedestrian rights of way. *Id.* ¶¶ 90–94, 97–98, 101–03, 105. *See Mote II*, 284 F. Supp. 3d at 884 (finding plaintiff's pleading sufficient because, for example, they alleged instances where they had to travel along the roadway due to inability to navigate the curb ramps).

The City says these allegations are insufficient by misconstruing the ADA to apply only when an individual endures a total denial of access. Mem. at 17, 21. But the Seventh Circuit and courts across the country hold that disabled plaintiffs need not show complete exclusion to state a claim. *Ellison v. U.S. Postal Serv.*, 84 F.4th 750, 757–58 (7th Cir. 2023) ("a plaintiff need not show that she has been completely deprived of access to prevail"); *see also Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) ("If the Courthouse's wheelchair ramps are so steep that they impede a disabled person or if its bathrooms are unfit for the use of a disabled person, then it cannot be said that the trial is 'readily accessible,' regardless whether the disabled person manages in some fashion to attend the trial." (internal citations omitted)).[8] The City's suggestion that

---

[8] This concept applies outside out of the Title II and Section 504 context as well. *See, e.g.*, *Walsh v. Dania Inc.*, 716 F. Supp. 3d 655, 661 (N.D. Ill. 2024) (finding it "not necessary" for a barrier to "completely preclude the plaintiff from accessing the goods and services" in Title III context).

Plaintiffs suffered no injury because they could eventually overcome or navigate these barriers misconstrues the breadth of the ADA's protections. *See Disabled in Action v. Bd. of Elections in City of N.Y.*, 752 F.3d 189, 198 (2d Cir. 2014) ("Plaintiffs need not, however, prove that they have been disenfranchised or otherwise 'completely prevented from enjoying a service, program, or activity' to establish discrimination under Section 504 or Title II."); *Bassilios v. City of Torrance*, 166 F. Supp. 3d 1061, 1083–84 (C.D. Cal. 2015) (holding a modification necessary to avoid discrimination where plaintiff was exposed to more "difficulty, risk, pain, and inconvenience," as "compared to what persons without a disability experience").

The City highlights several specific allegations that, in its view, illustrate Plaintiffs' failure to plead a barrier to accessibility. Mem. at 21. These pleadings include, among other things, assertions that Plaintiffs encountered sidewalk panels with "cracks and holes, . . . excessive cross-slope[s], . . . [u]pshifted panels . . . hazardous, large vertical gap, [and other] hazardous conditions." FAC ¶¶ 84(k)–(m), 95 (d)–(e). But the City ignores the obvious challenges sidewalks with cracks, holes, excessive slopes, upshifted panels, large gaps, and other hazardous conditions pose for wheelchair users, as well as the other extensive pleadings throughout Plaintiffs' Amended Complaint that explain how structural barriers impede their access. *See id.* ¶¶ 5, 81–84, 87–95, 99–104. Plaintiffs state a claim that the City fails to ensure newly constructed and altered facilities are readily accessible to and usable by people with disabilities.

### 2. Plaintiffs adequately plead that the City fails to maintain newly constructed and altered facilities in the pedestrian right of way.

Plaintiffs adequately plead that the City fails to maintain its newly constructed and altered facilities. The ADA's implementing regulations require public entities to ensure that their newly constructed and altered facilities are "maintained in operable working conditions" such that they remain "readily accessible to and usable by persons with disabilities." 28 C.F.R. § 35.133(a). "The

28

rationale for this requirement is obvious: there is little point in building an accessible route if it is not kept in a condition that allows disabled persons to use it." *Cohen*, 754 F.3d at 699. As part of this requirement, the City must maintain newly constructed or altered curb ramps, sidewalks, and other pedestrian passages. *Straw v. Village of Streamwood*, 734 F. App'x 344, 347–48 (7th Cir. 2018) (recognizing a "public entity's duty to maintain accessible facilities"); *Cohen*, 754 F.3d at 699 ("city sidewalks are among those facilities that the City must maintain in operable working condition.").

