**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| CHERLNELL LANE, ILIANA RIVERA HAVEN, and KEVIN SULLIVAN on behalf of all others similarly situated; | Case No. 1:25-cv-10880 |
| | Hon. Georgia N. Alexakis |
| Plaintiffs, | |
| v. | |
| CITY OF CHICAGO, | |
| Defendant. | |

**DEFENDANT CITY OF CHICAGO'S REPLY IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

    I.    Pedestrian "Facilities" Are Not "Programs" Or "Services" Under The ADA.................... 2

        A.    The regulatory and statutory text explicitly distinguish "facilities" from "services" or "programs." ......................................................................................................................... 2

        B.    Seventh Circuit and other caselaw confirms that "facilities" are distinct from "services" or programs," and Plaintiffs' citations are unpersuasive. .................................... 5

        C.    The policy and intent of the ADA and Rehabilitation Act require distinguishing between "facilities" and "services, programs, or activities." ................................................. 7

    II.    In The Alternative, Plaintiffs Fail To State A "Program" or "Services" Claim As To Citywide Pedestrian Facilities............................................................................................ 7

        A.    Plaintiffs do not adequately plead a "program accessibility" claim. ............................ 7

        B.    Plaintiffs do not adequately plead a "service accessibility" claim. ............................... 9

    III.    Plaintiffs' Facilities Claims Fail. ................................................................................ 10

        A.    Plaintiffs lack standing to challenge facilities they have no personal knowledge of and intent to use. ....................................................................................................................... 10

        B.    Plaintiffs Fail to State a Claim as to Specific Pedestrian Facilities. ........................... 13

            1.    Plaintiffs do not allege that existing facilities deny them access to any City service or program............................................................................................................................. 13

            2.    For newly constructed or altered facilities, Plaintiffs do not identify technical standards the City has violated. ........................................................................................ 14

            3.    Plaintiffs do not allege that curb ramps Citywide are non-compliant. ..................... 17

            4.    In many cases, Plaintiffs fail to allege barriers to accessibility. .............................. 18

    IV.    Plaintiffs Lack Standing To Challenge The Provision Of Accessible Temporary Routes, And The Claim Lacks Merit. .................................................................................. 19

    V.    Plaintiffs Cannot Bring Claims Alleging The City Failed To Designate An ADA Coordinator And Prepare And Publish A Self-Evaluation And Transition Plan...................... 20

CONCLUSION................................................................................................................... 20

**TABLE OF AUTHORITIES**

**Cases**                                           **Pages**

*Alexander v. Choate*,
469 U.S. 287 (1985) ...................................................................................................... 7

*Am. Council of Blind of Metro. Chi. v. City of Chicago*,
461 F. Supp. 3d 820 (N.D. Ill. 2020) ........................................................................... 12

*Am. Council of Blind of Metro. Chi. v. City of Chicago*,
667 F. Supp. 3d 767 (N.D. Ill. 2023) ............................................................... 6–8, 17

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................... 1

*Babcock v. Michigan*,
812 F.3d 531 (6th Cir. 2016) ................................................................................... 5–6

*Barden v. City of Sacramento*,
292 F.3d 1073 (9th Cir. 2002) ................................................................................. 5–7

*Bowers v. Dart*,
2017 WL 4339799 (N.D. Ill. Sept. 29, 2017) ............................................................ 16

*City and County of San Francisco v. EPA*,
604 U.S. 334 (2025) ........................................................................................ 3, 16–17

*Classen v. Ali's Invs. LLC*,
No. 3-CV-1369-JPS, 2024 WL 4286116 (E.D. Wis. Sept. 25, 2024) ....................... 15

*Ellison v. United States Postal Serv.*,
84 F.4th 750 (7th Cir. 2023) .................................................................................... 7–8

*Fortyune v. City of Lomita*,
766 F.3d 1098 (9th Cir. 2014) ................................................................................... 16

*Frame v. City of Arlington*,
657 F.3d 215 (5th Cir. 2011) .................................................................................... 6–7

*Fryman v. Atlas Fin. Holdings, Inc.*,
No. 18-CV-01640, 2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ................................ 2

*Hishon v. King & Spalding*,
467 U.S. 69 (1984) ........................................................................................................ 1

*Hummel v. St. Joseph Cty. Bd. of Comm'rs*,
817 F.3d 1010 (7th Cir. 2016) ............................................................. 5–6, 10–12, 19

*Kirola v. City & Cty. of San Francisco*,
860 F.3d 1164 (9th Cir. 2017) ......................................................................... 8–9, 15

*Lacy v. Cook County*,
897 F.3d 847 (7th Cir. 2018) ............................................................................ 3, 9, 13

*Liberty Res., Inc. v. City of Philadelphia*,
No. CV 19-3846, 2020 WL 3642484 (E.D. Pa. July 6, 2020) .................................................. 6

*Liberty Res., Inc. v. City of Philadelphia*,
No. CV 19-3846, 2021 WL 4989700 (E.D. Pa. Oct. 27, 2021) .................................... 13, 17–18

*Moore v. W. Illinois Corr. Ctr.*,
89 F.4th 582 (7th Cir. 2023) ...................................................................................... 19

*Mote v. City of Chelsea*,
284 F. Supp. 3d 863 (E.D. Mich. 2018) ...................................................................... 15

*New Jersey Prot. & Advoc., Inc. v. Twp. of Riverside*,
No. CIV.04-5914 (RBK), 2006 WL 2226332 (D.N.J. Aug. 2, 2006) ........................................ 6

*Oconomowoc Residential Programs v. City of Milwaukee*,
300 F.3d 775 (7th Cir. 2002) ................................................................................... 2, 5

*Parker v. Universidad de Puerto Rico*,
225 F.3d 1 (1st Cir. 2000)........................................................................................ 7

*Payton v. Cty. of Kane*,
308 F.3d 673 (7th Cir. 2002) ................................................................................. 12–13