As discussed, *see supra* Section III.B.1, Plaintiffs plead that the City has newly constructed and/or altered all of its curb ramps and substantial portions of its sidewalks, crosswalks, and other pedestrian passages since 1992. Plaintiffs' Amended Complaint includes extensive allegations that the City failed to maintain these newly constructed or altered facilities. *See* FAC ¶¶ 81–105, 129–33. For instance, Plaintiffs plead that they must travel in the street because stretches of uplifted or sunken sidewalk panels are impassable, *id.* ¶ 84(e), that a curb ramp leads to a pit of gravel instead of a sidewalk panel, *id.* ¶ 96(n), and that they cannot traverse portions of the pedestrian rights of way without assistance due to such barriers, *id.* ¶ 104(e). *See also, e.g.*, *id.* ¶¶ 34(c), 34(d), 34(f), 34(g), 34(h), 84(a)(ii)–(iii), 84(b)–(c), 84(f)–(i), 84(k)–(m), 84(q)–(t), 95(b)–(c), 95(e)–(g), 96(a)–(i), 96(m), 104(a)–(b), 104(j), 104(l)–(n), 104(p)(i)–(iv). Plaintiffs, moreover, plead in great detail that these ill-maintained facilities result from the City's lack of a comprehensive policy and practice to maintain accessible pedestrian rights of ways. *See, e.g.*, *id.* ¶¶ 26, 29, 38, 41–42, 45-48, 50–57, 133.

Notably, the City does not cite 28 C.F.R. § 35.133(a) at all, and references its maintenance obligations only to argue that Plaintiffs cannot state a claim based on inadequacies with the City's reactive, complaint-based 311 system. Mem. at 32. But this is not Plaintiffs' claim. While the

29

City's overreliance on its flawed 311 system is one root cause of the problem, Plaintiffs allege overall that the City fails to maintain newly constructed and altered elements of its pedestrian right of way and such ill-maintained facilities are no longer "readily accessible to and usable by persons with disabilities." FAC ¶ 129.

3.      **Plaintiffs adequately plead that, with respect to existing facilities, the City fails to operate the pedestrian rights of way program so that it is readily accessible to and usable by people with mobility disabilities when viewed in its entirety.**

Plaintiffs adequately plead their existing-facilities claim. An "existing facility" is one which was built on or before January 26, 1992, and has not been altered since. 28 C.F.R. § 35.104. Contrary to the City's assertion, Title II does not exempt existing facilities from accessibility requirements. Mem. at 28. Existing facilities are subject to the ADA's program accessibility requirement: a public entity must operate its services, programs, or activities, so that the services, programs, or activities, "when viewed in [their] entirety, [are] readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a). This requirement is coextensive with the Rehabilitation Act's requirement that disabled individuals have "meaningful access" to public programs. *ACBMC II*, 667 F. Supp. 3d at 775–76 (applying meaningful access standard to existing facilities claim); *Disabled in Action*, 752 F.3d at 189 (discussing similarities with Section 504's meaningful access standard and ADA's readily accessible "when viewed in its entirety" standard).

As courts have determined, programs, when viewed in their entirety, are not readily accessible when plaintiffs are "impede[d]" from accessing the program; they need not be completely excluded. The City's contention that the "readily accessible" standard is impermissibly vague ignores decades of judicial decisions applying precisely this standard across a wide range of public programs. *See, e.g.*, *Shotz*, 256 F.3d at 1080–81 (holding that plaintiffs stated a claim that trials were not readily accessible where courthouse bathroom was too small and ramp was too

30

steep, even though plaintiffs could attend trials); *Ellison*, 84 F.4th at 753–54, 759–60 (finding plaintiff lacked meaningful access to Postal Service program where one location was physically inaccessible, despite existence of Postal Service website and other accessible locations further away from plaintiff's home); *ACBMC II*, 667 F. Supp. 3d at 776 ("Where the plaintiffs identify an obstacle that impedes their access to a government program or benefit, they likely have established that they lack meaningful access to the program or benefit"); *Carter v. City of Chicago*, 520 F. Supp. 3d 1024, 1031 (N.D. Ill. 2021) (holding that plaintiff stated a claim that emergency shelter system was not "readily accessible" even though plaintiff was able to gain access to a shelter).

As in *ACBMC II* and *Shotz*, Plaintiffs allege a variety of obstacles impeding their access to the pedestrian rights of way such that the program, "when viewed in its entirety," is not "readily accessible" to them. 28 C.F.R. § 35.150(a). Throughout the Amended Complaint, Plaintiffs explain the barriers that they have encountered when attempting to navigate the City's pedestrian rights of way. *See, e.g.*, FAC ¶¶ 82–86, 89–98, 100–105 (describing variety of barriers that impede access to pedestrian rights of way). Plaintiffs' lack of access to the sidewalk program is further evidenced by the harm that they have experienced attempting to navigate the city in their wheelchairs. For example, Plaintiff Lane was thrown out of her wheelchair and injured when attempting to use a curb ramp with a rut between the concrete curb and gutter. *Id*. ¶ 84(a)(ii). Plaintiff Haven's scooter got stuck in a deep, jagged hole in a sidewalk panel and her husband had to come push her out. *Id*. ¶ 96(b). Plaintiff Sullivan's wheelchair is at risk of tipping at a disintegrating and crumbling crosswalk. *Id.* ¶ 104(b). These allegations and more are sufficient to state a claim that, when viewed in its entirety, the sidewalk program is not readily accessible to Plaintiffs. *See Celeste v. E. Meadow Union Free Sch. Dist.*, 373 F. App'x 85, 88 (2d Cir. 2010) (holding that "minor architectural barriers in the school forced [the plaintiff] to take a ten-minute