*REM Props. v. ExxonMobil Oil Corp.*,
No. 22 C 5108, 2023 WL 5152665 (N.D. Ill. Aug. 10, 2023)........................................... 2

*Russello v. United States*,
464 U.S. 16 (1983) ................................................................................................. 4

*Scherr v. Marriott Int'l, Inc.*,
703 F.3d 1069 (7th Cir. 2013) ......................................................... 7, 10–13, 19

*Shotz v. Cates*,
256 F.3d 1077 (11th Cir. 2001) ................................................................................ 8

*Silha v. ACT, Inc.*,
807 F.3d 169 (7th Cir. 2015) .................................................................................. 10

*Simmons v. Village of Minier*,
No. 20-CV-1283-JES-JEH, 2022 WL 3048115 (C.D. Ill. Aug. 2, 2022) ................................ 15

*Sparks v. City of Peoria*,
No. 09-CV-1159, 2009 WL 3764032 (C.D. Ill. Nov. 10, 2009) ............................................. 15

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................................ 10–11

*Tennessee v. Lane*,
541 U.S. 509 (2004) ................................................................................................. 9

*United States v. Berkos*,
543 F.3d 392 (7th Cir. 2008) ..................................................................................... 2

*Wagoner v. Lemmon*,
778 F.3d 586 (7th Cir. 2015) ................................................................................... 19

**Statutes and Ordinances**

42 U.S.C. § 12132 .................................................................................................... 3

42 U.S.C. § 12134 ......................................................................................... 3, 15–17

**Regulations**

28 C.F.R. Pt. 35 .................................................................................................... 5

28 C.F.R. § 35.104 ......................................................................................... 2, 5, 9

28 C.F.R. § 35.133 ............................................................................................ 16–17

28 C.F.R. § 35.149 ............................................................................................... 3–4

28 C.F.R. § 35.150 ............................................................................................ *passim*

28 C.F.R. § 35.151 ......................................................................................... 4, 13–15

**Exhibits and City Documents**

Chicago Complete Streets,

   https://www.chicago.gov/city/en/sites/complete-streets-chicago/home.html ........................... 18

Consultant Construction Engineer Procedural Guidelines,

   https://www.cdotcmqa.com/Identity/Account/Login?ReturnUrl=%2F ............................................. 18

Exhibit A to the City's Memorandum ......................................................................... 18

**INTRODUCTION**

Plaintiffs' claims fail across the board. First, their program access claim rests on the legally untenable premise that the City's pedestrian rights of way—which are "facilities" under the plain text of the ADA's implementing regulations, as Plaintiffs concede—should be evaluated as "services, programs, or activities." That reading is foreclosed by the statutory and regulatory text, precedent, and the ADA's design. But even on Plaintiffs' own terms, their program access claim fails. Their anecdotal allegations do not plausibly plead that the City's entire sidewalk network is inaccessible or that alternative means of access are unavailable.

Second, Plaintiffs' challenges to pedestrian facilities are jurisdictionally defective and insufficiently pleaded. Plaintiffs lack standing to challenge the City's thousands of miles of sidewalks in their entirety because they lack personal knowledge of and an intent to return to most locations. And where they plead injuries based on specific pedestrian facilities, their claims lack merit because they do not identify the enforceable standards each facility violates.

Third, Plaintiffs lack standing to challenge temporary construction routes and cite no violated regulation. Finally, Plaintiffs concede they have no private right of action to compel the City to appoint an ADA Coordinator or publish a self-evaluation and transition plan.

Before elaborating these arguments below, the City notes that Plaintiffs' suggestion that "any set of facts" consistent with their allegations could support relief, Resp. at 1, 8 (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)), predates *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which requires well-pleaded facts sufficient to state a claim "plausible on its face," *id.* at 678. Plaintiffs' "information and belief" allegations about thousands of miles of sidewalks are conclusory assertions that do not meet that standard.

Plaintiffs also mount a lengthy attack on the regulatory materials attached to the City's motion. Resp. at 7-12. They mischaracterize what the City asks the Court to notice. It does not

1

ask the Court to rely on its documents to hold that it complies with the law, but only to notice that the records exist and describe the City's regulatory framework. *REM Props. v. ExxonMobil Oil Corp.*, No. 22 C 5108, 2023 WL 5152665 (N.D. Ill. Aug. 10, 2023)—which Plaintiffs cite— permitted "a report's existence and some of its contents" to be judicially noticed. *Id.* at \*6. And courts "shall" take judicial notice of undisputed information on official websites. *Fryman v. Atlas Fin. Holdings, Inc.*, No. 18-CV-01640, 2022 WL 1136577, at \*7 (N.D. Ill. Apr. 18, 2022). The assertions Plaintiffs call "problematic" are publicly available regulations—squarely in the scope of what may be noticed—or, in one instance, quote their Complaint. *See* Resp. at 11–12.

## ARGUMENT

I.      **Pedestrian "Facilities" Are Not "Programs" Or "Services" Under The ADA.**

The Court should reject Plaintiffs' attempt to conflate "facilities"—like pedestrian infrastructure—and "services, programs, or activities." The statutory and regulatory text, Supreme Court and Seventh Circuit caselaw, and the policy goals underpinning the ADA and Rehabilitation Act all belie that reading. Because pedestrian rights of way are "facilities"— which Plaintiffs do not dispute, Am. Compl. ¶ 124 (citing 28 C.F.R. § 35.104)—and must be evaluated as such, Plaintiffs' claim that the City has denied them access to a public right-of-way "service" or "program" fails as a matter of law.[1]

   A.      **The regulatory and statutory text explicitly distinguish "facilities" from "services" or "programs."**

"Statutory interpretation begins with the plain language of the statute." *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008). The plain language of the ADA and its implementing regulations requires the Court to treat "facilities" as distinct from "services" or "programs."

---

[1] The ADA "does not explicitly define" the phrase "services, programs, or activities." *Oconomowoc Residential Programs v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002).