31

detour each way in order to reach and return from the athletic fields behind the school," resulting in "an unnecessary usurpation of [his] time" and denial of meaningful access).

The City misinterprets the existing facilities regulation to argue that it need not make sidewalks accessible. Mem. at 23–25. Although Section 35.150 does not "*[n]ecessarily* require a public entity to make each of its existing facilities accessible to and usable by individual disabilities," it may in fact be necessary to make certain existing facilities accessible to ensure that the sidewalk program, when viewed in its entirety, is readily accessible. 28 C.F.R. § 35.150(a)(1). Indeed, the regulations contemplate that "alteration of existing facilities and construction of new facilities" may be one of the methods necessary to make a service, program, or activity readily accessible to and usable by individuals with disabilities. *Id.* § 35.150(b)(1).

Plaintiffs adequately plead that the City's pedestrian rights of way program, when viewed in its entirety, is not readily accessible to individuals with mobility disabilities.

### 4. Plaintiffs adequately plead that the City fails to ensure access to the pedestrian rights of way during construction.

Plaintiffs adequately plead that when the City's pedestrian rights of way are not available due to construction, the temporary alternative pedestrian passages provided are not accessible for people with mobility disabilities. *See, e.g.*, FAC ¶¶ 84(d), 96(j), 104(o), 137–38. Contrary to the City's arguments, Mem. at 33, Plaintiffs identified 36 C.F.R. pt. 1191, App. B 201.3, providing that the ADA requirements for newly constructed and altered facilities apply "to temporary . . . facilities." *See also Californians for Disability Rts., Inc. v. Cal. Dep't of Transp.*, 2009 WL 2982847, at *2 (N.D. Cal. Sept. 14, 2009) ("to the extent that Defendants elect to provide temporary routes for the use of the public, Defendants have a duty to make such routes accessible").

Plaintiffs' claims are not speculative, as the City argues. Plaintiffs' frequent use of

Chicago's pedestrian right of way makes it highly likely that they will experience future barriers due to inaccessible temporary alternative pedestrian passages. For this reason, the City's cited case, *Hummel*, is inapt. 817 F.3d at 1019. In *Hummel*, the court found it speculative that the plaintiff would have a court hearing on a day where snow removal was required. *Id.* at 1019–20. Plaintiffs, by contrast, use the City's pedestrian rights of way on a regular basis, and it is not speculative that they will, in the future, do so during construction.

Finally, the City's citation to its own policies to defend itself is not proper at the pleading stage. *See REM*, 2023 WL 5152665, at *5–6 (even if judicially noticed, contents of documents "need not be taken as 'universal truth'").

## IV.     PLAINTIFFS' PRAYER FOR RELIEF IS PROPER

In addition to challenging Plaintiffs' allegations for failing to state a claim, the City also challenges Plaintiffs' request for an order "designating an employee to serve as the ADA Coordinator and preparing and publishing a Self-Evaluation and Transition Plan regarding the accessibility of the City's pedestrian rights of way." Mem. at 34-35; FAC, Prayer for Relief ¶ 2(f). The City says this request is improper because these concepts are derived from regulatory provisions without a private right of action. But the City misses the point. A private right of action is not required—Plaintiffs' requested relief falls firmly within the Court's broad equitable power to craft an appropriate injunction.

Both the ADA and Section 504 provide for injunctive relief. *See* 42 U.S.C. § 12133 (adopting the remedies available under section 504 of the Rehabilitation Act), 29 U.S.C. § 795a(a)(2) (incorporating the legal and equitable remedies available under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d-7); *Steimel v. Wernert*, 823 F.3d 902, 918 (7th Cir. 2016). "[A]bsent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin*

33

*v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 70–71 (1992).

Plaintiffs borrow regulatory terms and principles to ask the Court to order common-sense strategies to remediate the City's noncompliance. In particular, Plaintiffs seek: (1) a process by which the City assesses its pedestrian right of way and identifies access barriers; (2) a process by which the City plans to remediate identified barriers; and (3) the appointment of one or more persons responsible for overseeing such processes.