**The ADA.** Congress enacted section 12132 of the ADA to prohibit exclusion from "services, programs, or activities" by reason of disability. 42 U.S.C. § 12132. It then directed the Attorney General to "promulgate regulations . . . that implement this part," *id.* § 12134(a), and required that the regulations "include standards applicable to facilities," *id.* § 12134(c). By calling out "facilities" as distinct from "services, programs, or activities," Congress signaled that these terms occupy different regulatory lanes. Were "facilities" treated as "services, programs, or activities," Congress would not have mandated separate standards for them.

*City and County of San Francisco v. EPA*, 604 U.S. 334 (2025), confirms what section 12134's language means. *See* City's Memorandum in Support of Its Motion to Dismiss the Amended Complaint ("Mem.") at 26-27. *San Francisco* held that a statute requiring an agency to "implement" "standards" means that the agency must promulgate a "concrete plan" to "ensure that the end result is reached," not "simply state[] the desired result." 604 U.S. at 347. Section 12134's requirement to "implement" "standards applicable to facilities" thus demands a concrete plan governing facilities. That is distinct from the "flexible compliance options" for "services, programs, or activities" to be deemed "readily accessible." *Lacy v. Cook Cty.*, 897 F.3d 847, 853 (7th Cir. 2018). By conflating "facilities" with "services, programs, or activities," Plaintiffs read the ADA to simultaneously require public entities to follow a "concrete plan" for pedestrian facilities and promise them the lenience of "flexible compliance options" for that same infrastructure. Those benchmarks are irreconcilable, and the text does not permit that reading.

**The Title II regulations.** Title II's implementing regulations faithfully maintain the two-track structure that distinguishes facilities from services, programs, or activities. Consider the regulations Plaintiffs cite. *See* Am. Compl. ¶ 134. Section 35.149 states, in relevant part, that "no qualified individual with a disability shall, because a public entity's *facilities* are inaccessible . . .

3

be excluded from participation in, or be denied the benefits of the *services, programs, or activities* of a public entity." 28 C.F.R. § 35.149 (emphasis added). The regulation plainly distinguishes what is inaccessible (a "facility") from what is thereby denied because of that inaccessibility ("services, program, or activities"). Collapsing the two terms would mean the regulation prohibits a person from being denied access to a sidewalk because they are denied access to a sidewalk. The Court need not adopt an absurd tautology.

Section 35.150, which governs access to "service[s], program[s], or activit[ies]," 28 C.F.R. § 35.150(a), reinforces the distinction. Facilities are a means of accessing programs, not programs themselves. The regulation requires a public entity to "operate each service, program, or activity so that [each], when viewed in its entirety, is readily accessible," but expressly states that it does not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities." *Id.* § 35.150(a)(1). The program access mandate contemplates not just "alteration of existing facilities and construction of new facilities," but also "reassignment of services to accessible buildings," "home visits," and "delivery of services at alternate accessible sites." *Id.* § 35.150(b)(1).

The next section—28 C.F.R. § 35.151, which Plaintiffs also cite, Am. Compl. ¶ 123—governs "facility" accessibility. It does not mention the phrase "service, program, or activity" a single time. That omission is meaningful. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (alteration in original). Collapsing the terms would simultaneously subject public infrastructure to the flexible compliance options of § 35.150 and the more exacting standards of § 35.151, an outcome the text does not support.

4

**Plaintiffs' textual arguments fail.** Plaintiffs fail to engage this statutory and regulatory text. At most, they quote *Oconomowoc Residential Programs* to say that "services, programs, or activities" "applies to anything a public entity does." Resp. at 13 (quoting 300 F.3d at 782). But the actual quote—taken from the regulations—is that "*title II* applies to anything a public entity does." *Oconomowoc*, 300 F.3d at 782 (quoting 28 C.F.R. pt. 35, app. A) (emphasis added). A facility is not something a public entity *does*; it is something a public entity owns or maintains. Furthermore, how Title II "applies" is governed by the statute and implementing regulations, which make clear that "facilities" and "services, programs, or activities" are distinct.

B.      **Seventh Circuit and other caselaw confirms that "facilities" are distinct from "services" or programs," and Plaintiffs' citations are unpersuasive.**

Caselaw confirms the distinction the statute and regulations draw. In *Hummel v. St. Joseph County Board of Commissioners*, 817 F.3d 1010 (7th Cir. 2016), the Seventh Circuit examined the ADA regulation governing unaltered facilities and explained that "the public entity need only ensure that 'each service, program, or activity' offered by that public entity—*as opposed to the entire facility operated by the entity*—is 'readily accessible.'" *Id.* at 1016 (emphasis added). That contrast is dispositive here: the regulations expressly define pedestrian rights of way as "facilities," 28 C.F.R. § 35.104, and under *Hummel*, a facility is not a service, program, or activity. Other circuit courts agree. *See Babcock v. Michigan*, 812 F.3d 531, 536 (6th Cir. 2016) (collecting First, Eighth, and Eleventh Circuit cases distinguishing facilities from services, programs, or activities). That these cases do not specifically discuss sidewalks is beside the point. The principle applies regardless of the type of facility. If, as *Hummel* requires, "facilities" are distinct from "services, programs, or activities," then pedestrian rights of way cannot be the latter because they are explicitly defined as the former.

Plaintiffs' contrary authority does not hold up to scrutiny. As to *Barden v. City of*

*Sacramento*, 292 F.3d 1073 (9th Cir. 2002), Plaintiffs acknowledge that its "statutory analysis could be considered lacking." Resp. at 16. The City need not repeat why *Barden* was wrongly decided. *See* Mem. at 29–30. It notes, however, that *Barden* predates both *Hummel* and *San Francisco*—decisions that, as explained above, resolve the question against Plaintiffs' reading.