These sorts of practical solutions are well within the Court's equitable powers to remedy findings of discrimination. *See Steimel*, 823 F.3d at 918 (7th Cir. 2016). Upon finding a systemic violation of the ADA, courts regularly enter injunctions requiring public entities to undertake assessments, plan remediation, and hire or appoint individuals to coordinate ADA compliance. *See, e.g.*, *Am. Council of the Blind of Metro. Chi. v. City of Chicago*, 2025 WL 4694007, at *6 (N.D. Ill. May 29, 2025) ("*ACBMC III*") (ordering the City to "appoint and maintain (1) a single point person . . . responsible for overseeing implementation of the Remedial Plan Order . . ."); *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 195, 206 (2d Cir. 2014) (affirming remedial order requiring the city's board of election to hire on-site ADA coordinators and contract with a third party to survey poll sites, report on accessibility and remediation); *C.B. ex rel. W.B. v. Moreno Valley Unified Sch. Dist.*, 2024 WL 3259034, at *5–6 (C.D. Cal. June 28, 2024) (entering injunction to "establish a baseline understanding" of processes, delineate steps to produce systems change, and develop an implementation schedule with benchmarks and deadlines).

The City argues Plaintiffs' request is improper because there is no private right of action to appoint an ADA coordinator, and the Court should therefore strike the request *and* dismiss Plaintiffs' claims on that basis. *See* Mem. at 34–35. The City is wrong for two reasons. First, Plaintiffs do not allege the City's failures to comply with these regulatory requirements are

34

independent bases for liability, so there are no such "claims" to dismiss. Second and more importantly, that there is no right of private action to appoint an ADA coordinator does not prevent the Court from ordering the City to appoint one as a remedy.

Contrary to the City's position, unenforceable guidelines can provide courts with a useful framework to craft an injunction. *See, e.g.*, *Robles v. Domino's Pizza, LLC*, 913 F.3d 898, 907–08 (9th Cir. 2019) (holding district court could order compliance with Web Content Accessibility Guidelines, unenforceable private standards for website accessibility not adopted by Congress); *cf. Trivette v. Tenn. Dep't of Corr.*, 739 F. Supp. 3d 663, 707 (M.D. Tenn. 2024) (holding that while liability does not stem from a correctional facility's failure to affirmatively assess incarcerated persons' communication needs, "it would [] make sense for injunctive relief to require such assessments"). In fact, even the City's cited cases support Plaintiffs' position. In *Deck v. City of Toledo*, despite concluding there is no private right of action under 28 C.F.R. § 35.150(d), the court said: "It is certainly within the realm of possibility that the Court, at the end of this case, will enter a prophylactic injunction requiring the City to establish such policies and procedures." 76 F. Supp. 2d 816, 823 (N.D. Ohio 1999).

Plaintiffs' request is proper and should remain.[9]

## CONCLUSION

For all these reasons, the Court should deny the City's Motion to Dismiss in its entirety.

---

[9] In its final footnote, the City again improperly asks the Court to make factual determinations at the motion-to-dismiss stage. It argues that it "complies" with the ADA regulations requiring an ADA coordinator, self-evaluation and transition plan, by citing a series of unsupported statements for which it seeks judicial notice. Mem. at 35, n.22. As detailed above, the Court should disregard these materials and the City's improperly included statements. *See Evans v. City of Chicago*, 2001 WL 1028401, at \*12 (N.D. Ill. Sept. 6, 2001) (noting that in a motion to dismiss, "the court cannot weigh the facts").

Date: May 7, 2026

Respectfully submitted,

*/s/ Jack M. McNeily*

Eric R. Swibel
Jack M. McNeily
Dylan Glenn
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: eric.swibel@lw.com
     jack.mcneily@lw.com
     dylan.glenn@lw.com

Rachel Weisberg
Emily Roznowski
DISABILITY RIGHTS ADVOCATES
300 South Wacker Drive, Floor 32
Chicago, Illinois 60606
Telephone: (332) 217-2319
Facsimile: (212) 644-8636
Email: rweisberg@dralegal.org
     eroznowski@dralegal.org

Eliana Fisher
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, Suite 2619
New York, New York 10017
Telephone: (212) 644-8644
Facsimile: (212) 644-8636
Email: efisher@dralegal.org

36

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing document was filed on May 7, 2026, with the Clerk of the Court using the CM/ECF system which will send a notice of filing to all counsel of record.

*/s/ Jack M. McNeily*
Jack M. McNeily
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: jack.mcneily@lw.com