*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) (en banc), fares no better. Plaintiffs overstate the weight of an out-of-circuit eight-to-seven en banc decision, *see Frame*, 657 F.3d at 240 (dissent), whose dissent has been called "the better view," *Babcock*, 812 F.3d at 536–37. Other courts have rejected *Barden* and *Frame* to hold that pedestrian facilities are not services or programs. *E.g.*, *Liberty Res., Inc. v. City of Philadelphia*, No. CV 19-3846, 2020 WL 3642484, at *4 (E.D. Pa. July 6, 2020); *New Jersey Prot. & Advoc., Inc. v. Twp. of Riverside*, No. CIV.04-5914 (RBK), 2006 WL 2226332, at *3 (D.N.J. Aug. 2, 2006).

Indeed, Plaintiffs appear to tacitly agree with the *Frame* dissent's common-sense statement that "an inanimate and static public facility is distinguishable from a public service." *Frame*, 657 F.3d at 240 (dissent). They instead cite *Frame*'s conclusion that "[c]onstructing, altering, and maintaining" sidewalks is a service. Resp. at 15 (citing *Frame*, 657 F.3d at 226). But that is wrong too. Calling any work done on a facility—including just "maintaining" it—a "service" erases the regulations' distinction between "facilities" and "services, programs, or activities." *See New Jersey Protection and Advocacy*, 2006 WL 2226332, at *3 (construing sidewalks, or their maintenance, as a service, program or activity would "render superfluous the exception provided in 28 C.F.R. § 35.150(a)(1) that relieves entities of any obligation to make every facility accessible"). Moreover, as explained below at Part II.B, Plaintiffs do not allege denial of access to the "service" of constructing, altering, or maintaining sidewalks.[2]

---

[2] *American Council of Blind of Metropolitan Chicago v. City of Chicago*, 667 F. Supp. 3d 767 (N.D. Ill. 2023) ("*ACBMC II*") does not help Plaintiffs. Its bare statement that pedestrian signals being facilities

C. **The policy and intent of the ADA and Rehabilitation Act require distinguishing between "facilities" and "services, programs, or activities."**

"Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available." *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 6 (1st Cir. 2000); *Ellison v. United States Postal Serv.*, 84 F.4th 750, 756 (7th Cir. 2023) (same for the Rehabilitation Act). As the Supreme Court commented, "[a]ny interpretation of § 504 must . . . be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." *Alexander v. Choate*, 469 U.S. 287, 299 (1985). Plaintiffs' reading fails that test. If "program accessibility" standards apply to facilities like pedestrian infrastructure, the promise of "flexibility" is dead letter. Public entities would have to make every facility independently accessible as a program or service, with no room to achieve accessibility by alternative means. That is not workable, nor what Congress intended.

II. **In The Alternative, Plaintiffs Fail To State A "Program" or "Services" Claim As To Citywide Pedestrian Facilities.**

Even on Plaintiffs' view that pedestrian rights of way are a "program" or "service," Plaintiffs still fail to state a claim—both as to rights of way as a "program" and their construction, alteration, or maintenance as a "service."

A. **Plaintiffs do not adequately plead a "program accessibility" claim.**

Plaintiffs fail to allege that the City's pedestrian facilities, viewed "in their entirety," are

---

"does not mean that [they] cannot also be a program or service," Resp. at 15 (quoting 667 F. Supp. 3d at 780), did not consider that "facilities" and "services, programs, or activities" are mutually exclusive under the ADA and its regulations. The court simply cited *Barden*, *Frame*, and two district court opinions that relied on those cases. *See id.* at 774–75. But courts are to "construe statutes in the context of the entire statutory scheme" and avoid "rendering [statutory terms] meaningless, redundant, or superfluous." *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1077 (7th Cir. 2013).

7

not readily accessible. If—as Plaintiffs contend—public pedestrian rights of way are a Citywide "program," then Plaintiffs must "establish inaccessibility at a programmatic level." *Kirola v. City & Cty. of San Francisco*, 860 F.3d 1164, 1183 (9th Cir. 2017). They have not alleged that.

First, isolated allegations of specific barriers Plaintiffs have encountered are not enough to show inaccessibility on a programmatic level. Plaintiffs argue that it suffices to "explain the barriers that they have encountered" and "the harm that they have experienced." Resp. at 31. But "anecdotal testimony about cracked pavement, potholes, uneven sidewalks, and missing or difficult-to-use curb ramps d[oes] not establish inaccessibility at a programmatic level." *Kirola*, 860 F.3d at 1183. *Kirola*, which Plaintiffs cite favorably, held that 1,300 inaccessible curb ramps did not show program-level inaccessibility in a city with "approximately 2,000 miles of sidewalks, 27,585 street corners, and roughly 7,200 intersections." *Id.* (citation omitted). Plaintiffs' allegations fall even shorter. They allege roughly 60 barriers to accessibility in the City's pedestrian rights of way. *See* Am. Compl. at 22–42. The City contains "more than 7,400 miles of public sidewalks." *Id.* ¶ 7. Plaintiffs' allegations do not align with the "program"-level claim that they assert, and they therefore fail to state a claim.[3]

Second, Plaintiffs failure to allege a lack of alternative means of access similarly requires dismissal. As the Seventh Circuit has made clear, "alternative facilities can supply meaningful access." *Ellison*, 84 F.4th at 759. Because the regulations explicitly anticipate means to provide accessibility other than "alteration of existing facilities and construction of new facilities," 28 C.F.R. § 35.150(b)(1), Plaintiffs must—but do not—allege that no alternative means to gain

---

[3] Plaintiffs' comparison to *ACBMC II* and *Shotz* fails for the same reason. *See* Resp. at 31. *ACBMC II* concluded that access was denied at a programmatic level because only "one percent" of signalized crossings were equipped with accessible pedestrian signals. 667 F. Supp. at 776. Plaintiffs make no such allegations here. *Shotz* concerned accessibility of trials in a single courthouse, *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001), a far cry from Plaintiffs' claim regarding over 7,400 miles of sidewalk.

access to the pedestrian rights of way are available. Instead, they dismiss, in a footnote, the availability of "public transit and paratransit" as alternative means of achieving program access, on the theory that these are "separate programs" whose accessibility must be judged separately. Resp. at 13, n.4. To be clear, "rolling stock or other conveyances"—e.g., public transit and paratransit—fall within the explicit definition of "facility." 28 C.F.R. § 35.104. Moreover, "use of accessible rolling stock or other conveyances" is an expressly allowed method to provide program accessibility without needing to construct new facilities or alter existing facilities. 28 C.F.R. § 35.150(b)(1); *see Kirola*, 860 F.3d at 1183 ("The public transportation and paratransit services are the sorts of 'other methods' that can satisfy program access even if other particular methods of benefitting from the program are inaccessible.").

**B.      Plaintiffs do not adequately plead a "service accessibility" claim.**

Plaintiffs' fallback argument that the construction, alteration, or maintenance of pedestrian rights of way are "services" they have been denied, Resp. at 14-15, fails as well. A threshold element of a Title II or Rehabilitation Act claim is that a person be denied access "by reason of [their] disability." *Lacy*, 897 F.3d at 852. Plaintiffs do not allege that their mobility disabilities prevent them from accessing City construction, maintenance, or infrastructure programs. Resp. at 13. They do not allege, for example, that they cannot submit a request through the 311 system, but only that the system is "backlogged" and "ineffective." Am. Compl. ¶ 45. The ADA or Rehabilitation Act were meant to remedy the "*unequal* treatment of disabled persons," *Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (emphasis added), not to guarantee any particular level of service. Plaintiffs do not allege that the 311 system treats them differently from non-disabled users, and without that allegation there is no cognizable claim. Plaintiffs' references to the Aldermanic Menu Program and similar initiatives suffer the same defect: they do not allege that due to their disabilities, the City denies them access to those services.

**III.      Plaintiffs' Facilities Claims Fail.**

Applying the facility accessibility standards to Plaintiffs' claims—which is the correct framing of the claims, as explained above—Plaintiffs fail to allege that any of the City's pedestrian facilities violate any applicable accessibility standard under the ADA or Section 504. Indeed, their claim fails out of the gate because they lack standing to broadly challenge facilities Citywide and have not alleged an injury sufficient for standing for any particular facility.

**A.      Plaintiffs lack standing to challenge facilities they have no personal knowledge of and intent to use.**

To establish standing for prospective injunctive relief, plaintiffs must show a "concrete and particularized" injury-in-fact that affects them "in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation omitted). The injury must be fairly traceable to the defendant's conduct and likely redressable by a favorable decision. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). In an ADA case seeking injunctive relief, that requires: (1) personal knowledge of barriers to access at a given facility, and (2) a plausible intention or desire to return to that place but for those barriers. *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073–75 (7th Cir. 2013). Plaintiffs have established neither as to facilities they purport to challenge.

Two Seventh Circuit decisions control. In *Scherr*, a plaintiff brought an ADA claim seeking injunctive relief against both the hotel where she was injured by a door hinge and fifty-six other Marriott properties. *Id.* at 1071. The Seventh Circuit held that the plaintiff's standing to sue the Courtyard Marriott where she had been injured did not extend to the fifty-six other properties because she failed to "assert an intent to return to the particular place (or places) where the violations are alleged to be occurring." *Id.* at 1075.

In *Hummel*, the Seventh Circuit addressed the standing of plaintiffs who brought ADA claims challenging the accessibility of state court facilities. 817 F.3d at 1013. It held that certain

10

plaintiffs "d[id] not have standing to challenge all *aspects* of the courthouse." *Id.* at 1021 (emphasis added). In particular, plaintiffs (who were not blind) did not have standing to challenge the lack of services for blind individuals or the accessibility of jury facilities because "[t]he prospect of jury services remains too speculative." *Id.*

Together, *Hummel* and *Scherr* require ADA plaintiffs to identify facilities that affect them "in a personal and individual way," *see Spokeo*, 578 U.S. at 339, down to the specific "aspect" of a facility that injured them, *see Hummel*, 817 F.3d at 1021. Plaintiffs do not come close to making that showing. They claim to be injured by facilities "[t]hroughout the City of Chicago." Am. Compl. ¶ 1; s*ee also id.* ¶¶ 5, 32, 34, 147 (same), *id.* ¶ 82 (Lane "desires to travel throughout Chicago"), ¶ 89 (Haven "desires to and often travels across Chicago"), ¶ 100 (Sullivan "desires to travel across Chicago"). The Response reiterates that Plaintiffs claim to be harmed "each time they go *anywhere in Chicago*" and that they intend to return to "an entire network of sidewalks," not a "specific location." Resp. at 15 (emphasis added). They seek only Citywide relief. Am. Compl. at 52 (requesting relief as to "all future new construction and alterations" and "all damaged or deteriorated sidewalks, curb ramps, cross walks, and other elements").

Under *Hummel* and *Scherr*, Plaintiffs' standing to sue does not extend to the entirety of "more than 7,400 miles of public sidewalks, curb ramps, and crosswalks" where they speculate violations may exist. Am. Compl. ¶ 7. Plaintiffs do not—and cannot—allege either personal knowledge of, or a plausible intent or desire to return to every "particular place" in that multi-thousand-mile stretch. *See Scherr*, 703 F.3d at 1075.

None of Plaintiffs' attempts to evade this caselaw are availing. *Scherr* did not, as Plaintiffs argue, deny standing based on an insufficient intention to return "some day." Resp. at

11

15. That phrase does not even appear in the relevant part of the decision. *See* 703 F.3d at 1075. The court held that the plaintiff had no standing to redress violations at other Marriott locations because—as with the over 7,400 miles of public pedestrian rights of way here—the plaintiff had made no showing of an intent to return to any "particular place." *Id.* And Plaintiffs entirely miss the point of *Hummel*. The fact that they plead an intent to return to "an entire network of sidewalks" does not distinguish this case. Resp. at 15. Just as the *Hummel* plaintiffs lacked standing to challenge "all aspects" of a courthouse, 817 F.3d at 1021, Plaintiffs lack standing to challenge "an entire network of sidewalks." Article III requires greater specificity.

Plaintiffs' citation to *American Council of the Blind of Metropolitan Chicago v. City of Chicago*, 461 F. Supp. 3d 820 (N.D. Ill. 2020) ("*ACBMC I*") is not persuasive. Resp. at 14. The *ACBMC I* court ruled on individual standing in two sentences, without considering either *Scherr* or *Hummel*. *See ACBMC I*, 461 F. Supp. 3d at 823. Nor does the decision make clear what injury was alleged or why it was "concrete and particularized." *See id. ACBMC I* does not control here.

Plaintiffs' argument that they have standing to challenge the City's entire network of sidewalks and curb ramps because it is a singular "program," Resp. at 6, fails for two reasons. First, the City's pedestrian rights of way are not a "program"; they are "facilities." *See supra, Part I.* Second, program or not, Plaintiffs' claim to be injured by the City's entire pedestrian network is not particularized because they do not plead an intent to return to a "particular place" or specify what "aspect" of the network caused them injury, as required by *Scherr* and *Hummel*.

Finally, Plaintiffs' putative class action status does not cure their deficient standing. Plaintiffs argue that standing in a class action "is assessed based on the named plaintiffs' own injuries." Resp. at 15 (citing *Payton v. Cty. of Kane*, 308 F.3d 673, 680 (7th Cir. 2002)). That is correct, but it cuts against Plaintiffs, because they have not adequately pleaded standing for their

"own injuries." Again, injuries attributed to the entirety of the City's public pedestrian right of way system are too general and speculative to support standing. Neither does the Seventh Circuit allow "the named plaintiff . . . to piggy-back on the injuries of the unnamed class members." *Payton*, 308 F.3d at 682. The Court should reject any suggestion that the named Plaintiffs have standing to challenge sidewalks and curb ramps Citywide that they have never encountered because "[s]tanding cannot be acquired through the back door of a class action." *Id.*

Finally, even if Plaintiffs' claims are narrowed to barriers they allegedly experienced in the past, *see* Am. Compl. ¶¶ 84, 95, 104, they do not allege an intent to return to those "particular places" as required by *Scherr*, 703 F.3d at 1073–75, so they lack standing even for those claims.

### B. Plaintiffs fail to state a claim as to specific pedestrian facilities.

To state a claim that facilities violate Title II or Section 504, a plaintiff must allege either (1) for existing facilities, that services or programs are not readily accessible when viewed in their entirety; or (2) for facilities newly constructed or altered after January 26, 1992, that an applicable technical standard has been violated. The plaintiff must also allege that he was denied access because of his disability. *See* 28 C.F.R. §§ 35.150(a), 35.151; *Lacy*, 897 F.3d at 853-54; *Liberty Res., Inc. v. City of Philadelphia*, No. CV 19-3846, 2021 WL 4989700, at *4 (E.D. Pa. Oct. 27, 2021). Plaintiffs' facilities claims fail at every step.

#### 1. Plaintiffs do not allege that existing facilities deny them access to any City service or program.

For existing facilities—those in existence as of January 26, 1992—the ADA's implementing regulations do not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities," *id.* § 35.150(a)(1), as long as the services or programs that entity offers are "readily accessible to and usable by individuals with disabilities," *id.* § 35.150(a).

13

Accordingly, for most City pedestrian facilities, Plaintiffs must identify a City program or service that is not readily accessible. They attempt to do so via a circular argument: by categorizing the pedestrian rights-of-way as both (i) the allegedly inaccessible facilities and (ii) the program that those facilities impede. *See* Resp. at 30-32. That tautology fails for the reasons explained above. *See supra* Part I. As a result, as to these facilities, Plaintiffs do not state a claim that they violate Title II by denying them access to City programs. *See* 28 CFR § 35.150(a).

### 2. For newly constructed or altered facilities, Plaintiffs do not identify technical standards the City has violated.

For facilities newly constructed or altered after January 26, 1992, the City must comply with applicable technical standards. *See* Mem. at 3-4; 28 C.F.R. § 35.151. Except for curb ramps and two facilities for which Plaintiffs cite a post-1992 date of construction or alteration, *see* Am. Compl. ¶¶ 104(a)(1), 104(b), Plaintiffs do not plausibly allege that any pedestrian facility was newly constructed or altered after January 26, 1992. Their "upon information and belief" allegation that the City has "constructed or altered all of its curb ramps since 1992," *id*. ¶ 131, is conclusory and does not extend to other pedestrian infrastructure.[4]

But even to the extent Plaintiffs identify post-January 26, 1992 pedestrian infrastructure, Plaintiffs do not identify applicable standards the City has failed to comply with, other than the curb ramp requirement (addressed below). As the City explained, DOJ has adopted enforceable regulations only for curb ramps. *See* 28 C.F.R. § 35.151(i); Mem. at 5. As to other pedestrian infrastructure, while the Access Board published PROWAG in 2023, DOJ has yet to adopt enforceable technical standards. *See* Mem. at 4-5. Plaintiffs do not dispute this. Resp. at 3.

Plaintiffs argue that the "Disability Access Standards"— the Uniform Federal

---

[4] In their Response, Plaintiffs clarify that they do not contend that street resurfacing triggers an obligation to renovate adjoining sidewalks. Resp. at 20-21.

Accessibility Standards ("UFAS"), the ADA Accessibility Guidelines ("ADAAG"), and the 2010 Standards for Accessible Design ("ADAS")—apply to all pedestrian facilities through their "feature-specific requirements," *See* Resp. at 22-23. But section 35.151(c) requires compliance with "applicable" standards—meaning standards DOJ has adopted as enforceable for the facility type at issue, not merely standards that might arguably apply by analogy. Substituting inapplicable requirements where DOJ has left pedestrian facilities unaddressed would circumvent Congress's mandate that DOJ implement specific standards. 42 U.S.C. §§ 12134(a), (c). And in any event, Plaintiffs do not even allege which "feature-specific requirements" they think apply to which facilities, nor do they respond to the City's explanation of why the specific ADAAG provisions they cite in the Amended Complaint are inapplicable. *See* Mem. at 19.

The cases Plaintiffs cite, *see* Resp. at 22-23, confirm the problem: each applies specific requirements within the Disability Access Standards to non-compliant facilities. *See Kirola*, 860 F.3d at 1179-80; *Mote v. City of Chelsea*, 284 F. Supp. 3d 863, 884-85 (E.D. Mich. 2018); *Classen v. Ali's Invs., LLC*, No. 3-CV-1369-JPS, 2024 WL 4286116, at *5 (E.D. Wis. Sept. 25, 2024). By contrast, here, Plaintiffs fail to allege facts and identify relevant standards sufficient to show that the City has violated specific standards. *Sparks v. City of Peoria*, No. 09-CV-1159, 2009 WL 3764032 (C.D. Ill. Nov. 10, 2009), and *Simmons v. Village of Minier*, No. 20-CV-1283-JES-JEH, 2022 WL 3048115 (C.D. Ill. Aug. 2, 2022), do not suggest otherwise. Those cases involved facilities—a city hall and a municipal building—to which the Disability Access Standards unambiguously apply. They say nothing about pedestrian facilities for which DOJ has not adopted standards, and they cannot be read to dispense with the requirement that a plaintiff identify which standard a defendant has violated. And Plaintiffs' argument that Disability Access Standards are "workable standards for regulating accessibility in the pedestrian right of way"

15

because they are sometimes cited in consent decrees, Resp. at 23, falls short of an argument that they are *mandatory* standards that could support a finding of liability. They plainly are not.

Plaintiffs' alternative argument that section 35.133(a) imposes a freestanding "readily accessible" obligation, Resp. at 28–29, cannot be squared with Congress's mandate that DOJ "implement" Title II through technical facility "standards," 42 U.S.C. §§ 12134(a), (c), or *San Francisco*'s explanation of what that requires. Plaintiffs argue that *San Francisco* addressed only whether EPA could impose permit conditions without specifying concrete requirements, and not whether liability can exist absent technical standards. Resp. at 26. But the underlying principle is the same. *San Francisco* held that where Congress directs an agency to "implement" a general statutory goal through specific standards, the agency cannot substitute an end-result requirement, nor can courts impose liability based on the general end-result language alone. 604 U.S. at 347, 355. Here, Congress directed DOJ to "implement" Title II by issuing "standards applicable to facilities." 42 U.S.C. §§ 12134(a), (c). DOJ did so for curb ramps; it has not done so for other pedestrian facilities. Just as an EPA permittee cannot be held liable for failing to meet the Clean Water Act's end-result goals where Congress directed EPA to issue specific implementing standards, 604 U.S. at 350–51, a Title II defendant cannot be held liable for failing to satisfy "readily accessible" under section 35.133(a) where Congress directed DOJ to implement technical standards, and DOJ has not done so for the facilities at issue.

Plaintiffs invoke *Fortyune v. City of Lomita*, 766 F.3d 1098 (9th Cir. 2014), *Bowers v. Dart*, 2017 WL 4339799 (N.D. Ill. Sept. 29, 2017), and *ACBMC II* for the proposition that enforceable technical standards are not necessary to establish Title II liability. Resp. at 25. None of these decisions is precedential, and none survives *San Francisco*'s recent clarification that where Congress directs an agency to implement a statutory goal through specific standards,

16

courts may not impose liability based solely on general end-result language the standards were meant to implement. *Fortyune* and *Bowers* simply assumed that the "readily accessible" standard was self-executing without confronting that congressional directive. *ACBMC II* went further, holding that "the absence of a formally adopted design standard does not relieve a public entity of its underlying obligation" to meet the readily accessible goal. 667 F. Supp. 3d at 777–78. But all three holdings rest on the premise *San Francisco* forecloses. A general obligation provides no standards by which a court can judge compliance or a defendant can structure its conduct, and Congress's directive to issue "standards applicable to facilities," 42 U.S.C. § 12134(c), would be rendered superfluous if the general "readily accessible" language already did that work.

Finally, Plaintiffs argue that even if no construction standard applies, the duty to maintain newly constructed facilities in "operable working condition" requires no technical benchmark. Resp. at 28–30 (quoting 28 C.F.R. § 35.133(a)). But Section 35.133's maintenance obligation requires that accessible features be kept in "operable working condition," so it presupposes a standard of accessibility. It cannot float free of the underlying construction standards. Where DOJ has not adopted standards specifying what accessible pedestrian facilities look like, section 35.133 provides no independent basis for liability. To hold otherwise would allow Plaintiffs to use the maintenance obligation to impose requirements DOJ has not adopted.

Without an enforceable standard specifying what compliance requires for a pedestrian facility, there is no benchmark against which to measure a violation, and no basis for liability.

### 3. Plaintiffs do not allege that curb ramps Citywide are non-compliant.

Plaintiffs argue that the City has failed wholesale "to ensure its newly constructed and altered curb ramps are readily accessible to and usable by people with mobility disabilities." Resp. at 22. But a handful of named plaintiffs encountering difficulty at certain curb ramps does not plausibly support a Citywide claim. *See Liberty Res., Inc. v. City of Philadelphia*, 2021 WL

17

4989700, at *4 ("Plaintiffs must establish that the City has failed to meet legal obligations as to specific curb ramps and cannot simply show that its general policies do not conform to the regulation."); Mem. at 20-21. Plaintiffs must allege enforceable standards that specific curb ramps violate. They have not done so.

Plaintiffs' allegation of Citywide failure is rendered even less plausible by the City's compliance efforts. As Plaintiffs allege, the City agreed in 2007 to invest $140 million over five years to install curb ramps. Am. Compl. ¶ 28. It requires major transportation projects to assess the need for curb ramps and regulates their design and construction. Mem. at 6, 8-10; Ex. A to Mem. (ECF No. 48-2) at 4-30; *id.* at App. B, Sheets B-1-1, B-1-2; Chicago Complete Streets, available at www.chicago.gov/city/en/sites/complete-streets-chicago/home.html.[5] Plaintiffs protest that the City cannot rely on publicly available documents to undercut their allegations of systemic failure. Resp. at 21-22. But as explained above, the City does not ask the Court to credit its regulations and guidelines as proof of compliance, only to recognize that it has a regulatory framework in place. The existence of that framework renders implausible Plaintiffs' unsupported assertion that curb ramps Citywide are non-compliant with applicable standards.

### 4. In many cases, Plaintiffs fail to allege barriers to accessibility.

As to the specific facilities Plaintiffs challenge, they fail in many cases to allege barriers to accessibility. *See* Mem. at 21. Instead, Plaintiffs frequently allege that they must proceed more slowly or carefully through a given facility, *see* Am. Compl. ¶¶ 84(n), 96(d), (e), (i), 104(b); or they allege structural issues with facilities without also explaining how their travel access is meaningfully inhibited, *see id.* ¶¶ 84(k), (m), 95(c), (f), (g). Plaintiffs respond that this is enough

---

[5] Plaintiffs complain that the Consultant Construction Engineer Procedural Guidelines (ECF No. 48-3) are not publicly available. Resp. 12 n.3. They are available at the following link, labeled as "2022 CCE Manual": https://www.cdotcmqa.com/Identity/Account/Login?ReturnUrl=%2F.

18

to plead a Title II and Section 504 claim. *See* Resp. at 27. But as the City explained, Mem. at 21, a facilities claim hinges on Plaintiffs' ability to access "services, programs, or activities of a public entity," *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015) (internal citation omitted). Allegations that certain facilities must be navigated slowly, or that facilities have certain structural deficiencies without explaining their impact on disabled individuals, do not state a Title II claim. *See Moore v. W. Illinois Corr. Ctr.*, 89 F.4th 582, 595 (7th Cir. 2023).

IV.     **Plaintiffs Lack Standing To Challenge The Provision Of Accessible Temporary Routes, And The Claim Lacks Merit.**

Plaintiffs' claim challenging temporary routes during construction fails because Plaintiffs lack standing and do not adequately plead it.

First, Plaintiffs allege that they could be injured by hypothetical temporary routes that might be inaccessible in the future. They argue in their Response that they are "highly likely" to experience future barriers because of their "frequent use of Chicago's pedestrian right of way." Resp. at 32–33. But that is still not the kind of "concrete and particularized" injury required to establish Article III standing. *See Scherr*, 703 F.3d at 1074; *Hummel*, 817 F.3d at 1021 (rejecting standing for injury based on a "speculative probability"). And Plaintiffs' few examples of past barriers created by construction do not allege an intent to return, continued inaccessibility, or that such construction is even still ongoing. *See* Mem. at 33.

Second, Plaintiffs fail to state any claim related to temporary facilities for the same reason that they cannot state a claim with respect to permanent facilities: they have identified no regulation that the City has violated. *See supra* at Part III.B.

19

**V.**      **Plaintiffs Cannot Bring Claims Alleging The City Failed To Designate An ADA Coordinator And Prepare And Publish A Self-Evaluation And Transition Plan.**

Plaintiffs concede that they have no private right of action for claims that the City must appoint an ADA Coordinator and publish a Self-Evaluation and Transition Plan for its public rights of way. *See* Resp. at 33-34. The Court need not judge what remedies might be appropriate here before Plaintiffs have established any ADA violation at all.

## CONCLUSION

For the reasons set forth above and in the City's opening brief, Plaintiffs seek declaratory and injunctive relief that exceeds the scope of Title II and Section 504. They lack standing to challenge citywide pedestrian facilities and accessible temporary routes, do not allege the denial of access to any City service, program, or activity, and do not allege that any pedestrian facility violates enforceable statutory and regulatory requirements. And Plaintiffs acknowledge they cannot privately enforce any requirement that the City appoint an ADA Coordinator or publish a Self-Evaluation and Transition Plan. The Amended Complaint should therefore be dismissed in its entirety, with prejudice.[6]

Dated: June 5, 2026

                                           Respectfully submitted,

                                           MARY B. RICHARDSON-LOWRY
                                           Corporation Counsel of the City of Chicago

                                           By: */s/ Alexandra Giselle Belzley*
                                           Assistant Corporation Counsel

ANDREW WORSECK
andrew.worseck@cityofchicago.org
ELLEN WIGHT MCLAUGHLIN
ellen.mclaughlin@cityofchicago.org

---

[6] Dismissal with prejudice is warranted. The City's prior motion to dismiss raised substantially the same arguments presented here. *See* Dkt. 33-1. In response, Plaintiffs filed the Amended Complaint. Dkt. 39.

RYAN SUN
ryan.sun@cityofchicago.org
ALEXANDRA GISELLE BELZLEY
alexandra.belzley@cityofchicago.org
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
2 N. LaSalle Street, Ste. 520
Chicago, Illinois 60602
(312) 744-7129 / 742-5147 / 744-4439 / 744-4216

MATTHEW PAYNE
mpayne@foxrothschild.com
JOHN HANSBERRY
jhansberry@foxrothschild.com
Fox Rothschild LLP
321 N. Clark Street, Ste. 1600
Chicago, IL 60654
(312) 517-9200
*Attorneys for Defendant City of Chicago*